**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 19-cv-03100-JMC |
| Plaintiff, | |
| v. | |
| AGORA FINANCIAL LLC, et al., | |
| Defendants. | |

**PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

Omolara Bewaji Joseney (ojoseney@ftc.gov)
Gregory Madden (gmadden@ftc.gov)
Dillon Lappe (dlappe@ftc.gov)
Federal Trade Commission
600 Pennsylvania Avenue, NW CC-9528
Washington, DC 200580
202-326-2599 (Joseney); -2426 (Madden);
-2833 (Lappe); -3197(facsimile)

*Counsel to Plaintiff Federal Trade Commission*

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ......................................................................................... 1

I.    THE 28-DAY DIABETES CURE SCAM ..................................................... 1

    A.    Phase 1 – Email Marketing ........................................................................ 2

    B.    Phase 2 – Reverse Diabetes Presentation Claims ..................................... 3

        i.    The Reverse Diabetes Defendants Claim There Is A "Hidden Cause" for Type 2 Diabetes ................................................................................................................ 3

        ii.    Reverse Diabetes Defendants' Claim Their Three-Step Protocol Cures, Treats, or Mitigates Type 2 Diabetes and Its Symptoms. ............................................... 4

        iii.    The Reverse Diabetes Defendants Claim Their Three-Step Protocol is Scientifically Proven to Reverse Diabetes and Its Symptoms in 28 Days. ...................... 7

        iv.    The Reverse Diabetes Defendants Claim Their Protocol Reverses Diabetes Without Requiring Dietary Changes. ............................................................................ 7

    C.    Purchasing *The Doctor's Guide* ............................................................... 8

    D.    The Reverse Diabetes Defendants' Advertising Claims Are False. ........... 8

        i.    The Doctor's Guide Proves the Falsity of the Reverse Diabetes Defendants' Marketing Claims ................................................................................................... 8

        ii.    The Reverse Diabetes Defendants' Other Type 2 Diabetes "Cures" Demonstrate the Falsity of Their Claims. ......................................................................... 10

        iii.    Expert Testimony Further Confirms the Reverse Diabetes Defendants' Claims Are Not Supported by Science ................................................................................. 11

II.    THE CONGRESSIONAL CHECKS AND REPUBLICAN CHECKS SCAM ............... 14

    A.    Congressional Checks Defendants Represent to Consumers that They Are Legally Entitled to Collect Hundreds to Thousands of Dollars in Monthly Congressional or Republican Checks ............................................................................................... 15

    B.    Congressional Checks Defendants Represent that Anyone Can Collect Monthly Congressional or Republican Checks With Little or No Risk, Just By Adding Their Name to List of Check Payees ............................................................................................... 18

    C.    The Congressional Checks Defendants Represent That the Advertised Checks Are Furnished By or Otherwise Affiliated With U.S. Congress ................................... 19

    D.    The Congressional Checks Defendants Solicit Money From Consumers By Promising Instructions For Collecting Monthly Congressional/Republican Checks ............................ 21

    E.    *Congress' Secret Giveaway* Does Not Provide Instructions for Collecting Government Checks. .................................................................................................. 22

    F.    Congressional Checks and Republican Checks Do Not Exist .................... 23

III.    The Reverse Diabetes Defendants and Congressional Checks Defendants Advertise and Cross-Promote Other Cures and "Checks" Opportunities. ....................................................... 24

ARGUMENT ............................................................................................................................. 24

I.    The FTC Is Likely To Succeed On The Merits. ................................................................ 25

A.    The Reverse Diabetes Defendants' False and Unsubstantiated Advertising Claims Violate Section 5. ............................................................................................................. 26

i.    Expert Testimony Confirms the Reverse Diabetes Defendants Have No Reasonable Basis for Their Claims. .................................................................................................. 26

ii.    The Reverse Diabetes Defendants' Claims Regarding NIR and Diet are Directly Refuted by Defendant Gerhauser. .................................................................................. 28

B.    The Congressional Checks Defendants' False and Misleading Claims Violate Section 5.    29

i.    The Congressional Checks Defendants' False Express Claims ................................ 29

ii.    The Congressional Checks Defendants' Material Omission ................................... 32

C.    Defendants Gerhauser and Scheidt Are Individually Liable Under FTC Act. ........... 33

II.    The Balance of Equities Weighs In Favor of a Preliminary Injunction. ........................... 34

III.    The Proposed Preliminary Injunction is Necessary to Protect Consumers. ................... 34

CONCLUSION .......................................................................................................................... 35

## TABLE OF AUTHORITIES

**Cases**

*FTC v. Ameridebt, Inc.*, 373 F. Supp. 2d 558, 562 (D. Md. 2005) ........................................ 25, 34

*FTC v. Beatrice Foods Co.*, 587 F.2d 1225, 1229 (D.C. Cir. 1978).............................................. 25

*FTC v. Consumer Defense, LLC*, 926 F.3d 1209, 1212-13 (9th Cir. 2019) ................................ 34

*FTC v. COORGA Nutraceuticals Corp.*, 201 F. Supp. 3d 1300, 1309 (D. Wyo. 2016).............. 28

*FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 8 (1st Cir. 2010) ...................................... 26, 27

*FTC v. Febre*, No. 94 C 3625, 1996 WL 396117, at *2 (N.D. Ill. July 3, 1996), *aff'd*, 128 F.3d 530 (7th Cir. 1997).......................................................................................................... 31, 32

*FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 532 (S.D.N.Y. 2000).............................. 32

*FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1343 (4th Cir. 1976).................................. 25, 34

*FTC v. Health Formulas, LLC*, No. 2:14-CV-01649, 2015 WL 2130504, *26, (D. Nev. May 6, 2015) ................................................................................................................................... 35

*FTC v. Innovative Mktg, Inc.*, 654 F. Supp.2d 378, 385 (D. Md. 2009)...................................... 33

*FTC v. John Beck Amazing Profits, LLC*, No. 2:09-CV-04719, 2009 WL 7844076, at *6 (C.D. Cal. Nov. 17, 2009)................................................................................................................ 32

*FTC v. Mallett*, 818 F. Supp. 2d 142, 149 (D.D.C. 2011) ................................................ 30, 34, 35

*FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1190 (N.D. Ga. 2008), *aff'd*, 356 F. App'x 358 (11th Cir. 2009) ............................................................................................ passim

*FTC v. Ross*, 897 F. Supp. 2d 369, 381 (D. Md. 2012), *aff'd*, 743 F.3d 886 (4th Cir. 2014) 25, 26, 33

*FTC v. Simple Health Plans, LLC*, 379 F. Supp. 3d 1346, 1365 (S.D. Fla. 2019) ...................... 35

*FTC v. Stefanchick*, 559 F.3d 924, 930-31 (9th Cir. 2009) ........................................................ 33

*FTC v. The Crescent Publ'g Grp., Inc.*, 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001)................... 32

*FTC v. Vemma Nutrition Co.*, No. 15-CV-01578, 2015 WL 11118111, at *6 (D. Ariz. Sept. 18, 2015) ................................................................................................................................... 31

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989........................................... 34

*FTC. v. Millennium Telecard, Inc.*, No. CIV.A. 11-2479 JLL, 2011 WL 2745963, at *3 (D.N.J. July 12, 2011) ....................................................................................................................... 26

*In re Sanctuary Belize Litig.*, No. 18-CV-3309, 2019 WL 3714392, at *9 (D. Md. Aug. 2, 2019) .................................................................................................................................... 25, 33

*In re Telebrands Corp.*, 140 F.T.C. 278, 292 (2005), *aff'd*, 457 F.3d 354 (4th Cir. 2006) .......... 30

*P. Lorillard Co. v. FTC*, 186 F.2d 52, 58 (4th Cir. 1950)............................................................ 32

*Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989).......................................... 31

**Statutes**

FTC Act, 15 U.S.C. § 45......................................................................................................... passim

FTC Act, 15 U.S.C. § 53(b) ........................................................................................................ 24

## INTRODUCTION

Agora Financial, along with affiliated entities and individuals, target seniors and others approaching retirement with extravagant promises of a miracle health treatment in the form of a 28-day diabetes "cure," and free money in the form of government-provided "Congressional" or "Republican" checks. Both of Agora's schemes follow a common pattern — inundate consumers with emails and other advertisements containing tantalizing claims of "exclusive" and "limited time" offers, then direct them to long video presentations that urge them to "act now" or risk missing the promised benefits. Only after consumers buy Agora's products — and, often, enroll in a subscription program — do they learn the truth — there is no permanent cure for their diabetes, and the promised checks do not exist. Because these ongoing claims pose a serious risk of harm to consumers' health, safety, and financial well-being, a preliminary injunction is necessary to prevent further injury.

## STATEMENT OF FACTS

Two overlapping groups of affiliated entities and individuals run the diabetes and government checks schemes.[1] Defendants Agora Financial, LLC ("Agora Financial"), NewMarket Health, LLC ("NewMarket"), NewMarket Health Publishing, LLC ("NewMarket Health Publishing"), Health Sense Publishing, LLC ("Health Sense"), Health Sense Media, LLC ("Health Sense Media"), and Dr. Richard Gerhauser ("Gerhauser") (collectively, the "Reverse Diabetes Defendants") operate the 28-day diabetes "cure" scheme. Agora Financial also runs the government checks scheme with Defendant Zachary Scheidt ("Scheidt") (together, the "Congressional Checks Defendants").

### I.       THE 28-DAY DIABETES CURE SCAM

Since at least December 2018 and continuing to the present, the Reverse Diabetes Defendants have marketed a "simple," "doctor-guided," and "scientifically-proven" cure for type

---

[1] Each of the corporate defendants are direct or indirect subsidiaries of the same parent corporation, and the individual defendants, Dr. Richard Gerhauser and Zachary Scheidt, serve in public-facing positions for those entities. *See* FTC Ex. 1, Declaration of Adam Rottner ("Rottner Decl.") ¶¶ 3, 64, 68-70, 75, 79.

