## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION,** | * | |
| *Plaintiff*, | * | |
| v. | * | **Case No. 19-cv-3100-SAG** |
| **AGORA FINANCIAL, LLC,** *et al.*, | * | |
| *Defendants*. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................

BACKGROUND ................................................................................................................

I.      Defendants Are Publishing Companies and Authors....................................................

II.     Agora Financial Publishes *Congress' Secret* ................................................................

III.    NewMarket and Dr. Gerhauser Publish *The Doctor's Guide* .........................................

ARGUMENT ................................................................................................................

I.      The FTC Cannot Succeed on the Merits of Its Claims Because all of the Statements the FTC Challenges Are Noncommercial Speech, Which the FTC Cannot Regulate...............................................................................................

        A.   *Congress' Secret* and *The Doctor's Guide* Are Noncommercial Speech .................

        B.   The Challenged Statements in Defendants' Emails and Videos are Not Commercial Speech ................................................................................

II.     The FTC Cannot Succeed on the Merits of its Claims Because the Statements the FTC Challenges Are Not Misleading ...............................................................

        A.   The "Congressional Checks" and "Republican Checks" Promotions Are Not Misleading................................................................................................

        B.   The Promotional Video for *The Doctor's Guide* Is Not Misleading .........................

III.    The FTC Cannot Obtain an Injunction for the "Congressional Checks" Promotion Because Defendants Voluntarily Stopped The Promotion Well Before the FTC Sued .............................................................................................

IV.     The FTC's Proposed Injunction Is Prohibitively Overbroad ...........................................

        A.   The Proposed Injunction Is Overbroad Because It Seeks to Enjoin Conduct that the Commission Has Not Challenged .................................................

        B.   The Proposed Injunction Is Overbroad Because It Seeks to Enjoin Non-Party "Affiliates" Whose Conduct is Not At Issue .............................................

        C.   The Proposed Injunction Is Overbroad As to its Restrictions on and Substantiation Required For Claims About "Covered Products" and "Covered Programs." ................................................................................

        D.   The Notice and Distribution Provisions in the Proposed Injunction Are Overbroad .................................................................................................

V.      The Balance of the Equities Favors Denying The Relief Sought by the FTC.................

CONCLUSION...................................................................................................................

**INTRODUCTION**

In ancient Greek city-states, the *agora* was a central public space that served as the hub of the community's public discourse; it was a meeting place for exchanging and expressing political and commercial ideas no matter how unpopular or taboo those ideas were; and it was perhaps the bedrock of the democratic ideals that guide our society today. By exercising rights deeply imbedded in our democratic system and rooted in the First Amendment, defendants today operate a similar hub that promotes discourse, speaking, and writing about ideas that are not always embraced by the mainstream, while fulfilling the demand created by the public who seek to read about and learn from those ideas. The FTC, apparently believing that some of the defendants' ideas are too far outside of the mainstream for public consumption, seeks to restrain defendants' expression of those ideas. But the FTC's distaste for some of the defendants' views is not a valid basis for stifling defendants' voices, much less for granting the extraordinary remedy of a preliminary injunction.

First, the FTC cannot, as a matter of law, seek to restrain any of the speech it challenges because all of it is noncommercial and thus fully protected by the First Amendment. Second, the FTC failed to prove that anything about *Congress' Secret* or *The Doctor's Guide*, or the promotions for either, is deceptive or could otherwise support a claim for any FTC Act violation. Third, while the FTC provided communications dated over a year ago from consumers to attempt to show confusion over use of "Congressional Checks" in promoting *Congress' Secret*, the defendants voluntarily stopped using this promotion long before the FTC filed suit, thereby precluding the FTC from obtaining injunctive relief under section 13(b) of the FTC Act. Fourth, the FTC improperly seeks to restrain conduct, people and persons for which and whom the FTC has not even attempted to provide any proof of wrongdoing while simultaneously—and inappropriately—seeking relief to which it would not be entitled even if the FTC somehow could

and did prevail at trial. Finally, the balance of the equities weighs heavily and convincingly in favor of denying the FTC's motion. The Court should therefore deny the requested injunctive relief for any and all these reasons and allow defendants to vindicate their rights at a trial with a fully developed evidentiary record.

## **BACKGROUND**

### I.   **Defendants Are Publishing Companies and Authors.**

The entity defendants are among a family of independently operated companies that started forty years ago as a single entity, based in Baltimore, now known as Monument & Cathedral Holdings, Inc. ("M&C"), that has grown into a group of companies spanning the globe. (Norin Decl. ¶¶ 3, 7.) Over the past four decades, these companies have published and sold countless newsletters, books, and lectures on travel, leisure, health, financial, and lifestyle topics to millions of satisfied readers. (*Id*. at ¶ 8.) Each company, including the entity defendants, has sole and complete authority over its own operating decisions. (*Id*. at ¶¶ 4-6.)

The entity defendants owe their success to publishing innovative works that sometimes depart from popular views while sparking public debate. (Wiggin Decl. ¶¶ 12, 14-17; Hart Decl. ¶ 11.) Their readers value the opinions and information in these publications in large part because they often promote an exchange of ideas, often not presented in mainstream publications. (*Id*.) For example, when Dr. Atkins first began promoting his namesake low-carbohydrate diet in the 1980's, defendant NewMarket was one of the first companies to publish his ideas at a time when the mainstream medical community considered Atkins' claims fringe and unsupported. (*Id*. at ¶ 12.) Ultimately, however, the low-carbohydrate diet trend grew to dominate the sector. (*Id*.) Not surprisingly, then, the typical NewMarket customer has rejected the approach of mainstream medicine—often because they want to be less dependent on pharmaceuticals. (*Id*. at ¶ 11.)

2

Likewise, Agora Financial publishes financial and investment information and news containing contrarian and provocative views, thereby contributing to the "marketplace of ideas" in the investment community. (Wiggin Decl. ¶ 12.) Its publications include bestselling books and other critically acclaimed material, including *Financial Reckoning Day* (2003); *The Demise of the Dollar* (2005); *Empire of Debt* (2005); and *The Little Book of the Shrinking Dollar* (2012). (*Id.* at ¶ 6.) Agora Financial also produced a feature-length documentary. I.O.U.S.A., which was nominated for the 2008 Sundance Film Festival Grand Prize. (*Id.* at ¶ 7.) Agora Financial's writers and editors predicted many significant financial events of the past decades before the mainstream media (e.g., the bursting of the housing and credit bubbles, the collapse of Lehman Bros., and the rise of cryptocurrency). (*Id.* at ¶ 14.) Thus, Agora Financial, its analysts, and its writers have built a loyal customer base, many of whom proclaim they have reaped significant financial rewards by following trends and opinions published by Agora Financial's writers. (*Id.* at ¶ 13.)

The individual defendants, Richard Gerhauser, M.D., and Zachary Scheidt, a former investment manager, are authors for NewMarket and Agora Financial, respectively. (Gerhauser Decl. ¶ 11; Scheidt Decl. ¶ 9.) They have written hundreds of articles throughout their careers on their areas of expertise. (Gerhauser Decl. ¶ 12; Scheidt Decl. ¶¶ 7-9.) Their work typically provides alternative views to conventional thinking on health and financial products. (Hart Decl. ¶ 11; Wiggin Decl. ¶ 12.)

The defendants constantly seek out ways to deliver value to customers through newsletters and books on cutting-edge issues. These companies have been in business for years, and their continued success depends heavily on a loyal base of repeat customers. (Insley Decl. ¶ 7; Hart Decl. ¶ 13) They would derive no benefit from a bait-and-switch business model or false

or misleading advertising; to the contrary, defendants would have ceased to exist long ago if they relied upon "duping" consumers into purchasing their publications. (Insley Decl. ¶ 7; Hart Decl. ¶ 13.)

## II. Agora Financial Publishes *Congress' Secret*.

Agora Financial started publishing *Lifetime Income Report* ("LIR"), a publication that highlights established, fundamentally sound companies with sustainable yields, in February 2009. (Insley Decl. ¶ 12.) Zachary Scheidt is LIR's editor, and he tests every recommendation against his established investment philosophy. (Scheidt Decl. ¶ 13.)

