**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>   Plaintiff,<br><br>   v.<br><br>AGORA FINANCIAL, LLC, et al.,<br><br>   Defendants. | **Case No. 19-cv-03100-SAG** |

**PLAINTIFF FEDERAL TRADE COMMISSION'S REPLY MEMORANDUM IN**
**SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

Omolara Bewaji Joseney (ojoseney@ftc.gov)
Gregory Madden (gmadden@ftc.gov)
Dillon Lappe (dlappe@ftc.gov)
Federal Trade Commission
600 Pennsylvania Avenue, NW CC-9528
Washington, DC 200580
202-326-2599 (Joseney); -2426 (Madden);
-2833 (Lappe); -3197(facsimile)

*Counsel to Plaintiff Federal Trade Commission*

## TABLE OF CONTENTS

I.    THE FTC'S UNDISPUTED EVIDENCE DEMONSTRATES ITS HIGH
LIKELIHOOD OF SUCCESS ON THE MERITS. ..................................................... 1

   A.    Defendants Do Not Dispute Core Evidence Proving Their Diabetes Claims Are
Deceptive. .................................................................................................................. 1

     i.    Defendants' Characterizations of their Diabetes Claims Are Contrary to the Express
Representations They Made to Consumers ..................................................................... 2

     ii.    Defendants Have Not Identified Competent and Reliable Scientific Evidence
Supporting Their Diabetes Claims ................................................................................ 3

   B.    Defendants Do Not Dispute Core Evidence Proving Their Congressional/Republican
Checks Claims Are Deceptive. .................................................................................. 7

     i.    Defendants Mischaracterize the Net Impression of Their Congressional/Republican
Checks Claims. ........................................................................................................... 8

     ii.    Defendants' Retitling of Congressional Checks Marketing Does Not Deprive FTC Of
Jurisdiction. ............................................................................................................... 9

II.   THE FIRST AMENDMENT DOES NOT IMMUNIZE DEFENDANTS' DECEPTIVE
CLAIMS ............................................................................................................... 10

   A.    Defendants' Advertising Does Not Merely Repeat the Claims Found in Their
Publications — It Lies About Them. ........................................................................ 11

   B.    Defendants' Advertising is Pure "Commercial Speech." ........................................ 13

     i.    Defendants' Marketing Does No More Than Propose a Commercial Transaction. ...... 13

     ii.    Defendants' Advertisements Are Commercial Speech Under Supreme Court and
Fourth Circuit Precedent. .......................................................................................... 14

III.  THE BALANCE OF EQUITIES WEIGH IN FAVOR OF A PRELIMINARY
INJUNCTION. ...................................................................................................... 16

IV.   THE FTC'S PROPOSED INJUNCTION IS APPROPRIATE. ..................................... 17

     A.    The Proposed Fencing-In Relief is Appropriate. ................................................ 18

     B.    The Injunction Provisions Do Not Propose Improper Prior Restraints. ............ 19

     C.    Defendants Misstate the Proposed Order's Substantiation Provisions. .............. 19

     D.    The Proposed Notice and Distribution Requirements Are Appropriate ............. 20

CONCLUSION ................................................................................................................. 20

Unable to dispute the overwhelming evidence of their deception, Defendants rely almost exclusively on the misguided notion that the First Amendment provides safe harbor for their deceptive marketing.  However, no such refuge exists.  False or misleading commercial speech, such as the misrepresentations at issue here, receive no First Amendment protection. Defendants' other attempts to disclaim liability and to limit the scope of the proposed preliminary relief fare no better.

## I.    THE FTC'S UNDISPUTED EVIDENCE DEMONSTRATES ITS HIGH LIKELIHOOD OF SUCCESS ON THE MERITS.

The FTC amassed extensive evidence, now before the Court, including expert testimony, sworn statements, and the Defendants' own admissions, demonstrating Defendants' promises of a purported 28-day diabetes "cure," and hundreds to thousands of dollars in monthly "Congressional/Republican Checks" are deceptive and, thus, violate the FTC Act.  As set forth below, this evidence remains largely uncontested, confirming the FTC has well beyond the requisite "fair and tenable chance" of success on the merits for issuance of a preliminary injunction.  *See In re Sanctuary Belize Litig.*, 2019 WL 3714392, at *9 (D. Md. Aug. 2, 2019).

### A.    Defendants Do Not Dispute Core Evidence Proving Their Diabetes Claims Are Deceptive.

The FTC challenges six deceptive claims in Defendants' marketing for the 28-day diabetes protocol:  (1) type 2 diabetes is caused by "Non-Ionizing Radiation" ("NIR") from everyday electronic devices; (2) consumers can prevent type 2 diabetes through the use of certain "NIR" blockers, or by otherwise avoiding NIR; (3) their protocol will cure, treat, or mitigate type 2 diabetes and all of its symptoms; (4) supplements, "Himalayan Silk," "Epsom Blue," and "Chromanite," either alone or in combination, cure, treat, or mitigate type 2 diabetes and its symptoms; (5) their protocol is scientifically proven to cure, treat, or mitigate type 2 diabetes or its symptoms in 28 days; and (6) their protocol does not require consumers to change their diets.[1]

Defendants largely do not deny they made the challenged claims or that those claims are false.  For instance, Defendants do not contest the fact that they told consumers their advertised

---

[1] FTC Mem. at 1-8, 26 (ECF No. 2-1).

1

protocol was "scientifically-proven," nor that no scientific study has evaluated their protocol, much less confirmed its efficacy.[2]  Similarly, Defendants have not denied — nor could they — that no evidence supports their claim that the specified "NIR blockers" can prevent type 2 diabetes.[3]  Nor do Defendants deny that their own post-purchase admissions to consumers prove the falsity of their representations regarding diet.  Specifically, Defendants do not dispute that, contrary to their promise of a cure without dietary changes, the true "key" to their protocol is a severely restricted diet, involving fasting and limited carbohydrates.[4]

Having no basis to dispute the FTC's evidence, Defendants resort to two equally flawed arguments.  First, they contend, without support, that the "net impression" of their diabetes claims is somehow completely different from what they expressly communicated to consumers.  Second, Defendants disagree with the FTC's expert testimony concerning what constitutes the competent reliable scientific evidence ("CRSE") necessary to substantiate their claims, but offer no evidence regarding the only relevant legal inquiry on this question:  namely, what experts in the field require to demonstrate the truth of their claims.

     i.    **Defendants' Characterizations of Their Diabetes Claims Are Contrary to the Express Representations They Made to Consumers.**

Defendants principally argue the FTC has not "fairly represent[ed]" the "net impression" of their advertisements concerning the 28-day diabetes protocol.[5]  However, their *post-hoc* recasting of the relevant advertising bears no relation to what they promised consumers.