2 diabetes.  To receive details on this "brand-new treatment," consumers must pay $249 for a series of pamphlets, *The Doctor's Guide to Reversing Type II Diabetes in 28 Days* ("*The Doctor's Guide*").[2]

### A.     Email Marketing

The Reverse Diabetes Defendants initially attract consumers by bombarding them with emails[3] advertising a "scientifically-proven" treatment that cures type 2 diabetes in 28 days.[4] Specifically, they claim "a new study from the University of Kansas," "rock-solid proof," and "decades of peer-reviewed scientific studies (including one that showed a 100% success rate)" proves the efficacy of their 28-day diabetes treatment.[5]  They also make numerous claims about the ease of the "28-day plan to cure Type II diabetes," including that it reverses type 2 diabetes without:  (1) dietary changes; (2) "spending a minute in the gym;" or (3) "taking a single drug."[6] In these advertisements, the Reverse Diabetes Defendants claim to have information about a "shocking 'hidden' cause" of type 2 diabetes that has "nothing to do" with consumers' diet or fitness levels.  Therefore, the ads claim "doctors, the CDC, and the World Health Organization are **getting it all wrong** when it comes to diabetes" because "none of their solutions treat this new root cause."[7]

Outside of these bold claims, the email advertisements reveal no details about the 28-day treatment itself.  Instead, the Reverse Diabetes Defendants tell consumers a "free" video presentation contains the information about their diabetes "protocol" — including how it works, and proof of its efficacy.[8]  They frequently use high-pressure sales tactics to urge consumers to

---

[2] While the marketing refers to the set of pamphlets as *The Doctor's Guide to Reversing Type II Diabetes in 28 Days*, the actual documents are titled *The Doctor's Secret to Reversing Diabetes in 28 Days*.  *Id*. ¶¶ 27-28.

[3] The Reverse Diabetes Defendants send these email advertisements to subscribers of several of Agora Financial's free newsletters, including *The Rude Awakening*, *The Rich Life Roadmap*, and *Daily Reckoning*, among others.  *See e.g.*, Rottner Decl. ¶¶ 12-16, 80; *see id*. at Atts. 1, 3-13, 16-18.

[4] *E.g.*, Rottner Decl. ¶ 14, Atts. 1, 3, 8; *see also id*. at Atts. 3-5, 7.

[5] *E.g.*, *id.* at Atts. 1, 6.

[6] *E.g.*, *id.* at Att. 1.

[7] *Id.* at Att. 1; *see also e.g.*, *id.* at Atts. 4, 8.  Defendants frequently use ellipses and bolded, underlined, italicized or other emphasized text in their advertisements and promotional materials, which have been replicated herein unless otherwise noted.

[8] Rottner Decl. ¶¶ 15-16; *see also id*. ¶¶ 19, 24, Att 10.

2

view the video.  Specifically, they say that consumers will not "find this information anywhere else," and that the video is a one-time "live" event or only available for 24 hours.[9]  The Reverse Diabetes Defendants direct consumers who click on these advertisements to their website.[10]  Notwithstanding the fact that they advertise the video presentation as a one-time, limited space, never available again "event," the Reverse Diabetes Defendants continue to advertise the video presentation today.[11]

> ### B.      Reverse Diabetes Presentation Claims

The promised video is titled "Dr. Richard Gerhauser, M.D. presents:  How to Reverse Type II Diabetes in 28 days."  In the hour-long video, Dr. Gerhauser discusses the purported diabetes cure protocol.[12]  There, he reiterates the claims made in the Reverse Diabetes Defendants' email advertisements, telling consumers there is a "hidden cause" for type 2 diabetes, and that his simple three-step protocol will reverse and cure type 2 diabetes in just 28 days, without requiring dietary changes.

> #### 1.      The Reverse Diabetes Defendants Claim There Is A "Hidden Cause" for Type 2 Diabetes.

The Reverse Diabetes Defendants "explain" that exposure to everyday electronic devices — such as cell phones, televisions, or computers — causes type 2 diabetes.  Specifically, they claim these devices emit "a dangerous form of radiation known as '**Non-Ionizing Radiation**,' (or NIR)" that causes type 2 diabetes.[13]  In the video, Defendant Gerhauser further states that "everyone – from the CDC to the World Health Organization – has covered [] up" this "shocking, 'hidden' cause of Type II Diabetes."[14]

---

[9] *E.g.*, *id*. at Att. 1; *see also* Rottner Decl. ¶¶ 15, 18-19, 24.

[10] *Id*. ¶¶ 16-19.

[11] For example, the Reverse Diabetes Defendants advertised their 28-day diabetes protocol in a recent email dated October 1, 2019 that directs consumers to the video presentation.  *See id*. ¶¶ 30-30a, Att. 23.

[12] *Id*. ¶ 19, Att. 15.  Consumers who try to exit the video are urged to continue watching to learn about "this powerful solution for your health" or to receive a transcript "to read about this solution instead.  Rottner Decl. ¶ 27b, Att. 19 at 2:18.  The transcript and the video are substantially the same and make the same core claims.  *Compare* Rottner Decl. at Att. 15 (video presentation) *with* Att. 22 (transcript); *see also* Rottner Decl. ¶¶ 20-22.  Purchasing *The Doctor's Guide* requires watching the video to its near-end or scrolling to the bottom of the transcript.  *See id*. ¶ 27d, ¶ 29, Att. 19 at 8:34.

[13] Rottner Decl. at Att. 22 at FTC-PROD-00000554.

[14] *Id*. at Att. 22 at FTC-PROD-00000550-51, FTC-PROD-00000553-554.

The Reverse Diabetes Defendants also tell consumers that the connection between NIR and diabetes is supported by "undeniable scientific proof."[15]  In the video presentation, Gerhauser supports this claim in three ways.  First, he presents two charts showing a purported parallel between the rise of diabetes and the rise of electronic device usage, claiming that it is "impossible to deny the connection between the rise in diabetes – and the amount of new technology in our world."[16]



Second, he highlights the low diabetes rate among Amish people who choose to avoid these devices, calling them "diabetes proof" despite their "standard American diet" of bread, candy, cookies, and pies.[17]  Third, he cites two unspecified "studies" as purportedly supporting their claim.  According to Gerhauser, the first study, which he identifies only as a "shocking new study from leading health journal" *Informa Healthcare*, "reports that many modern-day devices" like televisions, cell phones, and computers "can slowly – and silently – cause Type II Diabetes."[18]  He further states that the other unnamed study from the *International Journal of Environmental Research and Public Health* concluded that NIR exposure alone could turn "healthy children" into type 2 diabetics.[19]

> **2.      Reverse Diabetes Defendants Claim Their Three-Step Protocol Cures, Treats, or Mitigates Type 2 Diabetes and Its Symptoms.**

The Reverse Diabetes Defendants repeatedly claim that their protocol cures type 2

---

[15] *Id*. at Att. 22 at FTC-PROD-0000554.
[16] *Id.*
[17] *Id*. at Att. 22 at FTC-PROD-0000553.
[18] *Id*. at Att. 22 at FTC-PROD-00000554.
[19] *Id*. at Att. 22 at FTC-PROD-00000555.

4

diabetes and reverses *every* diabetes symptom in just 28 days.[20]  For example, their video presentation plays under a banner, displayed for its entirety that proclaims a reversal and cure of diabetes in 28 days:[21]

**How to Reverse Type II Diabetes in 28 Days**

Shocking study shows 100% cure rate. Stay on this page for details

The Reverse Diabetes Defendants also explicitly promise that consumers will be "diabetes free" in just 4 weeks if they follow their simple three-step protocol.[22]  In the video, Defendant Gerhauser expressly guarantees that the protocol will work for consumers, claiming, "every single person who tried [it] has reversed their diabetes.  And I guarantee, it will do the same for you."[23]  Gerhauser further guarantees that his protocol is "revolutionary," and not about "masking [diabetes] symptoms" or "temporarily managing" blood sugar levels, but rather, it will get rid of type 2 diabetes "for good" so that consumers can throw their "glucose monitor in the trash…stop taking a diabetes pill every day… and never spend another dime on test strips."[24]

The touted three-step 28-day diabetes protocol involves using three natural ingredients; using "Non-Ionizing Radiation blockers;" and following "simple" NIR blocking tips.[25]

   a)   ***The Reverse Diabetes Defendants Claim "Himalayan Silk" Will Jumpstart Insulin Production.***

The first step in the Reverse Diabetes Defendants' protocol involves taking an all-natural supplement Defendant Gerhauser identifies as "Himalayan Silk."  In the video, Gerhauser claims that Himalayan Silk is an "**all-natural 'jumpstart'**" that will "rev[] up your body's ability to create insulin," "clean[] excess sugar out of your body," and "completely revers[e] Type II Diabetes in just 28 days."[26]  Gerhauser explains that insulin is important because it "removes excess sugar" from the blood stream.[27]  He further claims that Himalayan Silk works by

---

[20] *E.g.*, *id.* at Att. 22 at FTC-PROD-00000550, FTC-PROD-00000561. FTC-PROD-00000563.
[21] *Id*. at Att. 22 at FTC-PROD-00000550; Rottner Decl. ¶ 19.
[22] Rottner Decl. at Att. 22 at FTC-PROD-00000550.
[23] *Id.*
[24] *Id*.
[25] *Id.* at Att. 22 at FTC-PROD-00000557-561.
[26] *Id*. at Att. 22 at FTC-PROD-00000557.
[27] *Id*. at Att. 22 at FTC-PROD-00000556.

"'activating' the pancreas . . . allowing it to pump insulin in to the blood stream."[28]  According to

Gerhauser, "it's the first thing you need to reverse the effects of 'NIR.'"[29]  He also tells

consumers that they must purchase *The Doctor's Guide* to find out "the only place to get

Himalayan Silk."[30]

**b)**      ***The Reverse Diabetes Defendants Claim that "Epsom Blue" and "Chromanite" Will Reset Insulin Receptors.***

The Reverse Diabetes Defendants claim that the second step in the protocol involves

additional supplements known as "Epsom Blue" and "Chromanite."  Together, these "Sugar

Companions," "reset" insulin receptors, "so they open up and start accepting sugar again."[31]

According to the Reverse Diabetes Defendants, Epsom Blue "is the 'key' that unlocks the insulin

receptors . . . forcing them to 'open up' and accept sugar again."[32]  They further claim that

Chromanite "works by 'activating' the insulin receptors" in the body, forcing "cells to 'open

up' . . . accept insulin . . . and start cleaning sugar out of [the] blood stream."[33]  Epsom Blue and

Chromanite purportedly "work in perfect harmony to 'reset' your insulin sensitivity . . .