In December 2017, the International Business Times published an article about the 2017 Tax Cuts and Jobs Act ("TCJA") titled *Paul Ryan and Top Republican Lawmakers Could Reap Personal Windfall from New Real Estate Tax Breaks* ("IBT Article"). (Scheidt Decl. ¶ 14; Albuquerque Decl. ¶ 6 and Ex. 1, IBT Article.) According to the article, certain Republican lawmakers stood to benefit to the tune of millions of dollars of partially-exempt tax income from passive real estate income due to the TCJA (between $520,000 and $3.2 million from income annually). (Albuquerque Ex. 1, IBT Article.) The article noted that, in addition to members of Congress, passive investors in publicly traded entities also could benefit substantially from the tax advantages provided by the TCJA. (*Id.*)

After reading the article, one of Agora Financial's copywriters researched the TCJA and how everyday investors could benefit from it. (Albuquerque Decl. ¶¶ 7-8.) Given the potential tax benefits to their readers from pass-through entities, Agora Financial and Scheidt discussed writing a book identifying entities whose shareholders could benefit from the TCJA. (*Id.* at ¶ 9, Scheidt Decl. ¶ 15.) Scheidt and his staff eventually identified 13 entities with high yield and growth potential and recommended them in a book that Agora Financial first published in March 2018, *Congress' Secret $1.17 Trillion Giveaway* ("*Congress' Secret*"). (*Id.* at ¶¶ 16-17.)

4

Agora Financial used the term "Congressional Checks" when promoting the book as a reference to the fact that many Congress members received higher dividend payments, or "checks," from certain of their personal investments due to the TCJA's reducing taxes on passive real estate income. (Scheidt Decl. ¶ 15, Albuquerque Decl. ¶¶ 6-9.) The recommendations in *Congress' Secret* were highly successful, and a hypothetical investment in each of the 13 investments as of March 26, 2018 (the date of first publication) returned positive gains for 11 of the 13 (5 returning over 60%, and 10 returning at least 20%) as of November 25, 2019. (Insley Decl. ¶ 16 and Ex. 1, Spreadsheet.)

Agora Financial began promoting *Congress' Secret* on March 24, 2018. (Insley Decl. ¶ 17.) Although existing LIR subscribers could access the book for free, new customers typically could not order a copy of *Congress' Secret* without either watching a video or viewing a transcript of the video describing the program. (*Id*.) The video (and transcript) explained that the program consisted of investment recommendations in pass-through entities and the tax benefits associated with them and required an investment of money to repeat the rewards. (*E.g*., ECF No. 2-29 at 31 ("[o]f course, like any other investment, nothing is guaranteed. All investing carries a level of risk")). Customers were charged a small fee ($4.95) for shipping and handling and agreed to a 30-day trial of LIR. (Insley Decl. ¶ 18.) If they did not cancel after 30 days, they would be enrolled in an annual subscription to LIR. (*Id*.) Customers who disliked LIR for any reason were granted a refund within 30 days (and many requests for refunds outside of this period were granted as well). (*Id*.)

In early October 2018, LIR's publisher became aware that the nonprofit group "The Congressional Award" had contacted Agora Financial to report that it had received inquiries regarding "Congressional Checks." (Insley Decl. ¶ 23.) On October 4, 2018, Agora Financial

voluntarily shut down the "Congressional Checks" promotion and instead promoted *Congress' Secret* through the "Republican Checks" promotion.[1] (Insley Decl. ¶ 23.) Conversely, LIR's publisher is not aware of any unusual customer confusion relating to the "Republican Checks" promotion.[2] (Insley Decl. ¶ 26.)

## III.     NewMarket and Dr. Gerhauser Publish *The Doctor's Guide*.

Dr. Gerhauser has served as the author and public face of NewMarket's paid subscription newsletter *Natural Health Response* ("NHR") since the spring of 2017.[3] (Hart Decl. ¶ 6; Gerhauser Decl. ¶ 10.) He is board-certified in preventative medicine and public health, serves as a clinical assistant professor at the University of Arizona, and has served as a member of the medical staff at multiple facilities, including the world-famous Canyon Ranch Health Center in Tucson, Arizona. (*Id.* at ¶¶ 4-6.) In treating patients, Dr. Gerhauser focuses on identifying and eliminating environmental stressors and using a natural, holistic approach, while avoiding prescription drugs as much as possible. (*Id.* at ¶ 7.)

Type 2 diabetes is one of the diseases most frequently and successfully treated or managed through the use of supplements and environmental changes that have been shown to naturally improve blood sugar levels and insulin sensitivity. (*Id.* at ¶ 8.) Accordingly, during Dr. Gerhauser's decades of practice he adopted a multi-faceted natural approach to treat his diabetic patients. (*Id.* at ¶ 8.) He developed this approach by staying abreast of research and publications while rejecting mainstream medicine's default use of pharmaceuticals and the notion that a

---

[1] Republican Checks first started running on May 31, 2018. (Insley Decl. ¶ 21.) "Republican" was inspired by the fact that the TCJA was enacted by republican members of Congress without a single democratic vote. (Albuquerque Decl. ¶ 12.)

[2] Agora Financial continues to make *Congress' Secret* available to existing, paying customers of LIR but does not actively promote the book or make it available for purchase. (Insley Decl. ¶ 22.)

[3] When Dr. Gerhauser first began writing *NHR*, Defendant Health Sense Publishing, LLC ("Health Sense"), was its publisher. (Hart Decl. ¶ 5.) *NHR* is now published by NewMarket. (Amos Decl. ¶¶ 4-5.)

6

treatment protocol should only be used when supported by randomized, double-blinded, placebo-controlled, human clinical trials—support that is impractical, if not impossible, to obtain for multi-faceted natural protocols. (*Id.* at ¶ 7-9.) Using this approach, Dr. Gerhauser successfully kept many of his patients off prescription drugs, and none of his diabetic patients' symptoms progressed to any of the most severe complications of type 2 diabetes—blindness, amputation, and kidney failure. (*Id.* at ¶ 8.)

In the fall of 2018, NewMarket and Dr. Gerhauser compiled *The Doctor's Guide*, an informational publication addressing the causes, and suggesting ways to reduce the risk and symptoms, of type 2 diabetes without using pharmaceuticals, expanding on many of the subjects Dr. Gerhauser had written about in past issues of NHR and based on a protocol he used with his own patients. (Hart Decl. ¶ 11; Gerhauser Decl. ¶ 12.) The book explains that Dr. Gerhauser's default recommendation in treating type 2 diabetes is not prescription drugs with their dangerous side effects, but rather an alternative, natural three-step "protocol" to reverse diabetes symptoms by: (1) limiting exposure to environmental toxins, (2) helping the body to make more insulin, and (3) teaching the body's cells to use insulin effectively. (ECF No. 2-25 at 37.) The book includes Dr. Gerhauser's opinions (a) that a disrupted circadian rhythm may cause or exacerbate type 2 diabetes by altering the pancreas's insulin production, and it recommends ways to improve the circadian rhythm, (b) that non-ionizing radiation emitted by everyday electronics may cause or exacerbate type 2 diabetes, and (c) that taking mulberry extract, magnesium, and chromium may naturally improve blood sugar levels and decrease carbohydrate absorption to help reverse the symptoms of diabetes in as little as 28 days. (*Id.* at 2-61.) The book includes ancillary recommendations such as taking maqui berry and clove extract while adopting a seasonal, organic diet with seafood to "boost" the effects of his primary recommendations. (*Id.* at

7

62-83.) Each chapter of the book describes the research on which Dr. Gerhauser bases his opinions and recommendations for each step. (*Id.*) And although Dr. Gerhauser identifies sources where readers can purchase the recommended products, no defendant has a financial interest in those products. (Hart Decl. ¶ 10; Gerhauser Decl. ¶ 13.)

To promote *The Doctor's Guide*, Dr. Gerhauser recorded a video that was made available on December 11, 2018, in which he described his "three-step protocol" and the studies on which it was based. (Amos Decl. ¶ 7; Gerhauser Decl. ¶ 13.) One such study involved a human trial in which 100% of subjects with type 2 diabetes taking a mulberry supplement for twenty-eight days experienced significantly reduced fasting blood glucose concentrations—to a level not considered diabetic—on a standardized diet "very similar to that of the diet consumed by the subjects in their day-to-day life." (*Id.* at ¶ 14 and Ex. 4, Mulberry Study.) This mulberry study formed the basis for the claim that the protocol described in The Doctor's Guide might allow readers to reverse the symptoms of diabetes in as little as 28 days without changing their diet or giving up foods they love. (Gerhauser Decl. ¶ 14.) Although NewMarket promoted the video event through "lift" announcements in direct marketing emails, customers interested in purchasing *The Doctor's Guide* could only purchase *The Doctor's Guide* after watching the entire video (or reading the entire transcript of the video, which was also made available). (Amos Decl. ¶ 8.) In selling The Doctor's Guide, NewMarket offered a 100% unconditional money-back guarantee, providing a full refund to any customers who request one. (*Id.* at ¶ 9.)