Defendants first claim they "do[] not anywhere promise" that the advertised protocol will "cure" diabetes.[6]  In reality, Defendants repeatedly claim their advertised 28-day protocol will cure type 2 diabetes.  Not only do they specifically tout a "100% cure rate," as Defendants admit in their Opposition,[7] their advertisements represent that consumers' diabetes "will be gone [in]

---

[2] Report of Charles Burant, M.D., Ph. D., ("Burant Decl."), FTC Ex. 121 (ECF No. 2-124)  ¶ 71.

[3]  *See* FTC Ex. 23 (ECF No. 2-26), at FTC-PROD-00000561.

[4] FTC Ex. 22 (ECF No. 2-25), at FTC-PROD-00000462, FTC-PROD-00000464-467.

[5] Def. Opp to Pl. Mot. for Prelim. Inj. ("Def. Opp.") (ECF No. 33) at 21-23.

[6] Def. Opp. at 21.

[7] Their contention that the "100% cure rate" representation is mere "colloquial[ism]" (*id.*) is irrelevant.  (Def. Opp. 21.)  *See FTC v. Trudeau*, 579 F.3d 764, 764-767 (7th Cir. 2009) (finding that even subjective statements are actionable if they "appear as objective facts").

just 28 days" or "gone for good."  They also claim a "100% success rate," and that consumers

can "throw [their] glucose monitor in the trash [and] stop taking a diabetes pill every day."[8]

Next, Defendants attempt to walk back their repeated representations that NIR *causes*

diabetes by claiming Defendant Gerhauser merely stated, "there is a connection" between NIR

and "the incidence and severity of type 2 diabetes."[9]  In reality, Defendants claimed a direct

causal relationship between electronic devices and type 2 diabetes.  For example, they claimed

"NIR exposure alone could turn healthy children into Type II diabetics" and "new technology" is

"actually causing diabetes."[10]

Finally, Defendants contend they only vaguely mentioned the protocol did not require

consumers "to give up the foods they love."[11]  In fact, Defendants expressly promised consumers

that their protocol "had nothing to do with changing [consumers'] diet," and would allow

consumers to eat sugary foods without worrying about their blood glucose levels.[12]

Perhaps recognizing that their attempts to alter the plain meaning of their claims is

directly contradicted by their own advertisements, Defendants resort to a second equally infirm

argument.  Specifically, they claim that the legal standard for CRSE is wrong.  However, such a

claim is both unsustainable legally and factually unsupported.

### ii.    Defendants Have Not Identified Competent and Reliable Scientific Evidence Supporting Their Diabetes Claims.

It is black letter law that health claims like the diabetes claims at issue must be supported

by CRSE.[13]  *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1186 (N.D. Ga. 2008),

*aff'd*, 356 F. App'x 358 (11th Cir. 2009).  What constitutes CRSE "depend[s] on what pertinent

professionals would require for the particular claim to be made."  *Id.*  The FTC submitted

testimony from Dr. Charles F. Burant, an expert in type 2 diabetes, who explains experts in the

---

[8] FTC Ex. 23 (ECF No. 2-26) at FTC-PROD-00000550; *see id* at FTC-PROD-00000557-558.
[9] Def. Opp. at 21.
[10] FTC Ex. 23 (ECF No. 2-26) at FTC-PROD-00000554-56.
[11] Def. Opp. at 21-22.
[12] FTC Ex. 23 (ECF No. 2-26) at FTC-PROD-0000550, FTC-PROD-0000552.
[13] Competent and reliable scientific evidence ("CRSE") is defined as "tests, analyses, research, studies, or other evidence based on expertise of professionals in the relevant area, that have been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results."  *Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d at 1186.

field would require the following as CRSE:

> appropriately analyzed results from at least one independent, well-designed, well-conducted, randomized, double-blind, placebo-controlled, human clinical trial that tests the claimed treatment, drug, hypothesis, or protocol precisely as recommended (including at the recommended dosage, and which involves an appropriate sample population which is of large enough size and duration to generate reliable data that statistically supports a positive therapeutic benefit with an acceptable risk profile.[14]

Dr. Burant conducted an independent literature search, reviewed Defendants' cited studies (where identifiable), and concluded there is no CRSE supporting Defendants' diabetes claims. Each study cited by the Defendants was deficient, with several reflecting common hallmarks of unreliability.[15]  Importantly, Dr. Burant also explains there is not a single study (even one that falls short of the CRSE standard) evaluating Defendants' protocol as described.[16]

Tellingly, Defendants do not dispute these facts.  Instead, they claim that appropriately analyzed results from at least "one independent, well-designed, well-conducted, randomized, double-blind, placebo-controlled human clinical trial" ("RCT") should *not* be required to make their health claims to consumers because it is "inappropriate" when the treatment involves "supplements" as opposed to pharmaceutical drugs because supplements purportedly pose less consumer risks.[17]  This argument fails on both legal and factual grounds.

Courts routinely find that RCTs are required to substantiate health claims for supplements where the FTC has established that experts would require such testing.  *See e.g.*, *FTC v. Roca Labs, Inc.*, 345 F. Supp. 3d 1375, 1387 (M.D. Fla. 2018); *FTC v. NPB Adver., Inc.*, 218 F. Supp. 3d 1352, 1359 (M.D. Fla. 2016); *FTC v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285, 303 (D. Mass. 2008) ("[I]t seems well-accepted that double-blind, placebo-controlled studies are necessary to substantiate health-related efficacy claims."), *aff'd*, 624 F.3d 1 (1st Cir. 2010).