[c]leaning glucose out of your blood stream . . . **[a]nd completely reversing diabetes.**"[34]  As

with Himalayan Silk, Gerhauser tells consumers that *The Doctor's Guide* will reveal the "best

place" for consumers to get Epsom Blue.[35]

**c)**      ***The Reverse Diabetes Defendants Claim NIR Blockers Prevent Diabetes Recurrence.***

Although the Reverse Diabetes Defendants claim in the video that consuming Himalayan

Silk, Epsom Blue, and Chromanite together will completely reverse type 2 diabetes, their

protocol requires a third step to "make sure [diabetes] never comes back."[36]  They explain that to

prevent type 2 diabetes from recurring, consumers must prevent NIR exposure.  To do so, the

---

[28] *Id*. at Att. 22 at FTC-PROD-00000557.
[29] *Id*.
[30] *Id*. at Att. 22 at FTC-PROD-00000558; *see also id.* at Att. 22 at FTC-PROD-00000562.
[31] *Id*. at Att. 22 at FTC-PROD-00000558-561.
[32] *Id*. at Att. 22 at FTC-PROD-00000559.
[33] *Id.* at Att. 22 at FTC-PROD-00000560.
[34] *Id*. at Att. 22 at FTC-PROD-00000560.
[35] *Id.* at Att. 22 at FTC-PROD-00000559; *see also* FTC-PROD-00000562.
[36] *Id*. at Att. 22 at FTC-PROD-00000561.

Reverse Diabetes Defendants explain certain paints, window coverings, cell phone cases, and computer cases "<u>work like a shield</u>" and are the "perfect defense against 'NIR'" to **diabetes proof**" the body.[37]  They further claim that there are other "simple" tips that consumers must use to limit their NIR exposure.[38]

The Reverse Diabetes Defendants do not identify the particular paints, window coverings or other alleged "NIR blockers" in their advertisements.  Nor do their ads specify the "simple" tips for limiting NIR.  They once again promise consumers will learn this information by purchasing *The Doctor's Guide*.[39]

> ### 3.   The Reverse Diabetes Defendants Claim Their Three-Step Protocol is Scientifically Proven to Reverse Diabetes and Its Symptoms in 28 Days.

The Reverse Diabetes Defendants emphasize throughout their presentation that their three-step protocol is scientifically proven to cure type 2 diabetes.  In support of this claim, Gerhauser states in the video that certain unspecified studies show a "100% cure rate," and a "100% success rate."[40]  These alleged studies are unattributed and referred only as a "shocking study" or a "recent study."[41]

The Reverse Diabetes Defendants further claim that studies from the University of Kansas, *Informa Healthcare,* the *International Journal of Environmental Research,* the Health Sciences Center in Louisiana, and journal, *Diabetes, Obesity, and Metabolism* prove their claims.[42]

> ### 4.   The Reverse Diabetes Defendants Claim Their Protocol Reverses Diabetes Without Requiring Dietary Changes.

The Reverse Diabetes Defendants not only promise a scientifically proven treatment, but because reversing diabetes has "**nothing to do with changing your diet or exercising more**,"

---

[37] *Id*.
[38] *Id*.
[39] *Id*. at Att. 22 at FTC-PROD-00000561-562.
[40] *Id*. at Att. 22 at FTC-PROD-00000550, FTC-PROD-00000557.
[41] *Id*. at Att. 22 at FTC-PROD-00000550.
[42] *Id*. at Att. 22 at FTC-PROD-00000550, FTC-PROD-00000554-555, FTC-PROD-00000557, FTC-PROD-00000559-560.

consumers can do so without changing their diet or lifestyle.[43]  Indeed, Reverse Diabetes

Defendants tell consumers they will be able to go to a restaurant and, without worry, "**enjoy a**

**big stack of pancakes loaded with syrup.**"[44]  They further represent that once consumers know

the "hidden, root cause of diabetes" — that is, cell phones and other electronic devices — and

follow their simple three-step protocol, consumers can enjoy life without dietary restrictions and

consume foods like burgers, fries, and apple pie with ice cream without ever having to worry

about their blood sugar.[45]  They go so far as telling consumers that listening to "'mainstream'"

advice, which focuses on diet and exercise, will not work to treat their diabetes, and these

"mainstream solutions" "could be <u>making [their] diabetes worse</u>."[46]

      **C.**     **<u>Purchasing *The Doctor's Guide*</u>**

      Gerhauser claims that he would normally charge his patients $1,000 to walk them

through the protocol, but since $1,000 "is out of reach for most people," he decided to make the

protocol available for only $249.00.[47]  Once purchased, consumers can access the complete

*Doctor's Guide* immediately.[48]

      **D.**     **<u>The Reverse Diabetes Defendants' Advertising Claims Are False.</u>**

      *The Doctor's Guide*, however, contradicts the very claims the Reverse Diabetes

Defendants used to sell it.  Therefore, unsurprisingly, expert testimony confirms that there is no

competent and reliable scientific evidence supporting the notion that cell phones or other

electronic devices cause diabetes, that the Reverse Diabetes Defendants' "all-natural" cocktail

can cure the disease in 28 days, or that their three-step protocol is "scientifically-proven."

      **1.**     **<u>*The Doctor's Guide* Proves the Falsity of the Reverse Diabetes</u>**
                    **<u>Defendants' Marketing Claims.</u>**

      In direct contravention of the Reverse Diabetes Defendants' marketing claims, *The*

*Doctor's Guide* states the most important key to the "body's ability to **HEAL** itself, **REVERSE**

---

[43] *Id*. at Att. 22 at FTC-PROD-00000550-551; *see also* Rottner Decl. ¶ 14; *id*. at Att. 1.
[44] *Id.* at Att. 22 at FTC-PROD-00000550.
[45] *Id*. at Att. 22 at FTC-PROD-00000552.
[46] *Id*. at Att. 22 at FTC-PROD-00000550, FTC-PROD-00000552-53.
[47] *Id*. at Att. 22 at FTC-PROD-00000563.
[48] Rottner Decl. ¶ 27a-k, Att. 19 at 31:10.

the diabetes, and **CURE**" diabetes is diet.[49]  Specifically, it advises that consumers "**[e]at a seasonal, low-carb, organic diet with plenty of seafood.**" [50]  *The Doctor's Guide* further instructs consumers to commit to a low-carb diet where they eat grass-fed meat, seafood, eggs, and vegetables while abstaining from white bread, cereal, bagels, melons and pineapple, among other things.[51]  *The Doctor's Guide* also tells consumers to engage in "intermittent fasting," that is, waiting 12-16 hours between dinner and breakfast.[52]

 *The Doctor's Guide* also reveals that Himalayan Silk, Epsom Blue, and Chromanite are not unique substances as the Reverse Diabetes Defendants claim.  Rather they are common and readily available supplements marketed with unique names:  Himalayan Silk is mulberry extract, Epsom Blue is magnesium, and Chromanite is chromium.[53]  While marketing materials claimed *The Doctor's Guide* would show consumers "the only place to get Himalayan Silk" or "the best place to get Epsom Blue," mulberry extract, magnesium, and chromium are all readily available supplements found in most drugstores or supermarkets.

 Although the Reverse Diabetes Defendants claim in their advertising that their protocol works in 28 days "guarantee[d]," *The Doctor's Guide* demonstrates that this claim, too, is false.  For example, contrary to the claims in their marketing that "Epsom Blue" — in reality, magnesium — can help reverse diabetes in just 28 days, *The Doctor's Guide* itself relies on a study that did not show positive results from magnesium until after 24 weeks or 168 days."[54]  Likewise, while their marketing claims the advertised protocol cures and reverses diabetes in 28 days in 100% of the cases, *The Doctor's Guide* attempts to qualify this promise by adding the phrase "in as little as 28 days" on multiple occasions."[55]

---

[49] *Id.* ¶ 28, Att. 21 at FTC-PROD-00000462.
[50] *Id*. at Att. 21 at FTC-PROD-00000462.
[51] *Id*. at Att. 21 at FTC-PROD-00000464-467.  The Reverse Diabetes Defendants attempt to explain away their telling consumers they need to make **no** dietary changes, by falsely claiming in *The Doctor's Guide* that they promised consumers no "crazy, grueling diets." *Id*. at Att. 21 at FTC-PROD-00000461.
[52] *Id*. at Att. 21 at FTC-PROD-00000464.
[53] *Id*. at Att. 21 at FTC-PROD-00000428, FTC-PROD-00000433, FTC-PROD-00000443.
[54] *Id*. at Att. 21 at FTC-PROD-00000436.
[55] *E.g.*, *id*. at Att. 21 at FTC-PROD-00000391, FTC-PROD-00000393, FTC-PROD-00000396, FTC-PROD-00000427.

*The Doctor's Guide* also exposes the true nature of the Reverse Diabetes Defendants' purported "evidence" in support of their claims.  For example, the Reverse Diabetes Defendants originally present the two charts purportedly showing that NIR causes diabetes without identifying the x or y axes:



In *The Doctor's Guide*, however, the charts demonstrate there is virtually no temporal overlap between the two charts.[56]



The graph depicting the rise in diabetes covers the period from 1958 to 2016, while the electronic device usage chart begins at 2015 and extends to 2021.[57]  Therefore, there is not even a correlation between the two axes, much less evidence of causation.

       2.      **The Reverse Diabetes Defendants' Other Type 2 Diabetes "Cures"
Demonstrate the Falsity of Their Claims.**

The falsity of the Reverse Diabetes Defendants' claims is further demonstrated by the

---

[56] *Compare id*. at Att. 21 at FTC-PROD-00000416, *with id*. at Att. 22 at FTC-PROD-00000554.