## LEGAL STANDARD

The FTC sues for violations of Section 5(a) of FTC Act, which prohibits "unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45.  "To succeed under section 5(a), the FTC must prove (1) that there was a representation; (2) that the representation was likely to mislead consumers; and (3) that the

8

misleading representation was material." *FTC v. Ross*, 897 F. Supp. 2d 369, 381 (D. Md. 2012) (quoting *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003)), *aff'd*, 743 F.3d 886 (4th Cir. 2014). To obtain preliminary injunctive relief under Section 13(b) of the FTC Act, 15 U.S.C. § 53(a), for a violation of Section 5, the FTC bears the burden of showing a likelihood of success on the merits of its claims and that, on balance, the equities weigh in favor of granting the injunction. *FTC v. Infinity Grp. Servs.*, No. 09-cv-977, 2009 WL 10670551, at *3 (C.D. Cal. Oct. 1, 2009). Section 13(b) only empowers the FTC to address "ongoing or impending illegal conduct." *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 155-56 (3d Cir. 2019) ("Section 13(b) requires that the FTC have reason to believe a wrongdoer "is violating" or "is about to violate" the law.").

A preliminary injunction is an "extraordinary and drastic remedy," which is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 250 (4th Cir. 2014) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)); *FTC v. Sterling Precious Metals*, 894 F. Supp. 2d 1378, 1382-83 (S.D. Fla. 2012). Indeed, recognizing the importance of free speech in fostering public debate, courts are hesitant to issue preliminary injunctions that might chill speech protected by the First Amendment. *Bynog v. SL Green Realty Corp.*, No. 05-cv-305, 2005 WL 3497821, at *2 (S.D.N.Y. Dec. 22, 2005) ("It is well-established that in the context of speech, a preliminary injunction that imposes a prior restraint 'bear[s] a heavy presumption against its constitutional validity.'" (citation omitted)); *see also Wolfe Fin. Inc. v. Rodgers*, No. 17-cv-896, 2018 WL 1870464, at *17-18 (M.D.N.C. Apr. 17, 2018) (denying a proposed injunction as an unconstitutionally overbroad prior restraint on speech).

9

Finally, like any other type of injunctive relief, a preliminary injunction under Section 13(b) "must be narrowly tailored . . . to remedy the specific harm shown by the plaintiff[] rather than 'to enjoin all possible breaches of the law.'" *FTC v. John Beck Amazing Profits*, No. 2:09-cv-4719, 2009 WL 7844076, at *3-4 (C.D. Cal. Nov. 17, 2009) (citation omitted); *Hayes v. N. State Law Enforcement Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993) (vacating injunction as overbroad). Thus, "[c]rafting a preliminary injunction is an exercise in discretion and judgment," and the Court "'need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of a particular case.'" *Trump v. Int'l Refugee Assistance Project*, 137 U.S. 2080, 2087 (2017) (quoting 11A C. Wright & A. Miller, Federal Practice & Procedure § 2947, at 115).

## ARGUMENT

There is not a single ground for any of the preliminary relief that the FTC seeks. First, the speech it seeks to regulate is noncommercial speech that is fully protected by the First Amendment and beyond the FTC's reach. Second, the FTC failed to show a likelihood of success on the merits of its claims, including because the materials it challenges are not deceptive. Third, as to Congressional Checks, the FTC cannot show that defendants are currently violating, or about to violate, the law. Fourth, the FTC improperly seeks to restrain conduct, people, and entities for which and whom the FTC has not even attempted to provide any proof of wrongdoing while inappropriately seeking relief to which it would not be entitled even if the FTC somehow could and did prevail at trial. Finally, the balance of the equities weighs heavily and convincingly in favor of denying the FTC's motion. The Court should therefore deny the requested injunctive relief or, at a minimum, narrowly tailor it to the specific conduct over which the FTC complains.

10

I. **The FTC Cannot Succeed on the Merits of Its Claims Because all of the Statements the FTC Challenges Are Noncommercial Speech, Which the FTC Cannot Regulate.**

The FTC Act cannot not, as a matter of law, regulate non-commercial speech. *In re R.J. Reynolds Tobacco Co.*, 111 F.T.C. 539, 541, 1988 WL 490114 (1988) ("unless [speech] can be classified as commercial speech, it is not subject to the [FTC's] jurisdiction."). Thus, the FTC rarely pursues publishers advertising books, instead focusing on advertisements for products that are indisputably commercial. Yet the relief sought in this case does exactly what the FTC itself stated in *R.J. Reynolds* it cannot do: regulate the fully protected content of defendants' publications.

The Supreme Court has defined commercial speech as "expression related ***solely*** to the economic interests of the speaker and its audience," and as that which "does '***no more than*** propose a commercial transaction.'" *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561 (1980) (emphasis added); *Va. State Bd. of Pharmacy v. Va. Citizens of Consumer Council*, 425 U.S. 748, 762 (1976) (emphasis added) (citation omitted). The "commercial speech doctrine" distinguishes between fully-protected noncommercial speech and lesser-protected commercial speech and "rests heavily on 'the common sense distinction between speech proposing a commercial transaction . . . and other varieties of speech.'" *Zauderer v. Office of Disciplinary Counsel of Sup. Ct. of Ohio*, 471 U.S. 626, 637 (1985) (citation omitted).

Constitutional protection for noncommercial speech does not turn on "the truth, popularity, or social utility of the ideas and beliefs which are offered"; "erroneous statement is inevitable in free debate, and [] it must be protected if the freedoms of expression are to have the breathing space they need to survive." *New York Times Co. v. Sullivan*, 376 U.S. 254, 271 (1964) (citation omitted); *see also U.S. v. Alvarez*, 567 U.S. 709, 718 (2012) (rejecting government

11

attempt to regulate speech merely because it is false); *Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 964-65 (9th Cir. 2012) ("The First Amendment does not make protection contingent on the perceived value of certain speech."); *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002) (affirming order enjoining federal government policy "condemn[ing] expression of a particular viewpoint, i.e., that medical marijuana would likely help a specific patient," noting that "condemnation of particular views is especially troubling in the First Amendment context"). In the case of scientific and medical debate in particular, courts are typically loath to play "referee." *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 496 (2d Cir. 2013) (noting in a false advertising case under the Lanham Act that courts are "ill equipped" to referee controversies in novel areas of research where "propositions of empirical 'fact' advanced in the literature may be highly controversial and subject to rigorous debate by qualified experts."); *Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315, 326 (S.D.N.Y. 2006) (finding statements about the Atkins Diet in a book were not actionable under the First Amendment, noting that "[c]ourts cannot inquire into the validity of scientific works, for 'any unnecessary intervention by the courts in the complex debate and interplay among scientists that comprises modern science can only distort and confuse.'"). Thus, whether theories propounded in *The Doctor's Guide* "may lack scientific foundation is not for th[e] Court to decide." *See Oxycal Laboratories, Inc. v. Jeffers*, 909 F. Supp. 719, 726 (S.D. Ca. 1995) ("[U]nless the speech is determined to be commercial speech, the Lanham Act does not apply, and the truth or falsity of the statements is not at issue.")

Here, the statements the FTC challenges, the promotion of and the editorial content in *The Doctor's Guide* and *Congress' Secret*, are not within its purview because they are noncommercial speech. And if there is any doubt about whether the statements at issue are

12

commercial, such doubt should be resolved at trial—not by way of a preliminary injunction on an incomplete evidentiary record.

### A.     *Congress' Secret* and *The Doctor's Guide* Are Noncommercial Speech.

To determine whether speech is commercial, courts consider three factors set forth in *Bolger v. Youngs Drug Products Corp.*: (1) whether the communication is an advertisement, (2) whether the communication refers to a specific product or service, and (3) whether the speaker has an economic motivation for the speech. 463 U.S. 60 (1983). No one factor is dispositive; rather, if all three factors are present, the speech is likely to be commercial. *Id*. at 67.