Moreover, there are no relevant facts supporting Defendants' theory.  Defendants purport

---

[14] Burant Decl. ¶ 34.
[15] Burant Decl. ¶¶ 47-69.
[16] Burant Decl. ¶ 60.
[17] Def. Opp. at 23.

to rely on two declarations in support of their argument — one from Defendant Gerhauser, and one from an "advocate" of "functional medicine," Dr. Mark Hyman.  However, neither declaration supports the notion that RCTs are not required to show CSRE for their claims.  Gerhauser merely concludes without citation to any scientific evidence: "the rigorous testing that must be employed before pharmaceutical drugs are used to treat diseases should not be thoughtlessly imposed on natural treatments that do not pose comparable health risks."[18]  This argument falls woefully short of demonstrating that experts in the field of type 2 diabetes would not require an RCT as CRSE.  In fact, it wholly ignores the relevant legal analysis and utterly fails to address Dr. Burant's extensively detailed analysis.

Dr. Hyman addresses only whether "Dr. Gerhauser should [] be allowed to offer opinions, or recommend health advice, without randomized, double-blind, and placebo-controlled human clinical testing substantiating his recommendations," and not whether such RCT is required to constitute CRSE to substantiate the relevant claims.[19]  Even if their opinions could be interpreted to state that RCTs are not required to substantiate health claims for dietary supplements because "natural" products involve less risks, this theory is not scientifically supported.  As Dr. Burant explains, Defendants' marketing poses significant risks to consumers' health, particularly as Defendants encourage consumers to eat sugary foods that are dangerous to type 2 diabetics, and claim their advertised protocol will allow consumers to "throw away" their glucose monitors and stop taking their prescription medication.[20]  Critically, neither Gerhauser nor Dr. Hyman identify any criteria they deem sufficient to meet the CRSE standard.

There is, likewise, no merit to Defendants' suggestion that a "battle of the experts" precludes the Court from determining at this stage whether CRSE supports their claims.  There is no battle of the experts.  Defendants do not identify any CRSE to support their claims under any interpretation of that standard.  Rather, Gerhauser admits he bases his recommendations on his

---

[18] Declaration of Richard Gerhauser ("Gerhauser Decl.") (ECF No. 33-5) ¶ 9.  Obviously, neither the FTC nor Dr. Burant have *ever* contended that any CRSE criteria be "thoughtlessly imposed."
[19] Declaration of Mark Hyman, M.D. ("Hyman Decl.") (ECF No. 33-20) ¶ 9.
[20] Supplemental Declaration of Charles F. Burant ("Burant Suppl. Decl.") ¶¶ 12-13.

"own anecdotal evidence."[21]  However, anecdotal evidence is both insufficient to meet the evidence-based standards of science,[22] and to substantiate a health claim advertisement.  *See Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d at 1202 (accepting expert opinion establishing anecdotal evidence is insufficient to prove the efficacy of a product); *FTC v. Alcoholism Cure Corp.*, 2011 WL 13137951, at *37, 40 (M.D. Fla. Sept. 16, 2011) (rejecting argument that anecdotal evidence may supplant CRSE to substantiate health claims), *aff'd, FTC v. Krotzer*, 2013 WL 7860383 (11th Cir. 2013).  While Gerhauser identifies several studies he claims he relied on for his "recommendations," he notably provides no opinion on whether these studies amount to CRSE, or are otherwise scientifically reliable.  In fact, he addresses only a single one of these studies, from a university in India and the University of Kansas, in his declaration.[23]  Dr. Burant already reviewed this study, and explained why its several flaws render the study unreliable.[24]  Tellingly, Gerhauser does not respond to these issues.

Dr. Hyman provides even less support for Defendants' claims.  There is no indication he ever reviewed the challenged advertisements in order to form an opinion on whether the representations contained therein are substantiated by CRSE.[25]  Dr. Hyman only partially addresses one of the representations at issue — that mulberry (or "Himalayan Silk" as it was advertised to consumers) can cure, treat, or mitigate type 2 diabetes in 28 days.  Regarding this limited claim, he points to the same unreliable India study, merely concluding that it provides "*some* evidence" supporting Defendants' claim regarding mulberry.[26]  He does not conclude that this evidence is CRSE sufficient to substantiate any of Defendants' claims.[27]  Dr. Hyman offers

---

[21] Gerhauser Decl. ¶ 9.

[22] Burant Decl.¶ 46.

[23] Gerhauser Decl. ¶ 15.

[24] Burant Decl. ¶¶ 62-63.  Dr. Burant also confirms the participants' Hemoglobin A1C ("HbA1c") was unchanged throughout the duration of this study, another basis for why it cannot support Defendants "cure" claims.  Burant Supp. Decl. ¶ 5.

[25] In fact, his declaration suggests he only reviewed *The Doctor's Guide*, and not the advertising for *The Doctor's Guide*, which is different.  Hyman Decl. ¶¶ 5-6 (affirming only that he reviewed *The Doctor's Guide*).

[26] Hyman Decl. ¶ 8 (stating study provides "some evidence" that mulberry "may" allow a reader to reverse diabetes "in as little as 28 days without giving up the foods they love").

[27] Dr. Hyman's Declaration focuses on the irrelevant issue of whether doctors can "offer opinions, or recommend health advice" in their general medical practice without a supporting RCT, and not whether Defendants' diabetes claims are supported by CRSE.  Hyman Decl. ¶¶ 9-10.  To be clear, the governing boundary of what constitutes

no specific opinion on Defendants' claims concerning magnesium, chromium, or NIR.[28]

Because Defendants have not identified any CRSE supporting their claims, and expert testimony confirms there is none, their diabetes claims lack a reasonable basis, and are therefore, deceptive. *See FTC v. Nat'l Urological Grp., Inc.*, 786 F. App'x 947, 959 (11th Cir. 2019); *Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d at 300.[29]

### B.    Defendants Do Not Dispute Core Evidence Proving Their Congressional/Republican Checks Claims Are Deceptive.

In the Congressional Checks/Republican Checks scam, Defendants promised consumers (1) they were entitled, by law or otherwise, to money from "Congressional" or "Republican" Checks; (2) they could collect money from "Congressional" or "Republican Checks" if they added their name to the "list of check payees;" (3) they could claim hundreds to thousands of dollars per month in "Congressional" or "Republican" Checks with little or no risk; (4) anyone can collect hundreds to thousands of dollars in "Congressional" or "Republican Checks"; and (5) "Congressional" or Republican" Checks are affiliated or furnished by Congress or another government agency or program. Defendants also failed to disclose that consumers would have to risk tens to hundreds of thousands of dollars to collect the promised amounts.