[57] *Id*. at Att. 22 at FTC-PROD-00000416.  Beyond limited temporal overlap, approximately half of the electronic device usage chart is projected, not actual data.

fact that in a March 19, 2019 *NewMarket Health Publishing* newsletter, Gerhauser claims that research demonstrates that the "**REAL Cure for Diabetes**" is dieting, losing weight, and keeping that weight off.[58]

### 3. Expert Testimony Further Confirms the Reverse Diabetes Defendants' Claims Are Not Supported by Science.

Dr. Charles F. Burant is an expert in type 2 diabetes, including its treatment, management, causes and risk factors; and in the design, conduct, and analysis of clinical trials related to type 2 diabetes.[59] Dr. Burant evaluated the Reverse Diabetes Defendants' marketing claims that:  (1) type 2 diabetes is caused by NIR exposure; (2) consumers can prevent type 2 diabetes through the use of NIR blockers, or by otherwise avoiding NIR; (3) *The Doctor's Guide* protocol will cure, treat or mitigate type 2 diabetes and its symptoms; (4) the supplements, "Himalayan Silk", "Epsom Blue", and "Chromanite," either alone or in combination cure, treat, or mitigate type 2 diabetes and its symptoms; and (5) *The Doctor's Guide* is scientifically proven to cure, treat, mitigate type 2 diabetes or its symptoms in 28 days.[60] After reviewing the studies cited in the advertisements, and conducting an independent search of relevant scientific literature related to the Reverse Diabetes Defendants' diabetes claims, Dr. Burant unsparingly concluded that there is no competent and reliable scientific evidence supporting the Reverse Diabetes Defendants' claims. [61]

### a) *Dr. Burant Identified the Competent and Reliable Scientific Evidence Necessary to Support Reverse Diabetes Defendants' Diabetes Claims*

The FTC provided Dr. Burant with the legal definition of competent and reliable scientific evidence, specifically:

> tests, analyses, research, studies, or other evidence based on expertise of professionals in the relevant area, that have been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the

---

[58] Rottner Decl. ¶ 31, Att. 24 at FTC-PROD-00000128-131.
[59] FTC Ex. 121, Report of Charles Burant, M.D., Ph.D ("Burant Report") ¶ 12.
[60] *Id.* ¶ 17.
[61] *Id.* ¶¶ 15-22, 80.

profession to yield accurate and reliable results.[62]

Using this definition, Dr. Burant explained that competent and reliable scientific evidence for claims that a product, treatment plan, or protocol cures, treats, or mitigates type 2 diabetes; claims concerning causes, risks, and contributory factors for type 2 diabetes; and claims that a product, treatment plan or protocol can prevent the development or progression of type 2 diabetes requires:

> appropriately analyzed results from at least one independent, well-designed, well-conducted, randomized, double-blind, placebo-controlled, human clinical trial that tests the claimed treatment, drug, hypothesis, or protocol precisely as recommended (including at the recommended dosage), and which involves an appropriate sample population which is of large enough size and duration to generate reliable data that statistically supports a positive therapeutic benefit with an acceptable risk profile.[63]

Dr. Burant emphasizes that to the extent that a treatment plan requires multiple products, the plan must be tested in a human clinical trial using all of the products of that intervention because various products can inhibit the effects of each other when administered together, or even increase the side effects.[64]  Dr. Burant further explained such trials must evaluate the results using appropriate data and statistical analysis.[65]  He notes that anecdotal evidence not meeting these criteria are simply "observations" and are not competent and reliable scientific evidence.[66] He also explains that animal studies do not constitute competent and reliable scientific evidence in this context because of differences in physiology and metabolism between animals and humans.[67]

**b)** ***The Articles and Studies Cited in the Reverse Diabetes Defendants' Marketing Are Not Competent and Reliable Scientific Evidence Supporting the Diabetes Claims.***

Dr. Burant reviewed the articles and studies cited in the Reverse Diabetes Defendants'

---

[62] Burant ¶ 33; *see also FTC v. Nat'l Urological Group, Inc.*, 645 F. Supp. 2d 1167, 1186 (N.D. Ga. 2008) (defining competent and reliable scientific evidence).
[63] *Id.* ¶ 34.  *See also id*. ¶¶ 35-46.
[64] *Id.* ¶ 42.
[65] *Id.* at ¶ 44.
[66] *Id.* at ¶ 46.
[67] *Id.* ¶ 36.

marketing and explained that those references do not provide competent and reliable scientific evidence for the challenged diabetes claims and why.[68]  Dr. Burant first highlights that the Reverse Diabetes Defendants' marketing does not identify a single study — much less one meeting the criteria for competent and reliable scientific evidence — that actually tested all of the components of the Reverse Diabetes Defendants' protocol together as prescribed in their marketing.[69]

Dr. Burant also examined the two reports the Reverse Diabetes Defendants cite in support of their claim that NIR causes type 2 diabetes.  He explains the first study, published by *Informa Healthcare*, is merely an anecdotal observation about a single type 2 diabetic who self-reported lower blood glucose levels when reducing his exposure to "dirty electricity," and therefore, "has no scientific validity."[70]  He explains such an observation cannot be generalized to the public at large, and any conclusions drawn from an observation about one individual are no more than "mere conjecture."[71]  Dr. Burant further explains the second study, published by the *International Journal of Environmental Research and Public Health*, is fatally flawed because of: (1) erroneous statistical analysis; (2) arbitrary test subject selection; and (3) the study's failure to identify the variability in the subjects' NIR exposure over time.[72]

Second, Dr. Burant reviewed the four studies cited in the Reverse Diabetes Defendants' marketing as proof that the touted natural supplements — mulberry, magnesium, and chromium — cure, treat, or mitigate type 2 diabetes in 28 days.[73]  He explains these studies are not reliable scientific evidence because they either relied on flawed statistical analyses, were not double-blinded, or are merely conclusions from animal studies, which cannot constitute competent and reliable scientific evidence because of differences in metabolism between humans and animals.[74]

---

[68] *Id*. ¶¶ 47-69.
[69] *Id*. ¶ 60.
[70] *Id*. ¶¶ 50-51
[71] *Id*. ¶ 51.
[72] *Id*. at ¶¶ 53-57.
[73] *Id*. ¶¶ 70-79.
[74] *Id*.

*c)*   ***Dr. Burant's Independent Review of the Scientific Literature
Finds No Support for the Diabetes Claims.***

Dr. Burant also conducted an independent scientific literature review to determine

whether there is any competent and reliable scientific evidence to support the Reverse Diabetes

Defendants' claims.  He found none.  Specifically, he found no competent and reliable evidence

suggesting NIR has an effect on a patient's diabetic condition, or that mulberry, magnesium, or

chromium, individually, or in combination, will "cure, treat, or mitigate type 2 diabetes in 28

days."[75]

## II.   THE CONGRESSIONAL CHECKS AND REPUBLICAN CHECKS SCAM

In addition to peddling the 28-day diabetes "cure," Defendant Agora Financial also runs a

government checks scheme with Defendant Zachary Scheidt ("Scheidt").  Scheidt serves as the

principal spokesperson to consumers, while Agora Financial disseminates and controls the

advertisements and pockets the related fees from consumers.[76]  Together, these "Congressional

Checks Defendants" promise consumers hundreds to thousands of dollars in monthly checks

from the government.  They market this scheme much like the diabetes cure — first, by

bombarding consumers with email and other Internet-based marketing; and then, directing

consumers who click on those advertisements to a nearly hour-long video presentation reiterating

those claims.[77]

From approximately January 2018 into October 2018, the Congressional Checks

Defendants claimed consumers could collect monthly "Congressional" Checks from the

government.[78]  Beginning in approximately October 2018, the Congressional Checks Defendants

started telling consumers the monthly checks were "Republican" Checks.[79]  Whether billed as

Congressional or Republican Checks, the defendants make, or made, the same core

---

[75] *Id.* at ¶¶ 62-65.
[76] *See e.g.*, Rottner Decl. ¶¶ 3, 40-41, 47, Att. 48.
[77] *See e.g.*, Rottner Decl. ¶¶ 32-40.  Both the email marketing and video presentation contain many of the same
claims.  Consumers can watch the video presentation or read a transcript provided by the Congressional Checks
Defendants.  *Id.* ¶ 47a.
[78] *See* Rottner Decl. ¶ 34.
[79] *See* Rottner Decl. ¶¶ 34, 41.

representations to consumers.

The Congressional Checks Defendants tell consumers that for a fee, they will receive instructions on how to obtain their legally-guaranteed monthly checks in a book entitled *Congress' Secret $1.17 Trillion Giveaway* ("*Congress' Secret Giveaway*").  However, *Congress' Secret Giveaway* does not provide instructions on how consumers can obtain "legally-guaranteed" government checks.  In fact, both the Congressional Checks Defendants' own statements (made to consumers after purchase) and the Clerk of the U.S. House of Representatives confirm that neither Congressional nor Republican Checks exist.

      **A.**      <u>**Congressional Checks Defendants Represent to Consumers that They Are Legally Entitled to Collect Hundreds to Thousands of Dollars in Monthly Congressional or Republican Checks.**</u>

First, the Congressional Checks Defendants claim that a "new" tax code provision created millions of dollars that *must* be distributed to consumers in Congressional/Republican Checks.[80]  Specifically, "Section 199A" — a "little-known" provision "buried" in the "new tax rules"— designated $1.17 trillion for distributions.[81]  The Congressional Checks Defendants widely advertise:  "Thanks to IRS Code Section 199A…U.S. Taxpayers Could Collect a Total of $1.17 Trillion in 2018," "**Right Now, There's $1.17 Trillion in Total at Stake … Ready to be Distributed in 2018**," and "**New Law Allows Benefit of Collecting Monthly Check**."[82]

The Congressional Checks Defendants explain that pursuant to this "new" law, specific entities that provide "important services to society," such as companies that run hospitals or senior housing facilities, receive certain tax benefits, and then are required to "distribute" most of their money to consumers.[83]  The Congressional Checks Defendants emphasize:

> [T]he law dictates that this pile of cash MUST be distributed!
> That's not a question of if…It's the law!  These cash distributions

---

[80] *Id*. at Att. 55 at FTC-PROD-00000329-330; FTC Ex. 123, Declaration of Kristin Shapiro ("Shapiro Decl.") ¶ 11, Att. A at FTC-PROD-000001058, FTC-PROD-000001064-65.

[81] Rottner Decl. at Att. 55 at FTC-PROD-00000331; Shapiro Decl. at Att. A at FTC-PROD00001065.

[82] Rottner Decl. at Att. 55 at FTC-PROD-00000325; Rottner Decl. ¶ 54, Att. 66 at FTC-PROD-00000174; Shapiro Decl. ¶ 11, Att. A at FTC-PROD-00001056, FTC-PROD-00001059.