*Congress' Secret* and *The Doctor's Guide* are not commercial speech under *Bolger*. First, *Congress' Secret* provides opinions about investment opportunities while *The Doctor's Guide* sets forth Dr. Gerhauser's medical opinions about diabetes. Neither are advertisements. Second, although they discuss things consumers can purchase (supplements and interests in entities), defendants have no economic interest in the referenced products and entities.[4] Third, while defendants are economically motivated to sell their publications, that motivation does not render them commercial speech. *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 385 (1973) ("If a newspaper's profit motive were determinative, all aspects of its operations—from the selection of news stories to the choice of editorial position—would be subject to regulation if it could be established that they were conducted with a view toward increased sales. Such a basis for regulation clearly would be incompatible with the First Amendment."); *see also Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n.*, 149 F.3d 679, 685 (7th Cir.1998) ("A speaker's publication does not lose its status as protected

---

[4] In fact, Agora Financial prohibits its editors, including Scheidt, from trading the securities they write about. (Wiggin Decl. ¶16; Scheidt Decl. ¶ 11.) And while there are passing references in *Congress' Secret* to the LIR newsletter, those references are irrelevant, as the FTC does not take issue with statements about LIR in either the publication or the promotional materials.

speech simply because the speaker advertises the publication . . . If the result were otherwise, then even an editorial in The New York Times would constitute commercial speech because the newspaper seeks subscribers through advertisements." (citation omitted)).

Courts consistently find publications like *Congress' Secret* and *The Doctor's Guide* are not commercial speech and reject attempts to regulate allegedly false or misleading claims in those publications. *Oxycal*, 909 F. Supp. at 723-24 (book advancing "theories on the causes of cancer and the ways to eliminate cancer"); *Ginsburg v. Agora, Inc.,* 915 F. Supp. 733, 740 (D. Md.1995) ("investment newsletters"); *Lane v. Random House, Inc.*, 985 F. Supp. 141 (D.D.C. 1995) (book analyzing "the arguments raised by leading conspiracy critics" concerning the presidential assassination); *National Life Ins. Co. v. Phillips Publ'g, Inc.,* 793 F. Supp. 627, 645 (D. Md. 1992) (investment newsletter); *SEC v. Hirsch Org., Inc.,* 1982 WL 1343 (S.D.N.Y. 1982) (financial newsletter). Thus, no matter the extent to which the FTC may disagree with the views expressed therein, it may not regulate *Congress' Secret* or *The Doctor's Guide*.

## B.   The Challenged Statements in Defendants' Emails and Videos are Not Commercial Speech.

Seemingly acknowledging that it cannot regulate the speech in *Congress' Secret* and *The Doctor's Guide*, the FTC's Complaint and motions papers purportedly limit its challenge and proposed restrictions to statements in defendants' promotional materials.[5] However, the statements challenged in defendants' promotional materials also receive full, noncommercial, First Amendment protection because those statements are "inextricably intertwined" with the

---

[5] In reality, of course, even though the injunctive relief the FTC seeks is framed as restricting only claims made "in connection with the labeling, advertising, promotion, offering for sale, sale, or distribution" of various items, when those items are publications, the relief effectively requires defendants to conform their publications to the restrictions, otherwise they cannot accurately describe their publications to customers in marketing them. *See, e.g., Charles v. City of Los Angeles,* 697 F.3d 1146, 1155 (9th Cir. 2012) ("[i]f advertisements for expressive works were not entitled to the same immunity from tort as the underlying work, publishers would be unable to truthfully advertise certain protected works.").

noncommercial speech in the publications. *Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 958 (9th Cir. 2012). This is because speech that "in the abstract is indeed merely 'commercial'" does not "*retain*[] its commercial character when it is inextricably intertwined with otherwise fully protected speech." *Riley v. Nat'l Fed'n of Blind,* 487 U.S. 781, 796 (1988) (emphasis added).

In *Board of Trustees of SUNY v. Fox*, the Supreme Court elaborated on what it means for commercial and noncommercial speech to be inextricably intertwined. 492 U.S. 469 (1989). *Fox* involved a regulation that prohibited the operation of commercial enterprises on university grounds, which had been invoked to prohibit dormitory Tupperware parties for housewares at which the party hosts discussed home economics. *Id.* at 472. In holding that that the commercial and noncommercial speech at issue were not "inextricably intertwined," the Court observed that it is possible to sell housewares without teaching home economics, and vice versa. *Id.* at 474. By contrast it is impossible to sell a publication without describing its content. Thus, courts have held that when statements in advertising are "adjunct" or "incidental" to a protected publication, even "advertisements that accurately reprint[] false claims contained in the advertised works" are protected "to the same degree as the underlying works." *Charles v. City of Los Angeles*, 697 F.3d 1146, 1154 (9th Cir. 2012).

In the context of books, the US District Court for the District of Columbia has held that, "it is essential to identify and protect advertising which summarizes an argument or opinion contained in the book." *Lane*, 985 F. Supp. at 152. Thus, in that case, the court affirmed summary judgment in defendant's favor where the challenged advertising for a book repeated statements in the book, finding that the advertising "cannot be divorced" from the book. *Id. Lane* is not alone. *Stutzman v. Armstrong*, No. 2:13-cv-0116, 2013 WL 4853333, *18-19 (E.D. Cal.

Sept. 10, 2013) (finding advertising for a book about Lance Armstrong's life was afforded First Amendment protection because the promotional statements were "inextricably bound to the non-commercial contents of the books"); *William O'Neil & Co. v. Validea.com Inc.*, 202 F. Supp. 2d 1113, 1119 (C.D. Cal. 2002) (advertising for book analyzing investment strategies is "entitled to First Amendment protection to the same extent as the underlying publication" "to the extent the advertising is merely an adjunct of the protected publication and promotes only the protected publication.").

The challenged statements[6] in defendants' promotional materials for *The Doctor's Guide* are "inextricably intertwined" with the publication itself. For instance, with respect to non-ionizing radiation and the first step of Dr. Gerhauser's protocol, an entire module of the book is dedicated to Dr. Gerhauser's opinion that type 2 diabetes is not "always" caused by diet and exercise, and that increased exposure to "non-ionizing radiation" is also a cause of diabetes—the very concept that the FTC challenges. (ECF No. 2-25 at 23-35.) The second and third steps of Dr. Gerhauser's protocol—a recommended trio of supplements to jumpstart insulin production and increase insulin sensitivity—are found in modules 6 through 8. (*Id.* at 37-61). Dr. Gerhauser also explains that while his protocol does not require "starvation" or "grueling" diets, he proposes eating a "seasonal, low-carb, organic diet with plenty of seafood," to ensure that readers are getting "vital nutrients," while still being able to eat many of the "forbidden foods" other doctors say to avoid. (*Id.* at 74-75.)

Likewise, the challenged statements in the "Congressional Checks" and "Republican Checks" promotions are "inextricably intertwined" with *Congress' Secret*. The challenged

---

[6] The FTC's characterization of the challenged statements is not a fair representation of the "net impression" of the promotional video. Section II.C *infra*, sets forth a more accurate portrayal of the net impression of the video as to each of the topics at issue.

statements include general use of the metaphor "congressional checks" and "republican checks" and that "anyone" can collect hundreds to thousands of dollars using the strategy in *Congress' Secret*.[7] But the "congressional checks" metaphor is used throughout *Congress' Secret*—e.g., Chapter 2: "How to make sure you get the biggest, best Congressional Checks"; conclusion: "Begin collecting your Congressional Checks." (ECF No. 2-53, at 8.) The introduction informs readers the "the only way to collect a portion of these $1.17 trillion 'Congressional Checks' for yourself is to know the strategy." (*Id.* at 11.) The book repeatedly references members of Congress who "collect" checks from similar investments. (*Id.* at 13). Chapter 10 states that "Congressional Checks" let investors "cash in on the rules politicians added to the law to enrich themselves." (*Id.* at 64.) Thus, just as Scheidt's use of the descriptive metaphor "congressional checks" to characterize what he viewed as congress's self-serving behavior is protected under the First Amendment, so is the advertisement which promotes that protected speech.

At base, the FTC's challenge "is over the fact that the statements were made, not over where they happen to appear." *Nat'l Life Ins. Co.*, 793 F. Supp. at 644. This "does not transform the character of their content into commercial speech," and the FTC cannot bypass the First Amendment protections simply by attempting to separate "advertising" for a publication from the publication itself. *Id.* Because the statements the FTC challenges are inextricably intertwined with the noncommercial speech in defendants' publications, the FTC cannot show that it is likely to succeed on the merits of its claims respecting those statements.

---

[7] The FTC also challenges certain omissions in the promotional materials for *Congress' Secret*, including related to risk and government affiliation. Those are addressed below.