Defendants do not raise any defense with respect to many of these representations. Specifically, Defendants do not deny that they (1) represented consumers could collect hundreds to thousands of dollars in Congressional Checks or Republican Checks by putting their name on "the list of check payees," when neither the "checks" nor the list exists; (2) failed to disclose consumers would have to risk tens to hundreds of thousands of dollars to obtain the touted amounts; and (3) advertised that "anyone" can collect hundreds to thousands in these checks, when few could afford the hidden investment. Defendants also do not dispute they used doctored images and documents—many of which were designed to look like government or

medical malpractice for a doctor's subjective treatment decision regarding a patient is not at issue here.

[28] Dr. Hyman claims "scientific studies" referenced in *The Doctor's Guide* substantiate Defendant Gerhauser's "recommendations," but does not identify what studies substantiate which "recommendations." Hyman Decl. ¶ 7.

[29] Even if there were a "battle of the experts," such a dispute does not prevent the Court from making findings. *Eli Lilly & Co. v. Arla Foods Inc.*, 2017 WL 2976697, at *3 (E.D. Wis. July 11, 2017).

other official records—to deceptively bolster legitimacy for their scheme.[30]

Defendants raise only two arguments.  First, much like their diabetes claims, Defendants take the unfounded position that the "net impression" of certain of their claims is different from the express representations they made to consumers.  Second, Defendants rely on an inapplicable, wrongly-decided, and out-of-circuit decision to argue that the FTC does not have jurisdiction to seek relief related to the Congressional Checks scam.

### i.   <u>Defendants Mischaracterize the Net Impression of Their Congressional/Republican Checks Claims.</u>

Defendants blame the FTC for unfairly "casting" their advertising as "promising that consumers can collect 'legally guaranteed' monthly checks from the government, 'with little or no risk.'"[31]  However, that is precisely what they explicitly represented to consumers.  Defendants advertised:  the "cash MUST be distributed!" "It's the law!" and the checks are "contractually required by the U.S. government."[32]  They also claimed a new law "allows [the] benefit of collecting monthly check[s]," promising consumers "details on how to legally collect $1,000s from U.S. Government every month."[33]  They further emphasized "anyone" could collect the advertised checks just by adding their names "to the list of check payees."[34]

Defendants argue certain isolated and unqualified references to "investment" make these promises to consumers non-misleading.  However, these references are sporadic and inconsistent, and are thus insufficient to overcome the overall net impression that consumers can claim substantial payouts with little or no risk.  *See FTC v. Vemma Nutrition Co.*, 2015 WL 11118111, at *6 (D. Az., Sept. 18, 2015) ("[R]epresentations may be misleading despite the use of a disclaimer such as 'results may vary' if the consumer may reasonably believe that a statement of unusual potential represents typical earnings.").  This is particularly true in light of the various other false promises that the payouts are mandated by law, easy, contractually-

---

[30] FTC Ex. 56 (ECF No. 2-59) at FTC-PROD-00000337-338, FTC-PROD-00000348-349; FTC Ex. 44 (ECF No. 2-47) at FTC-PROD-00000269; FTC Ex. 45 (ECF No. 2-48) at FTC-PROD-00000586.
[31] Def. Opp. at 19-20.
[32] FTC Ex 56 (ECF No. 2-59) at FTC-PROD-00000330; FTC Ex. 123 (ECF No. 2-126) at FTC-PROD-00001065.
[33] FTC Ex. 67 (ECF No. 2-70) at FTC-PROD-00000174.
[34] FTC Ex. 123 (ECF No. 2-126) at FTC-PROD-00001078.

required, and available just by consumers' adding their name to "the list of check payees."[35]  In fact, Defendants expressly promise that their Congressional Checks program has worked for consumers "**in 100% of the cases**."[36]

Defendants' attempts to construct a legal "fig leaf" by making occasional and conflicting statements disclaiming affiliation with the government similarly fails to provide a defense.  *See Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1492 (1st Cir. 1989) ("contradictory double meanings" created by conflicting "disclaimers" are sufficient to overcome liability).  Indeed, this argument withers in the face of Defendants' damning admission that they were placed on notice by The Congressional Award, Congress' sole charity, which rewards young Americans for achievement, that consumers were misled into believing that Congressional Checks were affiliated with this charity.[37]

    ii.    **Defendants' Retitling of Congressional Checks Marketing Does Not Deprive the FTC of Jurisdiction.**

Defendants also argue that because they "voluntarily" stopped marketing "Congressional Checks" before this action, the FTC has no jurisdiction to sue over that marketing.  Defendants' sole authority for this argument is *FTC v. Shire Viropharma, Inc.*, 917 F.3d 147, 155 (3d Cir. 2019), which held the FTC must plead violations that are "ongoing" or "impending" to obtain preliminary relief under Section 13(b) of the FTC Act.  Even if *Viropharma* were controlling outside the Third Circuit —it is not — and its holding correctly decided — which it is not — Defendants' argument still fails because Defendants merely retitled Congressional Checks to Republican Checks and continued to make the same deceptive claims.

*Viropharma* does not apply where, as here, the FTC pleads an ongoing violation.  *FTC v. NextGen Inc.*, 2018 WL 5310414, at *4 n.6 (W.D. Mo. Sept. 10, 2018).  Indeed, Defendants never "ceased" the Congressional Checks promotion; by their own admission, they merely "retitl[ed]" it "Republican Checks."[38]  While there are minor differences in the post-retitling

---

[35] FTC Ex. 56 (ECF No. 2-59) at FTC-PROD-00000341; FTC Ex. 123 (ECF No. 2-126) at FTC-PROD-00001066.
[36] FTC Ex. 56 (ECF No. 2-59) at FTC-PROD-00000344; FTC Ex. 123 (ECF No. 2-126) at FTC-PROD-00001081.
[37] Def. Opp. at 25.
[38] Declaration of Evaldo Albuquerque ("Albuquerque Decl.") (ECF 33-1) ¶ 12.

marketing copy, both included the same deceptive representations, making the FTC Act violations ongoing and giving the FTC ample "reason to believe" that a violation of the FTC Act was "occurring" or "about to" occur.