[83] Rottner Decl. at Att. 55 at FTC-PROD-00000336, FTC-PROD-00000342; Shapiro Decl. at Att. A at FTC-PROD-00001080, FTC-PROD-00001073.

are **contractually required** by the U.S. government.  And there's
no way around that.[84]

After characterizing this "opportunity" as "new" and "rare," the Congressional Checks

Defendants further purport to quote major media outlets and former government officials

describing Section 199A as "one of the largest new loopholes in decades," "a complete

giveaway" and "a multimillion-dollar windfall."[85]

The Congressional Checks Defendants even advertise the specific check amounts

consumers can collect from the alleged monthly distributions.  For example, several

advertisements instruct consumers to "**Act before [**impending date**], and YOU too could pocket**

**$939, $6235 and even $21,538 in extra income… this month and every month after that**."[86]

At no point do they represent that consumers will receive less than a $900 monthly check.

Moreover, the Congressional Checks Defendants represent that "[b]ecause of the way the law is

written…[consumers] could receive up to 40 of those checks every year" if they follow their

instructions."[87]

The Congressional Checks Defendants use purported consumer testimonials to illustrate

the amount of money available to consumers by virtue of this "loophole."  In many of these

testimonials, the alleged satisfied customer attests to having received thousands of dollars in

Congressional or Republican Checks — one as much as over $44,000 — while expecting

additional money the subsequent month.[88]  In some instances, these testimonials appear

alongside purported images of the customer, holding a copy of his or her Congressional or

Republican Check:[89]

> Kevin Larry, from Chicago…. [is] set to collect a massive check
> for $44,577 this month. Imagine if that happened to you.

---

[84] Rottner Decl. at Att. 55 at FTC-PROD-00000330; Shapiro Decl. at Att. A at FTC-PROD-00001065-1066.
[85] Rottner Decl. at Att. 55 at FTC-PROD-00000322, FTC-00000326, FTC-PROD-00000329; Shapiro Decl. at Att. A at FTC-PROD-00001057.
[86] *E.g.*, Shapiro Decl. at Att. A at FTC-PROD-00001056.
[87] *Id.* at FTC-PROD-00001076.
[88] Rottner Decl. at Att. 55 at FTC-PROD-00000322; Shapiro Decl. at Att. A at FTC-PROD-00001059.
[89] Rottner Decl. at Att. 55 at FTC-PROD-00000322, FTC-PROD-00000323; Shapiro Decl. at Att. A at FTC-PROD-00001059-1061.



* * *

People like Chris T., a 73 year old retiree from Colorado. He sent me a note saying that he already collected more than $20,000 from these "Congressional Checks." And because these are not one time payments… He's not done yet. He's set to collect another check for $900 in the coming days.

***

Justin F., another one of my readers, is set to collect a Congressional Check for $2,975 . . . .

The Congressional Checks Defendants reinforce their pitch by claiming several members of Congress are "already cashing in" and "collecting this easy cash."[90]  To illustrate this fact, they include "official financial disclosure documents" which purports to reveal the millions of dollars politicians have already collected.  For example, the Congressional Checks Defendants include an alleged "official" copy of former Congressman Darrell Issa's Financial Disclosure Report in their advertisements,[91] claiming that it shows that he received a $410,000 Congressional or Republican Check:[92]



---

[90] Rottner Decl. at Att. 55 at FTC-PROD-00000333-334; Shapiro Decl. at Att. A at FTC-PROD-00001069, FTC-PROD-00001057.

[91] Rottner Decl. at Att. 55 at FTC-PROD-00000334; Shapiro Decl. at Att. A at FTC-PROD-00001069-1070.

[92] Before October 2018, the Congressional Checks Defendants used the purported image of Congressman Issa's Financial Disclosure Report showing a $410,000 "Congressional Check."  In marketing used after October 2018, they used the same purported image of the Financial Disclosure Report, but changed the name of the purported check to a "Republican Check."

17

**B.** **Congressional Checks Defendants Represent that Anyone Can Collect Monthly Congressional or Republican Checks With Little or No Risk, Just By Adding Their Name to List of Check Payees.**

The Congressional Checks Defendants frequently represent that *anyone* is eligible to "claim" their Congressional or Republican Checks.  For example, they advertise that collecting the promised checks "couldn't be easier," "[a]nyone can collect these checks," the checks are "wide open to the public," "[t]here's no income requirement," and "**Congressional Checks'…Now Available to Everyday Folks**."[93]  They also frequently suggest the checks just need to be "collected" by consumers, claiming, for example, that "3 out of 4 American Seniors Miss out on These 'Congressional Checks,'" and "Click here to see how to collect your share [of Congressional Checks].[94]  For both the Congressional Checks and Republican Checks programs, the Congressional Checks Defendants explain consumers just need to add their names "to the list of check payees" to obtain the advertised money, and warn if consumers fail to add themselves to the list of check payees, their "money will be sent to someone else."[95]



**Claim Your "Congressional Check" by October 18th**

Dear Reader,

In case you haven't heard yet, a small group of in-the-know Americans are now **collecting "Congressional Checks" of up to $6,235** each.

In fact, there is $1.17 Trillion at stake thanks to section 199A of Trump's new tax law.

And if you follow the instructions on the next page, you could **add your name to the list**, too.

But if you do not act by the October 18th deadline, you will miss out on the next check, and… *your money will be sent to somebody else.*

It would be foolish to let that happen. Especially since it's so easy to start collecting these checks. **See how to put your name on the list here.**

**To prevent your check from being sent to someone else,** you must get on the list for the next "Congressional Check" by Thursday, October 18th.

**See how to collect your first "Congressional Check" here.**
*(before the October 18th deadline)*

However, the Congressional Checks Defendants emphasize that these checks are not exclusive to congressional members, and are "available to regular folks."[96]  For example, one

---

[93]  Rottner Decl. at Att. 55 at FTC-PROD-00000336-337,FTC-PROD-00000341; *Id*. ¶ 37, Att. 26 at FTC-PROD-00000010; Shapiro Decl. at Att. A at FTC-PROD-00001073, FTC-PROD-00001078.
[94] Rottner Decl. ¶ 49, Att. 60 at FTC-PROD-00000487, *Id*. ¶ 38, Att. 27 at FTC-PROD-00000018.
[95] Rottner Decl. at Att. 55 at FTC-PROD-00000330, FTC-PROD-00000341; *Id*. ¶ 53, Att. 64 at FTC-PROD-00000781; Shapiro Decl. at Att. A at FTC-PROD-00001066, FTC-PROD-00001078; *Id*. ¶ 53, Att. 64 at FTC-PROD-00000781-82
[96] Shapiro Decl. at Att. A at FTC-PROD-00001058.

advertisement states "several [c]ongressmen" are "laughing all the way to the bank" as a result of the Congressional or Republican Checks they have collected, reminding consumers that these are "checks [that] are available to you right now…Checks that SHOULD be yours."[97]  In several advertisements, the Congressional Checks Defendants warn consumers, "Don't let these politicians collect all that money" and "Don't let [the politicians] take all YOUR money."[98]

The Congressional Checks Defendants also represent funds are available to consumers with little or no risk, claiming they are "100% confident" this will work for consumers because others are "already cashing in."[99]  In addition, they portray the advertised checks as a reliable and readily available source of income, stating that consumers can use the advertised checks "just a few days from now" to pay their medical expenses, mortgage, and other bills.[100]  When marketing as Republican Checks, the Congressional Checks Defendants sporadically refer to "investments" when describing this opportunity.  They also note, "nothing is guaranteed," but immediately thereafter claim that the program has worked for other consumers "**in 100% of the cases**."[101]

C.      **The Congressional Checks Defendants Represent that the Advertised Checks Are Furnished By or Otherwise Affiliated with U.S. Congress**

To further bolster the legitimacy of their claims, the Congressional Checks Defendants represent that the advertised Congressional/Republican Checks are affiliated with the government.  For example, the Congressional Checks Defendants advertise consumers can "Legally Collect $1,000s from US Government Every Month:"[102]

---

[97] Rottner Decl. ¶ 53, Att. 63 at FTC-PROD-0000243-244.
[98] Rottner Decl. ¶ 38, Att. 27 at FTC-00000018, *see id*. at Att. 63 at FTC-PROD-00000244; Shapiro Decl. at Att. A at FTC-PROD-00001073.
[99] Rottner Decl. at Att. 55 at FTC-PROD-00000337; Shapiro Decl. at Att. A at FTC-PROD-00001069.
[100] Rottner Decl. at Att. 55 at FTC-PROD-00000333; Shapiro Decl. at Att. A at FTC-PROD-00001069.
[101] Shapiro Decl. at Att. A at FTC-PROD-00001081; *see also* Rottner Decl. at Att. 55 at FTC-PROD-00000343-344.
[102] Rottner Decl. ¶ 54b, Att. 66 at FTC-PROD-00000174.



Frequently, the Congressional Checks Defendants claim that the checks are affiliated specifically with the United States Congress.  For example, marketing materials depict images of the purported Congressional/Republican Checks and consumers received.  Each depiction includes the seal of the U.S. Congress, a Washington D.C. address, and a U.S. Capitol watermark along with the words Congressional Check or Republican Check blazoned across the top of the check.[103]



Acting on these advertisements, several consumers wrote directly to the Clerk of the U.S. House of Representatives,[104] requesting their Congressional Check.[105]  In many instances, these consumer letters echo the Congressional Checks Defendants' marketing, by requesting to be added to the "list" of check payees, and referencing Section 199A as the source of their

---

[103] Rottner Decl. at Att. 55 at FTC-PROD-00000322-323, FTC-PROD-00000337-338.

[104] The Congressional Checks Defendants refer to the Clerk of the U.S. House of Representatives in their marketing. For example, they claim that certain documents filed with the Clerk of the U.S. House of Representatives "PROVES" that "congressmen" have collected Congressional Checks of "$115,000…$350,000…and even $2 million."  Rottner Dec. at Att. 55 at FTC-PROD-00000334; Shapiro Decl. at Att. A at FTC-PROD-00001057.

[105] FTC Ex. 122, Declaration of Cheryl L. Johnson ("Johnson Decl.") ¶ 2; Rottner Decl. ¶ 32, Att. 25 at FTC-PROD-00000253.

payout.[106]

### D. The Congressional Checks Defendants Solicit Money From Consumers By Promising Instructions For Collecting Monthly Congressional/Republican Checks.