**II.     The FTC Cannot Succeed on the Merits of its Claims Because the Statements the FTC Challenges Are Not Misleading.**

Even if the FTC could regulate the speech it seeks to suppress, the FTC failed to meet its burden of proving a likelihood of success on the merits of its claims.  A practice is deceptive in violation of § 5(a) if: (1) "there is a representation, omission, or practice"; (2) that "is likely to mislead consumers acting reasonably under the circumstances"; and (3) "the representation, omission, or practice is material." *FTC v. DIRECTV, Inc.*, No. 15-cv-01129, 2018 WL 3911196, at *5 (N.D. Cal. Aug. 16, 2018). First, when analyzing the representations in an advertisement, courts evaluate the "net impression" created by the challenged materials as a whole. *DIRECTV*, 2018 WL 3911196, at *5. "[T]he tendency of the advertising to deceive must be judged by viewing it as a whole, without emphasizing isolated words or phrases apart from their context." *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976) (citations omitted); *cf. Johns v. Bayer Corp.*, No. 09-cv-1935, 2013 WL 1498965, at *22 (S.D. Cal. Apr. 10, 2013) (in a private false advertising case, the court analyzes "the 'overall message conveyed' and not parsed out segments of that message, which have been selected by a party based on a desire to substantiate a particular argument.").

Second, the FTC must prove that the net impression was false, misleading, or unsubstantiated. *DIRECTV*, 2018 WL 3911196, *5 ("the FTC failed to establish that there was any misleading "net impression") (emphasis added).

**A.     The "Congressional Checks" and "Republican Checks" Promotions Are Not Misleading.**

The FTC failed to show that the respective "net impressions" of the "Congressional Checks" and "Republican Checks" promotions are misleading.   The FTC casts the "Congressional Checks" and "Republican Checks" promotions as promising that consumers can collect "legally guaranteed" monthly checks "from the government," "with little or no risk." In

18

the Congressional Checks promotion,[8] however, Mr. Scheidt explains that "Congressional Checks" is a metaphor for an investment opportunity that stems from a tax bill that congressmen passed and are benefitting from; he expressly states that it is not a government program, but rather an investment strategy related to a tax provision that requires certain private entities to pay out money to their investors. (ECF No. 2-29 at 7 ("*I call this opportunity 'Congressional Checks'…because*…a handful of congressmen  have already been collecting this easy cash.")[9]; at 8 ("some savvy *investors* are already cashing in"); at 12 ("[T]his has *nothing to do with Social Security or any government program*."); at 23 ("the *entities* impacted by Section 199A "must distribute" most of their money"); at 29 ("Section 199A benefits a very specific and select group of *private entities*."); at 31 ("Of course, like any other *investment*, nothing is guaranteed. All investing carries a level of *risk*. But the good news is, so far, anyone who's *become a partner of these entities* has received a check."); at 32 ("Right now, there are only 416 of those fiscally transparent entities in the U.S…. I've already identified the ones that could pay the biggest Congressional Checks.") (emphases added)).

The Republican Checks promotion is even more transparent. Mr. Scheidt explains that "Republican Checks" is a metaphor for an investment opportunity that stems from a tax bill that the Republican majority Congress passed and that multiple politicians are benefitting from; he expressly states that it is not a government program, but rather an investment strategy related to a

---

[8] The FTC suggests that the difference between the Congressional and Republican Checks promotions is irrelevant. (FTC Mem. at 14-15.) While defendants dispute that either promotion was misleading, they discontinued the Congressional Checks video in early October 2018 used only the Republican Checks promotional video thereafter. Notably, the FTC has not attached any evidence of consumer confusion over the Republican Checks promotion. Defendants will address the allegedly misleading nature of each promotion separately.

[9] As the IBT Article explained in December 2017, numerous congressmen were already collecting the soon-to-be tax-advantaged passive income, including Representative Issa who, according to the article, "is the owner of 11 different real estate partnerships that, in total, are worth between $21.5 and $103 million, and generate between $410,000 and $5 million in annual income." (Albuquerque Ex. 1.)

tax provision that provides tax benefits for payouts provided by certain private entities to their investors; he makes clear that there is risk involved and that consumers' payout depends on how much they invest. (ECF No. 2-59 at 3 ("The Republican Congress has passed a groundbreaking new law… a few everyday folks like you are already collecting extra ***investment income*** thanks to this new tax provision…In the form of what I call "Republican Checks."); at 4 ("***Depending on how much you invest***, you could see republican checks ranging from just a few hundred dollars to thousands of dollars."); at 5 (testimonials are from investors who "took a position larger than the typical investor," allowing them to collect "***above-average*** Republican Checks"; "this investment has ***nothing to do with Social Security or any government program***"); at 17 ("many [politicians] are collecting millions because of their ***larger than average initial stake***"); at 24 ("anyone can become a partner ***shareholder of those entities***") (emphases added)). The vast majority of that information is in the first five pages.

The FTC parses language concerning "Congressional Checks" and "Republican Checks" out of the respective promotions. When viewed in context, however, the net impression of the promotions is not misleading to a reasonable person[10] and does not imply that, as the FTC claims, consumers can collect "legally guaranteed" monthly checks "from the government,"

---

[10] The FTC attaches letters from eight individuals from July to November 1, 2018, who wrote to the Clerk of Congress requesting "checks." Those letters are not compelling evidence of how consumers would reasonably interpret the Congressional Checks promotion, however, as there is no evidence regarding which promotional materials they viewed or, critically, whether they read or listened to the Congressional Checks promotion in its entirety. Notably, moreover, only one of the consumers (William Steinberg, Jr.) even attempted to purchase *Congress' Secret*, but he did not pay for the book or enroll in *LIR* because the credit card charge was declined. (*Insley* Decl. ¶ 25.) There is also no evidence that Mr. Steinberg reviewed the entire promotion before he wrote to Congress.

20

"with little or no risk."[11] To the contrary, a reasonable potential consumer would have understood that the book explains how to earn income from an ***investment***[12] strategy.

### B.   The Promotional Video for *The Doctor's Guide* Is Not Misleading.

Similarly, the FTC failed to show that the "net impression" of the promotional video for *The Doctor's Guide* is misleading. First, the FTC's characterization of the promotional video for *The Doctor's Guide* is not a fair representation of the net impression of the video. (*See* FTC Mem., ECF No. 2-1 at 26). For example, Dr. Gerhauser does not anywhere promise that his protocol will "cure" diabetes; the only place the word "cure" appears is in a statement at the beginning of the transcript that a "shocking study shows 100% cure rate." (ECF No. 2-26 at 2.) That statement is a colloquial description of the results of a study in which the fasting blood glucose levels of 100% of the subjects ***decreased to a non-diabetic level***—what the public would generally refer to as a "cure"—following 28-days of mulberry therapy on a diet meant to imitate what the subjects consumed in their day-to-day lives. (Gerhauser Decl. ¶ 15.) Aside from the one reference to that study as showing a "cure," Dr. Gerhauser otherwise refers to "reversing" diabetes and its symptoms throughout the video. As for non-ionizing radiation, Dr. Gerhauser states that ***in his medical opinion***, there is a connection between the type of non-ionizing radiation emitted by electronic devices and the body's ability to regulate insulin, such that increased use of electronic devices is contributing to the incidence and severity of type 2 diabetes. (ECF No. 2-26 at 6-8). As for diet, Dr. Gerhauser states that his protocol does not

---

[11] And in any event, Scheidt's opinion on the level of "risk" associated with a given investment is protected by the First Amendment.

[12] The word "investment," of course, indisputably connotes an outlay of money to obtain an asset used to generate potential future wealth. "Investment." The Merriam-Webster.com Dictionary, Merriam-Webster Inc., https://www.merriam-webster.com/dictionary/investment?utm_campaign=sd&utm_medium=serp&utm_source=jsonld. Accessed 13 December 2019 ("the outlay of money usually for income or profit: capital outlay"); Black's Law Dictionary 11th ed., 2019 ("An expenditure to acquire property or assets to produce revenue; a capital outlay"). No reasonable reader would conclude otherwise.

require consumers to give up the foods they love. (*Id.* at 3, 13.) In fact, Dr. Gerhauser emphasizes that participants in the chromium studies ate "all the CARBS they wanted," which means that readers "can finally enjoy" birthday cake, pizza, and baked potatoes without worrying about their blood sugar, while counseling that he recommends those treats as "the exception, instead of the rule." (*Id.* at 59.) And as for claims about the "scientific proof" behind his recommendations, Dr. Gerhauser discusses exactly what that "proof" entails as to each recommendation, providing consumers who purchase *The Doctor's Guide* with a full understanding of the types of studies on which his recommendations are based in advance of their purchase. (*Id.* at 6, 7, 9, 11, 12); *See POM Wonderful, LLC v. FTC*, 777 F.3d 478, 492 (D.C. Cir. 2015) (distinguishing between references to tests or studies that merely describe specific research in sufficient detail to allow a consumer to judge its validity and those that suggest they are convincing evidence of efficacy). The FTC did not even attach those studies to its briefing, let alone challenge the accuracy of Dr. Gerhauser's descriptions (it challenges only his reliance on them). In the video, Dr. Gerhauser also makes clear that *The Doctor's Guide* aims to provide an alternative approach to that of the mainstream medical community, noting that "*rather than focusing on natural treatments... [t]heir mantra is, 'prescribe, prescribe, prescribe.'*" (ECF 2-26, at 10.) The video does not portray the net impression the FTC claims, let alone one that misleads reasonable consumers as to what they will receive when they order *The Doctor's Guide* or one that requires preliminary injunctive relief.