Moreover, even if the Congressional Checks and Republican Checks marketing were entirely distinct, Defendants' unjust enrichment and the resulting consumer harm from the Congressional Checks promotion are ongoing. Consumers who signed up to receive *Congress' Secret* through the Congressional Checks advertisement were also lured into a yearly negative option subscription to *Lifetime Income Report*. Those consumers, at a minimum, continue to suffer ongoing harm from Defendants' deceptive Congressional Check representations and will suffer harm again in the future when the subscription renews.[39]

Finally, Section 13(b) only requires the FTC to meet the low burden of alleging some "reason to believe" the Defendants are "about to violate the law." *FTC v. Hornbeam Special Situations, LLC*, 391 F. Supp. 3d 1218, 1223 (N.D. Ga. 2019) (allegations of past bad behavior gives FTC sufficient "reason to believe" for injunctive relief). Here, Defendants' past conduct shows a likelihood of recurrence. Defendants admit Republican Checks is a retitling of Congressional Checks and they "run different versions of a promotion" as well as "vary or rework [] promotions."[40] Absent injunctive relief, it is likely Defendants will simply "retitle" the promotion under another name while making the same deceptive claims.

## II. THE FIRST AMENDMENT DOES NOT IMMUNIZE DEFENDANTS' DECEPTIVE CLAIMS.

Because Defendants' advertising claims are false and/or unsubstantiated, they are not entitled to First Amendment protection. *Zauderer v. Off. of Disciplinary Counsel*, 471 U.S. 626, 638 (1985); *Direct Mktg. Concepts, Inc.*, 648 F. Supp. 2d at 217. Nevertheless, Defendants desperately attempt to save themselves from the consequences of their false and unsubstantiated commercial claims by claiming they receive full First Amendment protections because the

---

[39] In a recent decision in this District, Judge Messitte found this type of ongoing unjust enrichment constitutes an ongoing FTC Act violation." *In re Sanctuary Belize Litig.*, 2019 WL 4243079, at *2.
[40] Albuquerque Decl. (ECF 33-1) ¶ 11.

advertising is "inextricably intertwined" with statements from their "books."

Defendants' argument is meritless because the challenged advertising is not inextricably intertwined with the contents of the publications. First, Defendants' advertising is replete with *misrepresentations about the contents of the book*. Second, the advertisements do no more than propose a commercial transaction — the purchase of the books themselves — i.e., they are quintessential commercial speech. Thus, Defendants ask this Court to expand the "inextricably intertwined" doctrine to cover speech that courts have long found subject to regulation.

## A.    Defendants' Advertising Does Not Merely Repeat the Claims Found in Their Publications — It Lies About Them.

Defendants' advertising cannot be "inextricably intertwined" with their books because their claims misrepresent the contents of the book. No case, including the ones cited by Defendants, has found such deceptive advertising is entitled to First Amendment protection. In fact, the opposite is true. For example, the Seventh and Ninth Circuits have specifically rejected applying First Amendment protection to such false claims. *Cher v. Forum Int'l LTD*, 692 F.2d 634, 639 (9th Cir. 1982) ("[T]he advertising copy was patently false. This kind of mendacity is not protected by the First Amendment and those defendants responsible for the placement and circulation of the challenged copy must look elsewhere for protection."); *Trudeau*, 579 F.3d at 767 (holding that selective quotations from defendant's book "mislead because they present consumers with an incomplete picture of what the protocol requires, thereby inducing consumers to purchase the book on false hopes and assumptions").

Defendants' marketing does not truthfully represent what appears in its "books." For example, unlike *The Doctor's Guide* itself, the advertising for it claims: The three-step protocol cures diabetes, has a 100% success rate, and it will work for every consumer "guarantee[d]";[41] there are "decades of peer reviewed scientific studies" providing "rock-solid proof" the protocol reverses every symptom of diabetes in 28 days;[42] the protocol is easy and works without dietary

---

[41] FTC Ex. 2 (ECF No. 2-5) at FTC PROD-0000041; FTC Ex. 7 (ECF No. 2-10) at FTC-PROD-0000074; FTC Ex. 23 (ECF No. 2-26) at FTC-PROD-00000550.
[42] FTC Ex. 2 (ECF No. 2-5) at FTC-PROD-0000041; FTC Ex 7 (ECF 2-10) at FTC-PROD-0000074; FTC Ex. 23 (ECF No. 2-26) at FTC-PROD-00000550.

change,[43] allowing consumers to enjoy pancakes with syrup, fries, apple pie, and ice cream without worrying about their blood sugar;[44] and the protocol permanently reverses type 2 diabetes so consumers can throw away their glucose monitors and stop taking medication.[45]

*The Doctor's Guide* contains none of these claims.  Defendants' Opposition essentially admits as much, characterizing *The Doctor's Guide* as Dr. Gerhauser's "opinion" that the protocol "may" "help" reverse diabetes symptoms "in as little as 28 days" and the supporting study "might allow" reversing diabetes without "giving up foods they love," but recommending a diet with such foods as "the exception, instead of the rule."[46]  In contrast, Defendants' advertisements provide an unequivocal net impression of a guaranteed, scientifically proven, three-step treatment protocol that cures diabetes and reverses all diabetes symptoms in just 28 days, without consumers changing their diets in any way.

The same holds true for Defendants' Congressional Checks and Republican Checks marketing claims, which are directly contradicted in the publication, *Congress' Secret*, that consumers receive.  For example, Defendants advertise:  consumers can collect hundreds to thousands of dollars in Congressional/Republican checks each month just by adding their names to a list of check payees;[47] consumers are entitled by law to such checks;[48] consumers can claim this money with little or no risk;[49] and "anyone" including "everyday folks like you" can collect this money.[50]  In sharp contrast, *Congress' Secret* promotes a dividend investing program whereby consumers purchase stocks in private companies that pay dividends from their profits, if