Using their promises that consumers are legally entitled to receive hundreds to thousands of dollars from the government without risk, the Congressional Checks Defendants then solicit money from consumers, telling them that they must order their book, *Congress' Secret Giveaway*, to receive instructions on how to obtain their checks. They state that *Congress' Secret Giveaway* "has all the information you need to start collecting checks from $939 to as high as $6,235 or more…This month…and every month if you choose."[107]

The Congressional Checks Defendants initially charged consumers a $4.95 "shipping fee" for *Congress' Secret Giveaway*, and automatically enrolled those consumers in their monthly subscription newsletter, *Lifetime Income Report*, when they marketed Congressional Checks.[108] The Congressional Checks Defendants then employed a negative feature to enroll consumers in the *Lifetime Income Report* subscription. Specifically, they offered a purported 30-Day "FREE" trial of the newsletter but required consumers to cancel their subscription within 30 days or automatically billed them for the $99 yearly subscription.[109] The Congressional Checks Defendants characterized this $99 fee as "[a] small price to pay when you consider that your first Congressional Check alone could pay you $939, $6,235, and even $21,538."[110]

When marketing Republican Checks, as they do now, the Congressional Checks Defendants require consumers to enroll in the *Lifetime Income Report* subscription to receive *Congress' Secret Giveaway*, but do not offer a 30-Day "free trial."[111] Instead, they automatically bill consumers a $49 yearly fee and offer a 30-day refund guarantee.[112] The Congressional

---

[106] Johnson Decl. ¶ 4, Att. A at FTC-PROD-00001031, FTC-PROD-00001034-35, FTC-PROD00001037, FTC-PROD-00001044, FTC-PROD-00001046, FTC-PROD-00001048, FTC-PROD-00001050; *see also id*. at FTC-PROD-00001042.
[107] Rottner Decl. at Att. 55 at FTC-PROD-00000356; Shapiro Decl. at Att. A at FTC-PROD-00001100.
[108] Shapiro Decl. at Att. A at FTC-PROD-00001098.
[109] *Id*. at FTC-PROD-00001106.
[110] *Id*. at FTC-PROD-00000923.
[111] Rottner Decl. at Att. 55 at FTC-PROD-00000363-65.
[112] *Id*.

Checks Defendants describe this fee as "truly a bargain," claiming that "it's very likely your first check will more than pay for your entire subscription" and highlighting purported satisfied customers who received $900 and $6,235 checks as proof of the value.[113]

> **E.** ***Congress' Secret Giveaway* Does Not Provide Instructions for Collecting Government Checks.**

Contrary to the Congressional Checks Defendants' representations, *Congress' Secret Giveaway* does not provide instructions on how to obtain Congressional Checks or Republican Checks from the government — because the checks do not exist. Instead, the book describes dividend investing whereby consumers purchase stocks in private companies that pay dividends from their profits. The book recommends thirteen companies for investments, none of which has paid more than $1.05 per share in dividends throughout the entirety of the Congressional Checks Defendants' marketing.[114] Further, in the book, the Congressional Checks Defendants first disclose consumers can only receive dividend payments from these entities "as long as the company makes money."[115] *Congress' Secret Giveaway* also admits that Section 199A — the provision the Congressional Checks Defendants exclusively cite as proof that the monthly checks are legally required — merely "changed the way income from certain businesses, commonly called 'pass-through entities' is taxed."[116] Notably, in their book, the Congressional Checks Defendants do not claim Section 199A confers any legal entitlement to checks.

To obtain a dividend payment, *Congress' Secret Giveaway* explains, the consumer would have to take several steps including, identifying a stockbroker, opening and depositing money in the brokerage account, identifying potential entities for investment and purchasing sufficient stock in those private companies.[117] To obtain a dividend payment in the amounts advertised consumer would have to purchase tens of thousands to hundreds of thousands of dollars of stock. For example, the Congressional Checks Defendants advertise that a purported consumer, "Justin

---

[113] *Id*. at FTC-PROD-00000365.
[114] Rottner Decl. ¶ 48, Atts. 49, 54.
[115] *Id*. at Att. 49 at FTC-PROD-00000627.
[116] *Id*. at FTC-PROD-00000621.
[117] *Id*. at FTC-PROD-00000627-631.

F.," is scheduled to receive a "Republican Check" for $2,975 from an entity with Tax ID number 20-8875684.[118]  Public financial statements filed with the Securities and Exchange Commission confirm that entity is Blackstone Group LP ("Blackstone").[119]  Blackstone paid a $0.64 per share quarterly dividend on October 26, 2018, meaning that "Justin F." would have had to purchase 4,698 shares of Blackstone (at a cost of $33 a share at that time) to receive a $2,975 quarterly dividend.[120]  In other words, to receive the advertised amount of $2,975, a consumer would have to put at risk over $155,000.

### F.    Congressional Checks and Republican Checks Do Not Exist.

Admitting their claims were false, in one issue of the *Lifetime Income Report* — the subscription newsletter in which consumers are automatically enrolled as part of their purchase — the Congressional Checks Defendants address a letter from a consumer stating that he did not receive any Congressional Checks and asking when he will receive them.  They respond to the consumer by "explaining," "don't take the term 'Congressional check' too literally" and then disclose that Congressional Checks refers simply to "regular payouts" to investors.[121]  The Clerk for the U.S. House of Representatives likewise confirms that the Congressional/Republican Checks program does not exist.[122]

The falsity of the Congressional Checks Defendants' claims is further demonstrated by their rampant use of doctored images and documents in their marketing.  The check images themselves, along with the purported consumer testimonial images, are stock photos readily available online.  The Congressional Checks Defendants simply doctor the images.[123]  The advertised Financial Disclosure Report for former Congressman Issa is also doctored.  His actual Financial Disclosure Report is publicly available and there is no "Congressional" or "Republican" Check identified anywhere, nor is there any asset listed as having a value worth

---

[118] Rottner Decl. at Att. 55 at FTC-PROD-00000348; Shapiro Decl. at Att. A at FTC-PROD-00001086.
[119] *See* Rottner Decl. at Att. 49 at FTC-PROD-00000655.
[120] *Id*. ¶ 48, Att. 54.
[121] Rottner Decl. ¶ 50a, Att. 56 at FTC-PROD-00000977-978.
[122] Johnson Decl. ¶ 10.
[123] Rottner Decl. ¶¶ 41-42

$410,000 (as depicted in their marketing) in the report identified.[124]

### III.   The Reverse Diabetes Defendants and Congressional Checks Defendants Advertise and Cross-Promote Other Cures and "Checks" Opportunities.

The Congressional Checks Defendants and Reverse Diabetes Defendants frequently cross-promote their products and programs.  For example, Agora Financial repeatedly markets both the 28-day diabetes "cure" and the Congressional Checks schemes.  Similarly, the Reverse Diabetes Defendants advertise the Congressional Checks scheme.

Further, both groups of defendants co-market other similar products.  In addition to the 28-day diabetes cure, Defendants advertise a "Universal Vaccine" to "disease-proof" the body from cancer, Alzheimer's and heart disease; "biblical cures" for cancer; an "Old Age Cure" to reduce wrinkles and boost energy; and other products promising information on the real "cure" for various diseases, including pancreatic cancer.[125]  Likewise, Defendants cross-promote several other "checks"-related opportunities including, "Trump Bonus Checks," "Cash for Patriots," and "Trump's Tax Bonanza."[126]  Defendants frequently use similar marketing tactics and advertising content.  For example, both the Congressional/Republican Checks scheme and "Trump's Tax Bonanza," use several of the same consumer testimonials verbatim, despite the fact that the programs purportedly operate differently.[127]

### ARGUMENT

A preliminary injunction is necessary to stop both the diabetes and government checks schemes and to prevent continued consumer harm.  This Court has authority to grant such preliminary relief pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).  *See FTC v.*

---

[124] *Id*. ¶¶ 43-44, Att. 46.  In addition, the income from the assets reported on Congressman Issa's Financial Disclosure Report are reported only in 10,000-50,000 ranges; there are no exact numbers provided for each reportable asset.

[125] Rottner Decl. ¶¶ 27i, 86; FTC Ex. 124, Declaration of Paul Vincent DiStefano ("DiStefano Decl.") ¶ 2.  For example, Agora Financial has advertised that an unnamed company has a cure for pancreatic cancer, luring consumers to purchase their products to find out more information about the company.  These advertisements led one consumer to spend $2,770 on Agora Finanical subscriptions in the desperate hope of finding a cure for his wife's cancer.  DiStefano Decl. ¶¶ 1-14.  Tragically, his wife died and no such company was ever revealed to this consumer.  *Id*. ¶¶ 13-14.

[126] Rottner Decl. ¶¶ 50b, 84; *id*. at Att.  49 at FTC-PROD-00000618

[127] *Compare* Rottner Decl. ¶ 84d., Att. 103 at FTC-PROD-00000860-61, *with id*. at Att. 55 at FTC-PROD-00000332-333.

*Ameridebt, Inc*., 373 F. Supp. 2d 558, 562 (D. Md. 2005) ("To insure that any final relief is complete and meaningful, the court may also order any necessary temporary or preliminary relief . . . ." (citation omitted)).  To obtain preliminary relief under Section 13(b), the FTC must show (1) a likelihood of success on the merits and (2) that on balance the equities weigh in favor of granting the injunction.  *Ameridebt*, 373 F. Supp. at 563 (citing *FTC v. Food Town Stores, Inc.,* 539 F.2d 1339, 1343 (4th Cir. 1976)).  The evidence presented easily meets both requirements.

I.       **The FTC Is Likely To Succeed On The Merits.**

The FTC demonstrates the requisite "likelihood of success" if it shows "preliminarily, by affidavits or other proof, that it has a fair and tenable chance of ultimate success on the merits." *In re Sanctuary Belize Litig.*, No. 18-CV-3309, 2019 WL 3714392, at \*9 (D. Md. Aug. 2, 2019); *Ameridebt*, 373 F. Supp. 2d at 563 (quoting *FTC v. Beatrice Foods Co.*, 587 F.2d 1225, 1229 (D.C. Cir. 1978)).  Here, the FTC has amassed overwhelming evidence — including expert testimony, sworn statements, and the Defendants' own admissions — demonstrating that the Defendants' claims regarding the 28-day diabetes cure and Congressional/Republican Checks schemes are deceptive in violation of the FTC Act.  Further, the evidence demonstrates that Defendants Gerhauser and Scheidt are individually liable for monetary and injunctive relief for their role in these schemes.