As for the allegedly misleading nature of the claims in the promotional video, the FTC asserts that defendants' lack a "reasonable basis" for the claims, defined as "competent and reliable scientific evidence" ("CRSE"). (FTC Mem. at 26-28.) In support of its position, the FTC

submits a declaration from Charles Burant, M.D., Ph.D.[13] According to Dr. Burant, to be supported by CRSE, the claims in the promotional video for *The Doctor's Guide* must be supported by "one independent, well-designed, well-conducted, randomized, double-blind, placebo-controlled, human clinical trial…" ("RCT"). (ECF No. 2-124 ¶¶ 34-46.) However, as both Mark Hyman, M.D., and Dr. Gerhauser explain, Dr. Burant's proposed RCT standard is neither appropriate nor feasible given the minimal level of risk associated with Dr. Gerhauser's recommendations and the realities of the practice of medicine.[14] (Hyman Decl. ¶¶ 9-10; Gerhauser Decl. ¶¶ 9.)

Moreover, since the promotional video is for a publication, not a product, it is impossible to separate Dr. Burant's criticism of the promotional video from *The Doctor's Guide*, which is fully protected from Dr. Burant's criticism under the First Amendment. To the extent that the video accurately describes the publication, Dr. Burant's criticisms are actually of *The Doctor's Guide* itself, not just the promotional materials for it. The FTC has identified no authority permitting it to impose the CRSE standard on speech promoting a book of medical opinions where the promotional speech is inextricably intertwined with, and accurately describes, the medical opinions in the book. The FTC cannot accomplish indirectly, by regulating advertisements, what it cannot do directly: control the fully protected noncommercial speech in

---

[13] Among other of his other criticisms, Dr. Burant offers an opinion on how "diabetes experts" would interpret the word "cure." (ECF 2-124 at ¶ 30.) Dr. Burant is not, however, an expert in the area of consumer confusion or marketing, and he is not qualified to offer an opinion on how the word "cure" would be interpreted by a reasonable consumer, the relevant standard.

[14] Moreover, even if the FTC could require defendants to substantiate the claims in the promotional video for *The Doctor's Guide*, whether they are adequately supported turns on a battle of the experts in the relevant field, and this Court should—as many others have—decline to resolve that battle at the preliminary injunction stage. *Graceway Pharm., LLC v. Perrigo Co.*, 722 F. Supp. 2d 566, 576 n.9 (D.N.J. 2010) (citations omitted) (declining to credit one expert over another in the preliminary stages when the issue "will be resolved by a battle of the experts"); *Kroger Co. v. Lidl US, LLC*, No. 3:17-cv-480, 2017 WL 3262253, at *4 (E.D. Va. July 31, 2017) (citing a battle of the experts as to the strength of a trademark as one reason the court could not conclude that the plaintiff was not likely to succeed on the merits).

102753\000004\4820-2566-0846.v3

the *The Doctor's Guide* (let alone, as addressed below, countless other publications). The FTC cannot regulate claims in promotional materials that accurately describe a publication—by requiring CRSE or any other type of support. Dr. Burant's declaration thus has no bearing on whether the promotional video for *The Doctor's Guide* is misleading.

### III.   The FTC Cannot Obtain an Injunction for the "Congressional Checks" Promotion Because Defendants Voluntarily Stopped The Promotion Well Before the FTC Sued.

The FTC's ability to obtain injunctive relief under Section 13(b) is limited to situations in which it has reason to believe that a defendant "is violating, or is about to violate," the FTC Act. 15 U.S.C. § 53(b)(1). Thus, in *FTC v. Shire Viropharma, Inc.*, the Third Circuit found that the FTC did not have jurisdiction to proceed in court under Section 13(b) targeting conduct that ended before the FTC filed suit, holding that Section 13(b) only "empowers the FTC to speedily address ongoing or impending illegal conduct." 917 F.3d at 155. It explained: "Section 13(b) requires that the FTC have reason to believe a wrongdoer 'is violating' or 'is about to violate' the law. *Id.* § 53(b)(1). We conclude that this language is unambiguous; it prohibits existing or impending conduct." *Id.* at 156. The Third Circuit is not alone, as Justice O'Scannlain stated in a concurring opinion that "[Section] 13(b) anticipates that a court may award relief to prevent an *ongoing* or *imminent* harm." *FTC v. AMG Capital Management, LLC*, 910 F.3d 417, 430 (9th Cir. 2018) (emphasis in original). And in *FTC v. Hornbeam Special Situations, LLC*, the court found that the text of Section 13(b) is unambiguous and requires pleading specific facts establishing ongoing violations or that the defendant is "about to" violate the law. No. 1:17-cv-3094, 2018 WL 6254580, at *2 (N.D. Ga. Oct. 15, 2018). A rote, formulaic statement that the FTC has "reason to believe" that a defendant was "about to" violate the law is insufficient; rather, the "FTC must make factual averments regarding its reason to believe." *Id.* at *4. Without

pleading specific facts showing current violations of the law or those "about to occur," the FTC cannot proceed under Section 13(b). *Id.* at \*3-4.

Here, with respect to the Congressional Checks promotion, the FTC seeks an injunction based on conduct that ceased long before it filed its Complaint, as even the FTC's investigator acknowledged. (*E.g.*, Rottner Decl. ¶ 34, ECF No. 2-4 at 14 ("During my investigation, I discovered that the name of the program for Scheidt's book had changed from "Congressional Checks" to "Republican Checks."").) The FTC thus failed to show that defendants are violating or are about to violate the FTC Act by their use of the Congressional Checks promotion. Starting in March 2018, Agora Financial sent emails and other materials referencing "Congressional Checks." (Insley Decl. ¶ 17.) However, in early October 2018, after receiving communications from the nonprofit entity "The Congressional Award," Agora Financial stopped using the "Congressional Checks" video when promoting *Congress' Secret* and used only the "Republican Checks" video thereafter. (*Id.* at ¶ 23.) Thus, over a year before the FTC filed suit, Agora Financial had voluntarily ceased using its "Congressional Checks" video in promoting *Congress' Secret*. (*Id.*) The FTC therefore cannot show that any defendant "is violating" or "about to violate" a law that the FTC can enforce in connection with the "Congressional Checks" video, meaning it cannot obtain injunctive relief, regardless of whether it is misleading.

## IV.     The FTC's Proposed Injunction Is Prohibitively Overbroad.

Even if the FTC could regulate the speech it seeks to suppress, and even if it could show that it is likely to succeed on the merits of some or all of its claims that the promotional materials for *The Doctor's Guide* and *Congress' Secret* are misleading, its proposed injunction is impermissibly overbroad. As noted above, injunctive relief must be appropriately tailored to the harm actually shown by the FTC. And even when the FTC is regulating lesser-protected commercial speech, it "still bears the burden to demonstrate a 'reasonable fit' between the

25

particular means [of regulation] chosen and the government interest pursued." *POM Wonderful*, 777 F.3d at 502 (noting that a stricter "least-restrictive means" standard applies to government regulation of fully-protected noncommercial speech). Moreover, in evaluating the First Amendment implications of a prospective restraint, "the fact that the [FTC] may have imposed a remedy in the past . . . does not necessarily establish the closeness of its fit to a new set of facts," particularly where past imposition of a remedy has been by "consent orders—entered without litigation or explanation." *Id.* at 503-04.