---

[43] FTC Ex. 2 (ECF No. 2-5) at FTC-PROD-00000040; FTC Ex. 23 (ECF No. 2-26) at FTC-PROD-00000561-63.
[44] FTC Ex. 23 (ECF No. 2-26) at FTC-PROD-00000550, FTC-PROD-00000552.
[45] FTC Ex. 23 (ECF No. 2-26) at FTC-PROD-00000550.
[46] Def. Opp. at 7-8, 21-22.
[47] FTC Ex. 56 (ECF No. 2-59) at FTC-PROD-00000330, FTC-PROD-00000341; FTC Ex. 65 (ECF No. 2-68) at FTC-PROD-00000781; FTC Ex. 123 (ECF No. 2-126) at FTC-PROD-00001066, FTC-PROD-00001078; FTC Ex. 65 (ECF No. 2-68) at FTC-PROD-00000781-82.
[48] FTC Ex. 56 (ECF No. 2-59) at FTC-PROD-00000330; FTC Ex. 123 (ECF No. 2-126) at FTC-PROD-00001065-1066.
[49] FTC Ex. 56 (ECF No. 2-59) at FTC-PROD-00000337; FTC Ex. 123 (ECF No. 2-126) at FTC-PROD-00001069.
[50] *See e.g.*, FTC Ex. 56 (ECF No. 2-59) at FTC-PROD-00000322, FTC-PROD-00000325-27, FTC-PROD-00000332, FTC-PROD-00000341; FTC Ex. 27 (ECF No. 2-30) at FTC-PROD-00000010; FTC Ex. 123 (ECF No. 2-126) at FTC-PROD-00001062, FTC-PROD-00001067, FTC-PROD-00001078, FTC-PROD-00001080.

any.[51]  Nowhere does *Congress' Secret* tell consumers they can collect "cash distributions []

**contractually required** by the U.S. government" by "just" adding their "name to the list of

check payees" by a date certain.  Indeed, *Congress' Secret* does not use the phrase "list of check

payees" at any point.

> **B.    Defendants' Advertising is Pure "Commercial Speech."**

Defendants do not seriously dispute that the advertising in its own right is commercial

speech.  Throughout their Opposition, Defendants explicitly acknowledge their marketing

materials are "promotions."[52]  Instead, they attempt to divert the Court's attention by arguing the

non-controversial proposition that the publications themselves are non-commercial speech.[53]

But, Defendants concede, as they must, that is not the question before the Court.  The relevant

issue is whether the advertisements at issue amount to commercial speech.  They do.  Because

their advertising does nothing more than propose a commercial transaction, and meets the criteria

dictated by the Supreme Court and Fourth Circuit regarding whether an advertisement is

commercial speech, it is not entitled to enhanced First Amendment protections.  Defendants'

contention that their false claims are nevertheless protected because they are "inextricably

intertwined" with their books in wholly unsupported by this precedent.

> **i.    Defendants' Marketing Does No More Than Propose a Commercial Transaction.**

Commercial speech is "speech which does 'no more than propose a commercial

transaction.'"  *Handsome Brook Farm LLC v. Humane Farm Animal Care, Inc.*, 700 F App'x

251, 257 (4th Cir. 2017) (citation omitted).  To protect the government's interest in "insuring that

the stream of commercial information flow cleanly as well as freely . . . restrictions on false,

deceptive, and misleading commercial speech . . . are wholly permissible . . . ."  *Id.*

Here, Defendants' advertisements do no more than promote a commercial transaction.

The overwhelming message to consumers is to buy Defendants' product to learn the secret to:

(a) reversing your diabetes in 28 days without changing your diet; or (b) collecting hundreds to

---

[51] FTC Ex. 50 (ECF No. 2-53) at FTC-PROD-00000627.
[52] *See, e.g.*, Def. Opp. at 14, 16, 18, 21, 23, 25.
[53] Def. Opp. 13-14.

thousands of dollars in monthly government-related checks, with little or no risk, by simply putting your name on a list. To that end, Defendants bombard consumers with emails promising these results, telling them the Defendants' offer is time sensitive and/or being provided exclusively to them.[54] For example, Defendants tell consumers there are a limited number of books which are only available through their advertising and not available "anywhere on the Internet," on Amazon, nor in any bookstore.[55]

Ultimately, obtaining these products required a consumer purchase: For *The Doctor's Guide*, paying $249 to receive the protocol materials; and for *Congress' Secret*, paying either $49 or $99 for a *Lifetime Income Report* subscription. Because Defendants' marketing does no more than propose a commercial transaction, it is commercial speech, and has no First Amendment protection because it is false. *See Zauderer*, 471 U.S. at 638; *Handsome Brook Farm, LLC*, 700 App'x at 262.

> ii.   **Defendants' Advertisements Are Commercial Speech Under Supreme Court and Fourth Circuit Precedent.**

To the extent Defendants claim their advertising does more than propose a commercial transaction, their argument fares no better under Supreme Court and Fourth Circuit precedent. In *Bolger v. Youngs Products Corp.*, the Supreme Court explained that where a communication arguably does more than propose a commercial transaction, the evaluation of three characteristics, considered in combination, guides whether the communication involves commercial speech: (1) whether the speech is admittedly advertising; (2) whether the communication references a specific product; and (3) whether the speaker has an economic motivation for the communication. *Id.* Importantly, the *Bolger* court held that merely identifying a public issue in advertising does not, as Defendants suggest, vest commercial speech with the full First Amendment protections of noncommercial speech. *Id.* at 68.

Here, Defendants' advertising clearly meets the *Bolger* test for identifying commercial

---

[54] FTC Ex. 2 (ECF No. 2-5); FTC Ex. 4 (ECF No. 2-7); FTC Ex. 9 (ECF No. 2-12); *see also* FTC Ex. 8 (ECF No. 2-11); FTC Ex. 65 (ECF No. 2-68); FTC Ex. 67 (ECF No. 2-70).
[55] FTC Ex. 23 (ECF No. 2-26) at FTC-PROD-00000563; FTC Ex. 56 (ECF No. 2-59) at FTC-PROD-00000346-47; FTC Ex. 123 (ECF No. 2-126) at FTC-PROD-00001084-85.

speech.  First, Defendants concede their materials are advertising.[56]  Second, the advertising references specific products – *The Doctor's Guide*, *Congress' Secret*, and *Lifetime Income Report*.  Indeed, there is a direct offer to consumers to buy those products.  Third, there is an economic motivation for the advertisements, obtaining revenue from consumers.[57]

The Fourth Circuit considers an additional factor for evaluating whether a communication is commercial speech: specifically, whether the communication appears in a "commercial context" and whether it is "directed at the providing of services rather than toward an exposition of ideas."  *Handsome Brook*, 700 F. App'x. at 258, 260 (citations omitted).  Defendants' marketing clearly satisfies this factor with their exclusive, limited time, limited availability offer and the overwhelmingly commercial nature of their speech.