An act or practice is deceptive under Section 5 of the FTC Act, 15 U.S.C. § 45, if: (1) there was a representation; (2) the representation was likely to mislead consumers; and (3) the misleading representation was material.  *FTC v. Ross*, 897 F. Supp. 2d 369, 381 (D. Md. 2012), *aff'd*, 743 F.3d 886 (4th Cir. 2014).  An advertising claim is deceptive or misleading under Section 5 if either: (1) "the express or implied message conveyed by the ad is false"; or (2) there was no reasonable basis "for asserting that the message was true."  *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1190 (N.D. Ga. 2008), *aff'd*, 356 F. App'x 358 (11th Cir. 2009). Express and deliberately implied claims are presumed material.  *Id.*  Similarly, claims involving "health, safety, or other issues that would concern reasonable customers" are presumptively

25

material.  *Id.*  "A material omission can also violate Section 5 of the FTC Act."  *FTC. v. Millennium Telecard, Inc.*, No. CIV.A. 11-2479 JLL, 2011 WL 2745963, at *3 (D.N.J. July 12, 2011).

The FTC asserts four counts of deception under Section 5 of the FTC Act.

### A.      The Reverse Diabetes Defendants' False and Unsubstantiated Advertising Claims Violate Section 5.

In marketing for *The Doctor's Guide*, the Reverse Diabetes Defendants make several express representations that are misleading in violation of Section 5(a) of the FTC Act. Specifically, they represent that: (1) type 2 diabetes is caused by NIR exposure; (2) consumers can prevent type 2 diabetes through the use of NIR blockers, or by otherwise avoiding NIR; (3) their protocol will cure, treat or mitigate type 2 diabetes and all of its symptoms; (4) supplements, "Himalayan Silk", "Epsom Blue", and "Chromanite," either alone or in combination cure, treat, or mitigate type 2 diabetes and its symptoms; (5) the protocol is scientifically proven to cure, treat, or mitigate type 2 diabetes or its symptoms in 28 days; and (6) their protocol does not require consumers to change their diets.

Each of these claims is false or unsubstantiated, and thereby, deceptive.  *See Ross*, 897 F. Supp. 2d at 381.  Expert testimony establishes that the Reverse Diabetes Defendants claims are wholly unsupported by science, and Gerhauser himself directly refutes several of his and the companies' own claims, but only after consumers purchase their product.

### 1.      Expert Testimony Confirms the Reverse Diabetes Defendants Have No Reasonable Basis for Their Claims.

An advertising claim is deceptive if there is no "reasonable basis" for asserting that the claim is true.  *Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d at 1190; *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 8 (1st Cir. 2010).  For claims involving a person's health or the effectiveness of dietary supplements specifically, "this reasonable basis, must, at a minimum, consist of competent and reliable scientific evidence."  *Nat'l Urological Grp. Inc.*, 645 F. Supp. 2d at 1190.

Dr. Burant evaluated each of the Reverse Diabetes Defendants' efficacy claims regarding their 28-day diabetes cure and after a comprehensive scientific literature review, found no competent and reliable scientific evidence to support the notion that NIR causes type 2 diabetes, nor that the advertised protocol could cure, treat or mitigate type 2 diabetes in 28 days.[128]  In fact, Dr. Burant explains not a single study has tested the Reverse Diabetes Defendants' protocol as described.[129]  Moreover, there is no competent and reliable scientific evidence that any treatment plan, outside of the possibility of bariatric surgery, extreme weight loss, or medication, could cure, treat, or mitigate type 2 diabetes in as little as 28 days.[130]

Dr. Burant also reviewed every study cited by the Reverse Diabetes Defendants in their marketing and in *The Doctor's Guide* (where found) to determine whether they at least constituted competent and reliable scientific evidence that mulberry, magnesium, or chromium could cure, treat, or mitigate type 2 diabetes in 28 days.[131]  He explains these studies also fail to meet the standard for competent and reliable scientific evidence.[132]  Indeed, as Dr. Burant explains, the Reverse Diabetes Defendants cite only (i) rodent studies which do not constitute competent and reliable scientific evidence because of significant differences between rodent and human metabolism to control blood glucose; (ii) anecdotal "observations" which often rely on self-reported reflections and cannot be extrapolated in any event; or (iii) studies with other hallmarks of unreliability such as, flawed statistical analyses, insufficient duration, inadequate sample populations, or subjects who are not blinded to their treatment.[133]  Because no competent and reliable scientific evidence supports the Reverse Diabetes Defendants' claims, they lack a reasonable basis and are, therefore, deceptive.  *Direct Mktg. Concepts, Inc.*, 624 F.3d at 8 ("[W]here the advertisers so lack a reasonable basis, their ads are deceptive as a matter of law.").

---

[128] Burant Decl. ¶ 22.
[129] *Id.* ¶ 71
[130] *Id.* ¶ 72.
[131] *Id.* ¶¶ 60-69.
[132] *Id.*
[133] *Id.*

Dr. Burant also reviewed the Reverse Diabetes Defendants' claims that their protocol is "scientifically-proven," backed by "decades of peer-reviewed scientific studies (including one that showed an 100% success rate)," and supported by a "[s]hocking study show[ing] <u>100% cure rate.</u>"[134]  Although Reverse Diabetes Defendants provide no citations to support these claims, Dr. Burant conducted a literature search for any such scientific research.  He found no scientific studies that provide competent and reliable scientific evidence establishing that the treatment described in the marketing for *The Doctor's Guide* is "scientifically proven," or based on "decades of peer-reviewed scientific studies" or supported by a 100% success rate.[135]  Because these express claims of scientific proof are untrue, they are deceptive, and, therefore, violate Section 5.  *Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d at 1190; *FTC v. COORGA Nutraceuticals Corp.*, 201 F. Supp. 3d 1300, 1309 (D. Wyo. 2016) (advertiser asserting that claim scientifically established "must possess evidence sufficient to satisfy the relevant community of the claim's truth").

> **2.      <u>The Reverse Diabetes Defendants' Claims Regarding NIR and Diet are Directly Refuted by Defendant Gerhauser.</u>**

Tellingly, the Reverse Diabetes Defendants' own lead pitchman, Defendant Gerhauser, also directly refutes the scheme's diabetes cure claims.  For example, the Reverse Diabetes Defendants tell consumers the CDC, the World Health Organization, and the highest levels of the U.S. government have it completely wrong that food and diet effect diabetes.[136]  Instead, the Reverse Diabetes Defendants claim, electronic devices, which emit NIR, secretly cause diabetes, and reversing diabetes "has nothing to do with changing your diet or exercising more."[137]  Similarly, their marketing emails tell consumers the purported 28-day treatment reverses diabetes without "changing your diet."[138]

---

[134] *Id*. ¶¶ 69, 71.
[135] Burant Report ¶ 63.
[136] Rottner Decl. at Att. 22 at FTC-PROD-00000552, FTC-PROD-00000555-556.
[137] *Id*. at FTC-PROD-0000550-554.
[138] Rottner Decl. at Att. 1 at FTC-PROD-00000040.

Yet, *The Doctor's Guide* itself specifically prescribes dietary changes, including fasting and a specific diet, as the "key" to reversing and curing diabetes.[139]  Moreover, in his newsletter, *Natural Health Response*, Gerhauser proclaims that type 2 diabetes can be "reversed… as in '**CURED,**'" by going on a diet, losing weight, and keeping the weight off.[140]  Moreover, the very charts the Reverse Diabetes Defendants rely on to show a purported connection between the rise in electronic devices and the rise in diabetes are bogus, as confirmed by *The Doctor's Guide*, because there is virtually no temporal overlap in the times of the respective charts, and even if there were, they at best show a correlation.[141]  The same correlation could be made between the number of major league strikes per season and the rise of diabetes.

### B.      The Congressional Checks Defendants' False and Misleading Claims Violate Section 5.

The Congressional/Republican Checks scheme also violates Section 5 of the FTC Act. The FTC asserts two counts of deception related to this scheme.  The FTC is likely to prevail on both.

### 1.       The Congressional Checks Defendants' False Express Claims

The Congressional Checks Defendants make several express representations. Specifically, in email marketing, banner ads, and other widespread Internet-based advertisements, they expressly claim, (1) consumers are entitled, by law or otherwise, to money from "Congressional" or "Republican" checks; (2) consumers can collect money from "Congressional" or "Republican" checks if they add their name to "the list of check payees;" (3) consumers can claim hundreds to thousands of dollars per month in "Congressional" or "Republican" checks with little or no risk; (4) anyone can collect hundreds to thousands of dollars in "Congressional" or "Republican" checks; and (5)  "Congressional" or "Republican" checks are affiliated or furnished by Congress or another government agency or program.

---

[139] *Id.* ¶ 22, Att. 21 at FTC-PROD-00000462, FTC-PROD-00000464.
[140] *Id* at Att. 24 at FTC-PROD-00000131.
[141]  *Id*. at Att. 21 at FTC-PROD-00000416.  Further, *The Doctor's Guide* itself concedes its "28-day cure" claim is false.  Notably, *The Doctor's Guide* suggests that Epsom Blue - magnesium - will take 24 weeks, not 28 days, to positively impact consumers' diabetes.

These representations are patently false, and therefore, deceptive.  *See Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d at 1190.  Indeed, because Congressional Checks or Republican Checks do not even exist, none of the Congressional Checks Defendants' representations could possibly be true.  Moreover, as confirmed by the Congressional Checks Defendants' own post-purchase statements to consumers, nothing in Section 199A of the 2017 Tax Cuts and Jobs Act — the sole basis proffered by the Congressional Checks Defendants as proof of these "guaranteed" checks — requires Congress or even private entities to send out checks to consumers.  Therefore, consumers are not entitled, by law or otherwise, to money from nonexistent checks.

Similarly, both the Congressional Checks Defendants and the Clerk for the U.S. House of Representatives confirm that there is no "list of check payees" for Congressional or Republican Checks, and the government is not sending, nor is it affiliated, with such checks.  And because few consumers can afford to invest tens to hundreds of thousands in the entities described in *Congress' Secret Giveaway*, it is not true that "anyone" can collect "Congressional" or "Republican" Checks worth hundreds to thousands of dollars.  The claim that consumers can easily receive hundreds to thousands of dollars in Congressional or Republican Checks with little or no risk is likewise false.  Indeed, to receive the promised amounts, consumers would have to risk tens to hundreds of thousands of dollars to obtain the claimed payouts (*see supra* Section II.E).