A. **The Proposed Injunction Is Overbroad Because It Seeks to Enjoin Conduct that the Commission Has Not Challenged.**

The FTC focuses on only two of the thousands of publications and campaigns in which defendants have had any involvement over the years and currently. Yet, if granted, the FTC's proposed injunction would restrict all publications and advertising by the defendants, not just in connection with promoting *The Doctor's Guide* and *Congress' Secret*, but also in connection with promoting any of their dozens of other unrelated publications and products. Further, the restrictions on defendants' "affiliates," would reach promotional materials for countless other publications and products,[15] including in industries unrelated to health and finance, such as travel and wine, thereby chilling First Amendment-protected speech indisputably not challenged in this case. And although the FTC is occasionally permitted to "'fence in' offenders by enjoining more than the specific misconduct previously engaged in," such an injunction nevertheless "must bear a reasonable relation to the unlawful practices found to exist." *FTC v. COORGA Nutraceuticals Corp.*, 201 F. Supp. 3d 1300, 1314 (D. Wyo. 2016) (citation omitted); *FTC v. Wash. Data Res.*, No. 8:09-cv-2309, 2012 WL 2075827, at *5 (M.D. Fla. June 8, 2012) (noting that Rule 65 and

---

[15] As addressed in Section IV.B, infra, the use of the term "affiliates" throughout the proposed injunction exceeds the scope of the court's authority under Federal Rule of Civil Procedure 65(d)(2).

binding precedent "permit a moderate and precise injunction limiting the prohibited misrepresentation to a particular 'line of business'" and modifying a proposed FTC injunction because it included a "global prohibition against misrepresentation in general" which was broader than necessary to prohibit misrepresentations about the challenged debt-relief services).

Here, the FTC has not shown a "reasonable relationship" between its claims and the broad preliminary injunctive relief it seeks. The allegations in the FTC's complaint and the arguments in its motion are limited to advertising for *The Doctor's Guide* and *Congress' Secret*. Although the FTC offers little explanation why the broad injunctive relief it seeks is warranted, it makes passing comments about defendants' cross-promotional practices for "other similar products," presumably in reference to a handful of exhibits to Mr. Rottner's declaration,[16] which are promotions for other publications. (FTC Mem. at 24, 35.) Yet no allegations in the complaint relate to those materials and the FTC did not even attempt to establish how they are misleading or otherwise violate the FTC Act. The FTC has, at most, shown that defendants promote other publications, a fact they readily admit. Particularly in light of the First Amendment implications, at this preliminary stage and on the record before it, the Court should limit any injunctive relief to the promotions for the two publications at issue if the Court is inclined to grant any relief at all. *See Beneficial Corp. v. FTC*, 542 F.2d 611, 619 (3d Cir. 1976) ("the remedy for the perceived violation can go no further in imposing a prior restraint on protected commercial speech than is reasonably necessary to accomplish the remedial objective

---

[16] Mr. Rottner's characterization of those exhibits demonstrates an extraordinary lack of understanding regarding defendants' publishing activities. For example, Mr. Rottner asserts that "Agora Financial also promoted other non-diabetes health-related products" (Rottner Decl. ¶ 83), citing multiple exhibits that are *unmistakably* promotions not for health-related products but for *publications recommending investments in biotechnology companies*. (E.g., ECF No. 2-99 ("chance to change your family's *wealth* forever."); ECF No. 2-101 ("get the details before the *stock* of this tiny neuro-tech lab goes through the roof…").) Surely the FTC does not seek to prevent a financial publishing company from discussing investments in biotechnology companies (in which it has no interest) unless and until the efficacy of the company's products have been proven by RCTs.

27

of preventing the violation"); *FTC v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285, 307 (D. Mass. 2008), *aff'd*, 624 F.3d 1 (1st Cir. 2010) ("defendants' First Amendment objection thus has merit to the extent it may preclude a remedy that includes complete suppression of the infomercials").

### B.     The Proposed Injunction Is Overbroad Because It Seeks to Enjoin Non-Party "Affiliates" Whose Conduct is Not At Issue.

An injunction can only bind the parties; their officers, agents, servants, employees, and attorneys; and "other persons who are in active concert or participation"[17] with them. Fed. R. Civ. P. 65(d)(2). Thus, "a non-party is not bound by an injunction pursuant to Rule 65 until a finding is made in a proceeding in which it is a party that the requisites are indeed present." *In re N.A.A.C.P., Special Contribution Fund*, 849 F.2d 1473 (6th Cir. 1988). "The rule derives from the common law doctrine that an injunction 'not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control'—any person or entity through whom the defendants might carry out enjoined activity and so nullify the order." *U.S. v. Philip Morris USA Inc.*, 566 F.3d 1095, 1136 (D.C. Cir. 2009) (quoting *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945)). Thus, injunctive relief flows down the corporate chain, so long as the requisite control and involvement exist, but not up or across:

> It is one thing for an injunction against a principal also to bind the principal's agents or servants. An order forbidding the principal to do an act on her own would normally be understood to bar the principal's servants or agents from doing the act for the principal's benefit. It is quite different for an injunction against an agent or servant also to bind the principal. By definition, the servant does not control the principal.  If the court does not have jurisdiction over the principal, it is not easy to see why the court should have the power to bind her through an order directed against her servant.

---

[17] The FTC has neither alleged nor provided proof that any of defendants' non-party, independent "affiliates" were in active concert or participation with the named defendants or otherwise under their control. (Norin Decl. ¶¶ 4, 6).

*Doctor's Assocs., Inc. v. Reinert & Duree, P.C.*, 191 F.3d 297, 304 (2d Cir. 1999). The FTC cannot expand the reach of the injunction beyond that permitted by rule 65(d). *Id.*

The law limiting the reach of a preliminary injunction does not change simply because a nonparty shares a corporate relationship with one or more named defendants. Thus, the Supreme Court held that it was error to enter an injunction against the corporate parent of the named counter-defendant, where the parent was not a party to the suit and the trial court had made no finding that the parent and named counter-defendant were one entity. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 112 (1969); *see also Kenseth v. Dean Health Plan Inc.*, 722 F.3d 869, 890 (7th Cir. 2013) (citations omitted) (rejecting plaintiff's request to enjoin subsidiary or parent corporations of a named defendant, noting that "a court may not enter orders against nonparties" except under specific conditions).

Here, the defendants' nonparty parent company, M&C, directly or indirectly owns more than eighty (80) other nonparty companies, many of which conduct activities unrelated to the specific advertising campaigns at issue. (Norin Decl. ¶¶ 3, 7-8.) Including "affiliates" in the order's definition of "defendants" would subject those entities to civil contempt proceedings without any predicate finding that those entities engaged in any violation of the law. Many of these entities are far-removed from the challenged activity, and an order enjoining them would exceed the Court's authority under Rule 65(d).

### C. The Proposed Injunction Is Overbroad As to its Restrictions on and Substantiation Required For Claims About "Covered Products" and "Covered Programs."

The FTC seeks injunctive relief that would, in essence, require defendants (not to mention their "affiliates") to have an RCT to substantiate any representation about a "Covered Product" or "Covered Program." (ECF 2-2, at 7, 9.) The injunction defines "Covered Product" as "any dietary supplement, food, drug, or other product intended to provide health-related benefits,

including any product recommended by The Doctor's Guide, and "Covered Program," as "any program, protocol, or service purported, designed, or intended to provide health-related benefits, including the protocol in The Doctor's Guide." (ECF No. 2-2 at 4-5.) The FTC cannot obtain this relief in a preliminary injunction because it could not do so after a trial on the merits.

As for the FTC's proposed RCT restriction on "Covered Products," it has not made any showing justifying the imposition of any injunctive relief, let alone an RCT restriction. The FTC has neither alleged nor proven that defendants engaged in misleading commercial speech in connection with any "Covered Product" they sell; the FTC's claims and evidence relate exclusively to statements made in connection with promoting defendants' publications.[18] Moreover, even if the FTC could somehow justify the imposition of injunctive relief on representations related to "Covered Products," its proposed RCT restriction enjoys no legal support.[19] The FTC's own guidance, *Dietary Supplements: An Advertising Guide for Industry*,[20] as well as federal case law, provides that the standard for "truthful and not misleading" advertising for health-related product claims is "competent and reliable scientific evidence, defined as "tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area, that have been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results" ("CRSE"). FTC Guide at *9. Perhaps, in the case of some products, an RCT constitutes CRSE. However, neither the FTC Guide nor federal case law blindly imposes

---

[18] Nor can the FTC point to the products recommended in *The Doctor's Guide* as support for this restriction, as defendants do not sell or benefit in any way from the sale of those products. (Hart Decl. ¶ 10; Gerhauser Decl. ¶ 13.)

[19] In fact, the FTC's proposed RCT requirement is not even supported by its expert, Dr. Burant, whose opinion is expressly limited to the level of support necessary for certain claims related to type 2 diabetes. (Burant Decl. ¶ 34, ECF No. 2-124.)