Nevertheless, Defendants urge this Court to do what the law says it must not: inoculate their false advertisements simply because the products they sell allegedly discuss matters of public concern (i.e., diabetes and tax policy).  But, as *Bolger* held, "[a]dvertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues."  463 U.S. at 68; *see also Adventure Commc'ns, Inc. v. Ky Registry of Election*, 191 F.3d 429, 441 (4th Cir. 1999) ("[I]f a communication at bottom, proposes a commercial transaction, the fact that it contains some commentary about issues of public interest will not alter its nature." (citation omitted)).

Defendants also mischaracterize controlling Supreme Court and Fourth Circuit "inextricably intertwined" jurisprudence in order to wrongly suggest that they can market their "books" with deceptive advertising, as long as the deceptive statements come directly from their books.[58]  This is plainly not the law.  The First Amendment does not provide a license to steal by converting deceptive advertising into constitutionally protected core speech.  Rather, as the Fourth Circuit recently set forth in *Handsome Brook Farm, LLC*, the inextricably intertwined

---

[56] *See, e.g.*, Def. Opp. at 14, 16, 18, 21, 23, 25 (identifying challenged advertisements as "promotions" or "promotional materials").
[57] Defendants do not apply the *Bolger* factors to their marketing, instead focusing on their books.  Def. Opp. 13-14.
[58] Def. Opp. at 14-15.

doctrine protects non-profit advertising that is enmeshed with advocacy for its mission. 700 F.

App'x at 261 ("[A] non-profit organization cannot solicit donations without also advocating for

its mission; and conversely, a non-profit organization cannot advocate for its mission unless it

can solicit donations to support its advocacy."). Defendants, of course, operate a for-profit

concern. The Fourth Circuit in *Handsome Brook*, citing the Supreme Court's *Bd. Of Trustees of*

*State Univ. of N.Y. v. Fox* decision, further noted that a corporation's purportedly educational

seminar coupled with a pitch to purchase home goods was still commercial speech. *Id.* (*citing*

*Fox*, 492 U.S. 469, 473-74 (1989)). That is because there is "nothing whatever 'inextricable'

about the noncommercial aspects of these [seminars]. No law of man or nature makes it

impossible to sell housewares without teaching home economics, or to teach home economics

without selling housewares." *Id.*

Likewise here, there is nothing preventing Defendants from truthfully advertising their

products or from otherwise disseminating the ideas therein in a non-deceptive and/or non-

commercial manner. That they have made a business decision to falsely market them was

Defendants' decision alone. As in *Handsome Brook*, "the commercial proposition in

[Defendants' advertising] is therefore not 'inextricably intertwined' with its noncommercial

message." *Id.* at 262.[59]

## III.    THE BALANCE OF EQUITIES WEIGH IN FAVOR OF A PRELIMINARY INJUNCTION.

Having established the FTC's likelihood of success on the merits, and disposed of

Defendants' First Amendment theory, the only remaining inquiry for issuance of the preliminary

injunction is whether the balance of equities favors a preliminary injunction. They do. The

public's interest outweighs any private interest, as a matter of law. *See FTC v. Ameridebt, Inc.*,

---

[59] Defendants did not cite the Fourth Circuit's controlling *Handsome Brook* decision. Rather, Defendants attempt to conflate the "inextricably intertwined" doctrine with non-binding, out-of-circuit opinions analyzing the intersection between state law tort claims and commercial speech. None of the cases adopt a categorical rule that "truthful advertisements for noncommercial speech always share the identical level of First Amendment protection as the underlying speech." *See Charles v. City of Los Angeles*, 697 F.3d 1146, 1155 (9th Cir. 2012). Indeed, courts have rejected parties' attempts to so insulate their commercial speech. *See, e.g.*, *Gordon & Breach Sci Publrs. S.A. v. Am. Inst. Of Physics*, 859 F. Supp 1521, 1540 (S.D.N.Y. 1994).

373 F. Supp. 2d 556, 564 (D. Md. 2005). Here, stopping deceptive conduct is clearly in the public's interest.

Defendants recycle their First Amendment and *Viropharma* theories to claim that the balance of equities weighs against a preliminary injunction. First, they contend that the public will suffer harm from the "serious chill" on Defendants' "protected speech." [60] However, as established above, there is no First Amendment protection for Defendants' false claims, and no prohibition on publishing their books. Defendants also argue that because they allegedly voluntarily ceased promotions for the 28-day diabetes cure and Congressional Checks and Republican Checks, there is no need for injunctive relief.[61] However, "the court's power to grant injunctive relief survives discontinuance of the illegal conduct." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). To the extent Defendants' argument hinges on the Third Circuit's ruling in *Viropharma*, the FTC has already demonstrated why this decision is inapplicable and non-binding.

Defendants incorrectly suggest that the FTC must provide detailed proof of consumers' "loss of money or property," to justify its request for injunctive relief. But, the FTC has no such obligation. *Cf. FTC v. BlueHippo Funding*, 762 F.3d 238, 244 (2d Cir. 2014) (collecting cases).

## IV.        THE FTC'S PROPOSED INJUNCTION IS APPROPRIATE.

Defendants object to the scope of the FTC's proposed injunction on four bases. First, they argue the proposed injunction is overbroad to the extent that it imposes prohibitions against misrepresentations and substantiation requirements that are not limited to the challenged advertisements and that would affect their "affiliates." However, the proposed preliminary injunction includes fencing-in relief that courts have repeatedly upheld. Second, Defendants loosely suggest the proposed relief has impermissible First Amendment implications; it does not. Third, Defendants claim that the substantiation requirements are too onerous, but their argument relies on a misreading of the proposed Order's limited restrictions. Finally, Defendants seek to

---

[60] Def. Opp. 33-34.
[61] Def. Opp. 33-34.

eliminate the notice and distribution requirements, but these are both required and standard.