Because each of these representations bears on the entitlement, availability, ease, risk, and source of the hundreds to thousands of dollars the Congressional Checks Defendants promise, each go to central characteristics that would matter to a reasonable consumer, and are thus, material.  *See, e.g.*, *In re Telebrands Corp.*, 140 F.T.C. 278, 292 (2005), *aff'd*, 457 F.3d 354 (4th Cir. 2006) (claims are material when they relate to a product's "central characteristics"); *FTC v. Mallett*, 818 F. Supp. 2d 142, 149 (D.D.C. 2011) (defendants' representations of

government affiliation is "information that [would be] important to consumers" and thus material).[142]

The Congressional Checks Defendants' attempt to include an isolated disclaimer in some, but not all, of their marketing that "nothing is guaranteed" and that there is some risk involved in obtaining the advertised payouts does not insulate them from Section 5 liability. Such a disclaimer is insufficient to overcome the advertisements' overall net impression that consumers can obtain the promised Congressional/Republican Checks with little to no risk, and is ineffective to overcome the various promises of mandatory Congressional/Republican Checks, including the promises that the payouts are mandated by law, easy, contractually-required, and available to "everyday Americans" just by putting their name on "the list of check payees." *See FTC v. Vemma Nutrition Co*., No. 15-CV-01578, 2015 WL 11118111, at *6 (D. Ariz. Sept. 18, 2015) ("[R]epresentations may be misleading despite the use of a disclaimer such as 'results may vary' if the consumer may reasonably believe that a statement of unusual earning potential represents typical earnings."(citations omitted)); *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989) ("Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings.").

Similarly, the Congressional Checks Defendants' sporadic, unqualified references to "investment" when marketing Republican Checks are also insufficient to overcome the overall net impression that consumers can claim substantial payouts with little or no risk. *See FTC v. Febre*, No. 94 C 3625, 1996 WL 396117, at *2 (N.D. Ill. July 3, 1996), *aff'd*, 128 F.3d 530 (7th Cir. 1997) (where advertisements did not guarantee specific earnings but made express claims regarding the earnings potential, the earnings claims were still deceptive). Nor do their references to investing make their failure to mention the tens to hundreds of thousands of dollars

---

[142] These claims are also express, and thus, presumptively material. *Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d at 1190.

necessary to obtain the promised payouts any less deceptive.  *FTC v. John Beck Amazing Profits, LLC*, No. 2:09-CV-04719, 2009 WL 7844076, at *6 (C.D. Cal. Nov. 17, 2009) (based on statements and images indicating that customers had purchased homes for minimal amounts, infomercial created false overall net impression that a typical consumer could purchase high-valued properties for pennies on the dollar); *see also P. Lorillard Co. v. FTC*, 186 F.2d 52, 58 (4th Cir. 1950) (net impression is the important criterion not "fine spun distinctions and arguments that may be made in excuse").

### 2.    The Congressional Checks Defendants' Material Omission

Failure to disclose material facts that could affect consumers' decisions, such as the "conditions and costs associated with participating in a program and the true nature of the services or product offered" violates Section 5.  *Febre*, 1996 WL 396117, at *3; *see also FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 532 (S.D.N.Y. 2000) ("Failure to disclose the true nature of a service or product can constitute a material omission").

Here, the Congressional Checks Defendants promise consumers that they can collect hundreds to thousands of dollars but fail to disclose that in order to do so, consumers would have to risk tens to hundreds of thousands of dollars.  The Congressional Checks Defendants only tell consumers the true costs to receiving the advertised payouts after consumers purchase *Congress' Secret Giveaway.*  Courts have repeatedly found that cost is material to consumers' purchasing decisions, and that a failure to disclose the complete costs of a transaction or promise is violative of Section 5.  *FTC v. The Crescent Publ'g Grp., Inc.*, 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001) (information concerning prices or charges is material); *see also FTC v. Bluehippo Funding, LLC*, No. 08-CV-I1819, 2015 WL 6830161, at *3-4 (S.D.N.Y. Nov. 6, 2015) (failure to disclose limits on store credit material because the limits increased the cost of the transaction); *see also Five-Star Auto Club, Inc.*, 97 F. Supp. 2d at 532.  Thus, the FTC is likely to prevail on this claim as well.

C.      **Defendants Gerhauser and Scheidt Are Individually Liable.**

An individual is liable under the FTC Act for injunctive and monetary relief if the individual "(1) participated directly in the deceptive practices or had authority to control those practices, and (2) had or should have had knowledge of the deceptive practices." *FTC. v. Ross*, 743 F.3d 886, 892 (4th Cir. 2014); *FTC v. Innovative Mktg, Inc.*, 654 F. Supp. 2d 378, 385 (D. Md. 2009). Knowledge is established by proof of actual knowledge, reckless indifference to its deceptiveness, or "an awareness of a high probability of deceptiveness" and intentional avoidance learning the truth. *See In re Sanctuary Belize Litig.*, 2019 WL 1934673, at *2 (citing *Ross*, 743 F. 3d at 892). Notably, the extent of an individual's participation in business affairs or the violative conduct alone is sufficient to establish the requisite knowledge for liability. *See Innovative Mktg*, 654 F. Supp. 2d at 387.

Defendants Gerhauser and Scheidt directly participated in the marketing for the diabetes cure and government checks schemes, respectively. In fact, both directly communicated the representations at issue to consumers through the respective video infomercials and marketing emails. *See FTC v. Stefanchick*, 559 F.3d 924, 930-31 (9th Cir. 2009) (director liable for deceptive scheme where, among other things, his picture and signature appeared on much of the marketing materials).

Moreover, they each have the requisite knowledge for individual liability. Both authored the books attached to the schemes — the same publications that prove the falsity of several of the representations in the marketing. For example, while Gerhauser claims in the marketing that their 28-day diabetes protocol does not involve dietary changes, his book prescribes a low-carb diet and intermittent fasting. Gerhauser's parallel marketing of a "mainstream" diabetes "cure" — namely, a sensible diet — shows he knows the advertising for *The Doctor's Guide* is false. Similarly, in the Congressional Checks marketing, Scheidt knowingly communicates several claims to consumers that he directly contradicts in post-sale admissions to consumers — most notably, that consumers can obtain hundreds to thousands of dollars in Congressional Checks just by putting their name on the "list of check payees."

33

**II.        The Balance of Equities Weighs In Favor of a Preliminary Injunction.**

Having established the FTC's strong likelihood of success, the only remaining inquiry is whether, on balance, the equities weigh in favor of granting the injunction.  *Ameridebt, Inc.*, 373 F. Supp. 2d at 564.[143]  As a matter of law, when balancing public and private equities, the public interest is given greater weight, and "private injuries are not proper considerations for granting or withholding injunctive relief under Section 13(b)." *Id*. (quoting *Food Town Stores, Inc.*, 539 F.2d at 1346).

Here, the equities weigh in favor of injunctive relief.  Defendants' deceptive diabetes and government checks schemes are ongoing, thereby threatening further consumer harm, and they are particularly pernicious in light of their potential impact on consumer health, safety and financial stability.  The public's interest, which the Fourth Circuit weighs heavily — is served by stopping these deceptive practices.  *See Mallett*, 818 F. Supp. 2d at 149 ("The public interest in ensuring the enforcement of federal consumer protection laws is strong").  By contrast, there is no legitimate interest in being allowed to deceive consumers.  *See FTC v. World Wide Factors, Ltd.,* 882 F.2d 344, 347 (9th Cir. 1989) ("[T]here is no oppressive hardship to defendants in requiring them to comply with the FTC Act [and] refrain from [making] fraudulent representation[s]." (citation and internal quotation marks omitted)).  Although Defendants may suffer some pecuniary harm if prevented from making misleading or unsubstantiated statements about their books and products, that harm pales in comparison to the persistent public harm of allowing the Defendants to continue to deceptively market their products.

**III.        The Proposed Preliminary Injunction is Necessary to Protect Consumers.**

The FTC's proposed injunctive relief seeks only to prohibit each of the Defendants from making false or unsubstantiated claims related to diabetes, health-related products or programs, Congressional or Republican checks, and other goods and services.  Courts have issued similar

---

[143] The FTC is not required to show irreparable harm to obtain preliminary relief because it is presumed under Section 13(b).  *In re: Sanctuary Belize Litig*, 2019 WL 3714392, at *8; *FTC v. Consumer Defense, LLC*, 926 F.3d 1209, 1212-13 (9th Cir. 2019).

34

preliminary relief in past cases, including cases involving health, financial, and government affiliation claims.  *See e.g.*, *FTC v. Simple Health Plans, LLC*, 379 F. Supp. 3d 1346, 1365 (S.D. Fla. 2019) (preliminary injunction enjoining misrepresentation of material facts regarding any good or service);  *FTC v. Health Formulas*, *LLC*, No. 2:14-CV-01649, 2015 WL 2130504, at *26, (D. Nev. May 6, 2015) (preliminary injunction enjoining false or unsubstantiated claims, including weight-loss supplement claims); *Mallett*, 818 F. Supp. 2d at 150 (preliminary injunction enjoining claims of affiliation with the federal government to market debt-relief scheme).

Moreover, in addition to the diabetes cure and Congressional/Republican Checks schemes, Defendants promote other very similar health "cures" and checks "opportunities," with recycled consumer "testimonials" and using shared email distribution lists.  Injunctive relief is particularly necessary here in light of their practice of cross-promotion and transferring claims across business lines.[144]

### CONCLUSION

For the reasons stated above, the FTC respectfully requests that the Court enter the proposed preliminary injunction against the Defendants.

Dated:  October 24, 2019

/s/ Omolara Bewaji Joseney
OMOLARA BEWAJI JOSENEY, pro hac vice
ojoseney@ftc.gov
DILLON JOSEPH LAPPE, pro hac vice
dlappe@ftc.gov
GREGORY J. MADDEN, Bar No. 07023
gmadden@ftc.gov
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue NW, CC-9528
Washington DC 20580
(202) 326-2599, -2833, -2426
Fax: (202) 326-3197
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

---

[144] It is also important that the injunctive relief equally apply to the Defendants, in light of their pattern of cross-promoting each other's products.

35