[20] "FTC Guide" *available at* https://www.ftc.gov/tips-advice/business-center/guidance/dietary-supplements-advertising-guide-industry.

an RCT restriction on all product claims without consideration of the product at issue. *Id.*; *FTC v. QT, Inc.*, 512 F.3d 858, 861 (7th Cir. 2008); *U.S. v. Bayer Corp.*, No. 07-cv-01, 2015 WL 5822595, at *4 (D.N.J. Sept. 24, 2015); *Basic Research Labs, LLC v. FTC*, No. 2:09-cv-0779, 2014 WL 12596497 (D. Utah Nov. 25, 2014); *FTC v. Garden of Life, Inc.*, 845 F. Supp. 2d at 1337-38 (S.D. Fla. 2012) *aff'd in part, vacated in part*, 516 F. App'x 852 (11th Cir. 2013). Instead, *according to the FTC*, the "guiding principle for determining the amount and type of evidence that will be sufficient is what <u>experts</u> in the relevant area of study would generally consider to be adequate." FTC Guide at *14 (emphasis added). Courts agree. *Bayer*, 2015 WL 5822595, at *14 ("[b]ecause the definition of [CRSE] looks to the view of experts in the relevant field, it is appropriate for the court to consider the testimony of experts in the field."); *Basic Research*, 2014 WL 12596497, at *13. Such an inquiry should, necessarily, be performed on a product-by-product basis.

The FTC's proposed RCT injunction on "Covered Programs" is on even shakier ground. If the FTC has the authority to regulate defendants' speech promoting their publications, that authority is necessarily limited to ensuring that defendants' promotional materials accurately represent the content of their publications. Even setting aside the impropriety of a blanket order that CRSE must consist of RCTs for any and all health-related claims, in claiming that the marketing for publications must supported by CRSE, the FTC seeks to impose a standard that has not ever been imposed on speech promoting a medical publication that is inextricably intertwined with, and accurately describes, the publication itself. The FTC cannot regulate advertisements in a manner that controls the fully protected noncommercial speech in defendants' health-related publications. Were the FTC able to do so, it could effectively prohibit any publisher from even accurately advertising publications espousing non-mainstream,

31

alternative, or experimental medical opinions. The chilling effect on medical discourse would be staggering. (*See* Hyman Decl. ¶¶ 9-10.)

    **D.**    **The Notice and Distribution Provisions in the Proposed Injunction Are Overbroad.**

The FTC's proposed injunction requires defendants to distribute the order to every "affiliate, telemarketer, marketer, sales entity, successor, assign, member, officer, director, employee, agent, independent contractor, client, attorney, subsidiary, division, and representative" of every defendant. (ECF No. 2-2 at 13-14.) This requirement is so overbroad (not to mention unreasonable) that defendants could not possibly comply with it. Although the proposed injunction does not define "affiliates" (and separate and apart from the Court's authority to bind such entities), the notice provision could be construed to require notice to more than 80 non-party affiliate entities, some which do not engage in marketing and advertising affecting U.S. commerce, and others which the named defendants have no control over, and perhaps even every employee and independent contractor of those affiliates. Even if affiliates were removed, Agora Financial and NewMarket (and their wholly-owned subsidiaries) have a combined roughly four hundred employees, and dozens if not hundreds of independent contractors, the majority of whom have no role in marketing goods and services. (Insley Decl. ¶ 4; Hart Decl. ¶ 14.) Requiring defendants to provide copies of the order to all such employees and independent contractors would be unnecessary, as only a small subset is involved in marketing and advertising. As drafted, defendants must distribute the proposed order to painters, cleaners, and landscapers. Because this would render the injunction overbroad, the notice provision should be limited to those entities and persons involved in the marketing and sales of *The Doctor's Guide* and *Congress' Secret*.

Moreover, the injunction requires defendants to distribute the order to all "clients" and provide the FTC with the names, physical addresses, phone numbers, and email addresses of each such person who received a copy. (ECF No. 2-2 at 13-14.) If "clients" includes defendants' customer-subscribers or Dr. Gerhauser's patients, this would infringe on the constitutional rights of these individuals to read what they want without government interference and would run afoul of HIPAA. *Lubin v. Agora, Inc.*, 389 Md. 1, 5 (2005) (holding that Agora, Inc. could not be forced to provide the Maryland Securities Commissioner "its subscriber lists, marketing lists, and other documents containing information identifying any of its subscribers" because this would violate the First Amendment); s*ee also Buckle*y *v. Valeo,* 424 U.S. 1, 64 (1976) (government cannot compel disclosure of membership lists in any private organization, unless its purported interests "survive exacting scrutiny."). The FTC cannot require the defendants to disclose this information, and the notice provision is overly broad for this additional reason.

## V.      The Balance of the Equities Favors Denying The Relief Sought by the FTC.

The balance of equities convincingly warrants denying the requested injunctive relief. *FTC v. Merch. Servs. Direct, LLC*, No. 13-cv-0279, 2013 WL 4094394, at \*4 (E.D. Wash. Aug. 13, 2013) (denying temporary restraining order and noting "a balance of equities weighs in Defendants' favor"). Here, there is no harm to the public because the defendants have not deceived or otherwise misled consumers. Further, although the FTC has provided isolated communications from individuals dated over a year ago related to "Congressional Checks," the FTC has not shown that those individuals purchased the challenged publications. Indeed, the FTC has not shown any injury to the public as a result of defendants' sale of the challenged publications such as loss of money or property. And because the FTC challenges past conduct that has ceased, this too "militates against the imposition of a preliminary injunction." *Infinity Grp. Servs.*, 2009 WL 10670551, at \*4 (denying preliminary injunction and holding that without

33

showing that defendants "are still engaged in the complained-of conduct," the balance of equities did not tip in FTC's favor).

To the contrary, the public will suffer harm if the Court grants the FTC's motion because the injunction would violate the public's right to access, read, and exchange ideas over issues of public concern if defendants cannot express and exchange their views. The Supreme Court has repeatedly recognized that "[t]he constitutional guarantee of free speech 'serves significant societal interests' wholly apart from the speaker's interest in self-expression." *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Ca.*, 475 U.S. 1, 8 (1986) (quoting *First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 776 1(978)). "By protecting those who wish to enter the marketplace of ideas from government attack, the First Amendment protects the public's interest in receiving information." *Id*. And that defendants are private entities is not determinative because corporations also "contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster." *Id*. (quoting *First National Bank of Boston,* 435 U.S. at 783); *see also Consolidated Edison Co. v. Public Service Comm'n of N.Y.,* 447 U.S. 530, 544 (1980) ("The inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual.") (citation omitted). Thus, the balance of equities in this case tip in favor of the defendants given the "potential for extraordinary harm and a serious chill upon protected speech" if the Court were to grant the relief requested by the FTC. *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 671 (2004).

Likewise, the defendants will suffer harm if the Court grants the requested injunction because they would be restrained from exercising their right to free speech guaranteed by the First Amendment. The injunction would be especially burdensome to Dr. Gerhauser who

34

routinely consults with individuals about diabetes and regularly expresses his medical opinions. Likewise, as discussed above, the injunction would require notice and compliance by parents and other affiliates of the entity defendants, thereby causing disruption to dozens of businesses, hundreds of employees, and countless independent contractors who have nothing to do with anything alleged in the FTC's complaint. Then, upon receipt of notice, each person and entity would, for example, be required to have double-blind, placebo-controlled, clinical trials before making certain statements about any "covered product" or "covered program," among other restrictions. The burdens are as clear as they are onerous, thereby tipping the equities squarely in favor of denying the requested relief.

## CONCLUSION

For the reasons set forth above, the Court should deny the FTC's Motion for Preliminary Injunction or, alternatively, modify the FTC's proposed injunction as set forth herein.

Respectfully Submitted,


| | |
|---|---|
| _____/s/ William M. Krulak, Jr._____ | _____/s/ Ari N. Rothman_____ |
| William M. Krulak, Jr. (Fed. Bar No. 26452) | Ari N. Rothman (Federal Bar No. 17560) |
| Joshua J. Gayfield (Fed. Bar No. 29189) | VENABLE LLP |
| Megan J. McGinnis (Fed. Bar No. 12810) | 600 Massachusetts Avenue, N.W. |
| MILES & STOCKBRIDGE P.C. | Washington, D.C. 20001 |
| 100 Light Street | T: 202-344-4000 |
| Baltimore, Maryland 21202 | F: 202-344-8300 |
| T/F: 410-385-3448 | nrothman@venable.com |
| wkrulak@milesstockbridge.com | |
| jgayfield@milesstockbridge.com | |
| mmcginnis@milesstockbridge.com | |

*Counsel for Defendants*