      **A.**    <u>**The Proposed Fencing-In Relief is Appropriate.**</u>

      The proposed Preliminary Injunction is limited to (1) prohibiting certain misleading representations to consumers, and (2) requiring appropriate substantiation for particular health claims.[62] Defendants bristle at the fact that these restrictions would impact their marketing of products outside the 28-day diabetes cure, or Congressional Checks or Republican Checks, but well-worn case law confirms that FTC's injunctive relief need not be "limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past . . . . [Defendants] 'must expect some fencing in.'" *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965) (citation omitted). The order must "serve to 'close all roads to the prohibited goal, so that (the FTC's) order may not be by-passed with impunity.'" *Litton Indus., Inc. v. FTC*, 676 F.2d 364, 370 (9th Cir. 1982) (citation omitted). To that end, the FTC may, as it seeks to do here, enjoin other illegal conduct, such as misrepresentations about related products or services, and impose heightened substantiation requirements for health claims. *See Direct Mktg. Concepts, Inc.*, 648 F. Supp. 2d at 213 ("[C]ourts have discretion to issue multi-product injunctions . . . that extend beyond the specific violations at issue in the case to prevent defendants from engaging in similar deceptive practices in the future." (citation omitted)). The fencing-in provisions need only "bear a reasonable relation to the unlawful practices found to exist." *Colgate-Palmolive Co.*, 380 U.S. at 394-94; *see Telebrands v. FTC*, 457 F.3d 354, 362 (4th Cir. 2006) (upholding injunctive relief impacting all of the defendant's products).

      Defendants' contention that there is no "reasonable relationship" between the proposed restrictions and their unlawful practices that gave rise to this action has no merit. The proposed preliminary injunction requires the Defendants refrain from otherwise illegal deceptive speech in the sale of the same or similar products at issue in this case. The prohibited misrepresentations are substantially similar, if not identical, to the representations challenged in this action. The proposed Order also requires Defendants to appropriately substantiate their diabetes and other

---

[62] [Proposed] Prelim. Inj. (ECF No. 2-2).

health-related claims —also, directly relevant to the conduct challenged in this action.  The broadest injunctive relief in the proposed Order prohibits Defendants from misrepresenting any good or fact, and requires that any health claim be supported by competent and reliable scientific evidence.  Both restrictions are not only the law as it applies to any marketing, but identical to the type of relief typically sought and obtained in FTC cases.  *See e.g.*, *FTC v. Cardiff*, 2018 WL 5622644, at \*4 (C.D. Cal. Oct. 10, 2018); *Direct Mktg Concepts, Inc.*, 648 F. Supp. 2d at 216.

Defendants also complain the proposed Order would affect an unknown set of nonparty "affiliates."  However, such parties would clearly be bound if they are acting in concert or participation with the Defendants, and it is well-settled that even a non-party may be directly bound under various theories of liability including successorship, common enterprise, and common law principles of privity.  Moreover, Defendants' pattern and practice of cross-promotion and shifting claims necessitates this relief.  As previously demonstrated, Defendants continue to promulgate similar claims as those at issue here, from a myriad of connected entities.[63]

## B.    The Proposed Injunction Provisions Are Not Improper Prior Restraints.

Defendants also appear to object to the proposed injunction on First Amendment grounds.[64]  However, injunctive provisions requiring "truthful, non-misleading, and adequately substantiated" product claims are not barred by the First Amendment because "deceptive and misleading advertisement" has no First Amendment protection.  *Direct Mktg. Concepts, Inc.,* 648 F. Supp. 2d at 217; *see also United States v. Bell,* 414 F.3d 474, 480 (3rd Cir. 2005) (granting government preliminary injunction request over prior restraint objection because if commercial speech is misleading "the government may restrict it and the inquiry ends" (citation omitted)).

## C.    Defendants Misstate the Proposed Order's Substantiation Provisions.

Defendants devote over two pages to the notion that the FTC's proposed Preliminary Injunction imposes a blanket RCT requirement to substantiate claims related to any Covered Product or Covered Program.  To the contrary, under the proposed Preliminary Injunction,

---

[63] Declaration of Adam Rottner (ECF No. 28-1) ¶¶ 5-7; *See also* Declaration of Adam Rottner (ECF No. 2-4) ¶ 86.
[64] [Proposed] Prelim. Inj. (ECF No. 2-2) Section II.E & V.F.

health-related claims made in connection with a Covered Product or Covered Program must be substantiated by CRSE — the standard Defendants concede is required for truthful and not misleading health claims.[65]

### D.    The Proposed Notice and Distribution Requirements Are Appropriate.

Finally, Defendants argue that the "notice and distribution" provisions of the proposed Injunction are overbroad because they require Defendants to distribute the Order to "each affiliate, telemarketer, marketer, sales entity, successor, assign, member, officer, director, employee, agent, independent contractor, client, attorney, subsidiary, division, and representative of any Defendant." According to Defendants, this requirement is "unnecessary, as only a small subset [of the proposed recipients] is involved in marketing and advertising."[66]

In fact, the proposed injunctive relief is necessary. Defendants frequently use banner ads, email distribution lists, and other means by which third-parties disseminate their advertisements. For the injunctive relief to hold any weight, the third-parties who assist them in promulgating their advertisements must be aware of the prohibited representations. Without this relief, Defendants can continue to reap the rewards of currently circulating advertisements, without risk of contempt, causing consumer harm. Accordingly, the FTC regularly seeks nearly identical preliminary injunctive relief. *See, e.g.*, *In re Sanctuary Belize Litig.*, 2019 WL 5250566, at *18; *FTC v. D Squared Solutions, LLC*, 2003 WL 22881377, at *4 (D. Md. 2003).

### CONCLUSION

For the reasons stated above, the FTC respectfully requests that the Court enter the proposed preliminary injunction against the Defendants.


Dated:  January 15, 2020                      /s/ Omolara Bewaji Joseney
                                              OMOLARA BEWAJI JOSENEY, pro hac vice
                                              ojoseney@ftc.gov
                                              DILLON JOSEPH LAPPE, pro hac vice
                                              dlappe@ftc.gov
                                              GREGORY J. MADDEN, Bar No. 07023

---

[65] In Section II (governing substantiation for Covered Product and Covered Program claims), CRSE requires RCTs only when *such experts would generally require* such testing. [Proposed] Prelim. Inj. at 8-9 (emphasis added).
[66] Def. Opp. 32-33.

gmadden@ftc.gov
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue NW, CC-9528
Washington DC 20580
(202) 326-2599, -2833, -2426
Fax: (202) 326-3197
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

**<u>CERTIFICATE OF SERVICE</u>**

I, Omolara Bewaji Joseney, hereby certify that on this 15th day of January, 2020, a copy of the foregoing PLAINTIFF FEDERAL TRADE COMMISSION'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION was served on all counsel of record through the Court's CM/ECF system.


　　　　　　　　　/s/
　　　　　　　　Omolara Bewaji Joseney

22