## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
#### (Northern Division)

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION,** | * | |
| *Plaintiff,* | * | |
| v. | * | **Case No. 19-cv-3100-SAG** |
| **AGORA FINANCIAL, LLC,** *et al.*, | * | |
| *Defendants*. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

# **TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

BACKGROUND .............................................................................................................................1

I.      The Health Defendants Authored and Published *The Doctor's Guide* ................................1

II.     The Financial Defendants Authored and Published *Congress' Secret* ............................. 4

LEGAL STANDARD......................................................................................................................7

ARGUMENT ..................................................................................................................................9

I.      Congress' Secret and The Doctor's Guide Are Not Commercial Speech .........................10

II.     Representations in Promotional Materials for Publications That Are Inextricably
        Intertwined With the Content of the Underlying Publications Are Noncommercial........11

        A.    In Determining Whether Promotions Selling Speech Are Commercial for
              Purposes of the FTC Act, the Court Should Bear in Mind the Fundamental
              Differences Between Promotions Selling Speech and Promotions Selling Goods
              and Services. ..........................................................................................................13

        B.    The Challenged Representations in the Health Defendants' Promotional Materials
              for *The Doctor's Guide* Are Inextricably Intertwined With the Underlying
              Publication ..............................................................................................................17

        C.    The Challenged Representations in the Financial Defendants' Republican Checks
              Promotion for *Congress' Secret* Are Inextricably Intertwined With the Underlying
              Publication ..............................................................................................................21

III.    The Alleged Omission in Count IV Is Demonstrably False .............................................27

IV.     The FTC Cannot Cite the Congressional Checks Promotion as a Basis for its Claim That
        the Financial Defendants Are "Violating, or About to Violate," the FTC Act.................28

CONCLUSION...............................................................................................................................30

102753\000004\4810-5616-9137.v7

Defendants, Agora Financial, LLC, NewMarket Health, LLC, NewMarket Health Publishing, LLC, Health Sense Media, LLC, Health Sense Publishing, LLC, Richard Gerhauser, M.D., and Zachary Scheidt, by and through their undersigned counsel and pursuant to Federal Rule of Civil Procedure 12(b)(6), submit this Memorandum in Support of their Motion to Dismiss and state as follows:

## <u>INTRODUCTION</u>

In a stark departure from its typical pursuit of advertisements for goods and services (commercial speech), the Federal Trade Commission ("FTC") in this action seeks to control promotional materials for ***publications*** that are fully protected by the First Amendment to the United States Constitution. The representations the FTC challenges in the promotional materials are inextricably intertwined with the content of the underlying publications, which renders those representations noncommercial speech that is outside the FTC's reach. In fact, while the FTC's attack is nominally directed at Defendants' promotional materials, an examination of its Complaint reveals that the FTC is attacking the content of the underlying publications. For the reasons set forth below, the FTC's Complaint fails to state a claim upon which relief can be granted and should be dismissed in its entirety.

## <u>BACKGROUND</u>

### I.     The Health Defendants Authored and Published *The Doctor's Guide*.

Defendants New-Market Health and NewMarket Health Publishing, LLC (collectively, "NewMarket") publish a health-related book, *The Doctor's Guide to Reversing Diabetes in 28 Days* ("*The Doctor's Guide*"), by Defendant Richard Gerhauser, M.D.[1] (Compl. ¶ 16.)

---

[1] The FTC incorrectly alleges that Defendants Health Sense Media, LLC and Health Sense Publishing, LLC (collectively, "Health Sense") also "advertised, marketed, promoted, offered for sale, sold, published, or distributed" *The Doctor's Guide* to consumers. (Compl. ¶ 16.) Defendants acknowledge that in the posture of this motion to dismiss, the Court will take this allegation as true. However, they note that in August 2018, prior to the publication of *The Doctor's Guide*, NewMarket took over publication of Health Sense's titles, so Health Sense was not involved in

NewMarket, Health Sense, and Dr. Gerhauser are collectively referred to herein as the "Health Defendants." *The Doctor's Guide* is an informational publication based on a protocol Dr. Gerhauser has long used with his own patients addressing the causes of, and suggesting ways to reduce the risks and symptoms of, type 2 diabetes without using pharmaceuticals. The book explains that Dr. Gerhauser's default recommendation in treating type 2 diabetes is not prescription drugs with their dangerous side effects, but rather an alternative, natural three-step "protocol" to reverse diabetes symptoms by: (1) limiting exposure to environmental toxins, (2) helping the body to make more insulin, and (3) teaching the body's cells to use insulin effectively. (*See* Ex. 1, *The Doctor's Guide* at 37.)[2] The book includes Dr. Gerhauser's opinions that (a) a disrupted circadian rhythm may cause or exacerbate type 2 diabetes by altering the pancreas's insulin production, and it recommends ways to improve the circadian rhythm, (b) non-ionizing radiation emitted by everyday electronics may cause or exacerbate type 2 diabetes, and (c) taking mulberry extract, magnesium, and chromium may naturally improve blood sugar levels and decrease carbohydrate absorption to help reverse the symptoms of diabetes in as little as 28 days. (*Id.* at 2-61.) The book also includes ancillary recommendations such as taking maqui berry and clove extract while adopting a seasonal, organic diet with seafood to "boost" the effects of his primary recommendations. (*Id.* at 62-83.) Each chapter of the book describes the research on which Dr. Gerhauser bases his opinions and recommendations. (*Id.* at 62-83.) And although Dr. Gerhauser

---

the advertisement, marketing, promotion, offering for sale, sales, publication, or distribution of *The Doctor's Guide*, which was not released until after that transfer. (*See* Affidavit of Kevin Hart ¶¶ 8, 10, ECF No. 33-19.) Health Sense reserves the right to move for summary judgment on this basis at the appropriate juncture. However, even assuming *arguendo* that Health Sense "advertised, marketed, promoted, offered for sale, sold, published, or distributed" *The Doctor's Guide*, as the FTC alleges, those claims against Health Sense fail for the reasons set forth herein.

[2] As set forth in the Legal Standard below, the Court may consider these exhibits on Defendants' Motion to Dismiss because they are integral to the FTC's Complaint.

2

also identifies sources where readers can purchase the products he recommends, the FTC does not

allege that any defendant has a financial interest in those products.

To promote *The Doctor's Guide*, Dr. Gerhauser recorded a video in which he described his

"three-step protocol" and the studies on which it was based. NewMarket then promoted the video

through "lift" announcements in direct marketing emails. (Compl. ¶ 28.) Interested consumers

could purchase *The Doctor's Guide* after watching the video (or reading the transcript of the video,

which the Health Defendants also made available). (Compl. ¶¶ 29-30; *See* Ex. 2, Promotion for

*The Doctor's Guide*.)

Counts I and II of the FTC's Complaint assert claims against the Health Defendants under

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), for unfair or deceptive acts or practices in or

affecting commerce in connection with the promotional materials for *The Doctor's Guide*. Count

I asserts a claim for allegedly false or unsubstantiated ***efficacy*** claims. Specifically, the FTC alleges

that, "in connection with the advertising, marketing, promotion, offering for sale, or sale of *The*

*Doctor's Guide*," the Health Defendants:

> have represented, directly or indirectly, expressly or by implication, that:
> a) The protocol described in The Doctor's Guide will cure, treat, or mitigate type 2 diabetes or its symptoms;
> b) The protocol described in The Doctor's Guide does not require consumers to restrict or make changes to their diets;
> c) Supplements, including Himalayan Silk, Epsom Blue, and Chromanite will, either alone or in combination cure, treat, or mitigate type 2 diabetes or its symptoms;
> d) Type 2 diabetes is caused by NIR exposure;
> e) Consumers can prevent type 2 diabetes through the use of Non-Ionizing Radiation "blockers," or by otherwise avoiding NIR.

(Compl. ¶ 105.) Count II of the FTC's Complaint asserts a claim for allegedly false ***establishment***

claims. Specifically, the FTC alleges that "in connection with the advertising, marketing,

promotion, offering for sale, or sale of *The Doctor's Guide*," the Health Defendants "have

represented, directly or indirectly, expressly or by implication, that the protocol described in *The*

3

*Doctor's Guide* is scientifically proven to cure, treat, or mitigate type 2 diabetes or its symptoms in 28 days." (Compl. ¶ 108.) The FTC asserts that the six representations at issue in Counts I and II "are false, misleading, or were not substantiated," at the time they were made, and that their making thus violated the FTC Act. (Compl. ¶¶ 106-07, 109-10.)

## II.     The Financial Defendants Authored and Published *Congress' Secret*.

Defendant Agora Financial, LLC ("Agora") is the publisher of a financial book, *Congress' Secret $1.17 Trillion Giveaway* ("*Congress' Secret*"), and a related financial newsletter, *Lifetime Income Report* ("*LIR*"), both by Defendant Zachary Scheidt. (Compl ¶ 18.) Agora Financial and Scheidt are collectively referred to herein as the "Financial Defendants." *Congress' Secret* outlines a strategy for investing in publicly traded entities that stood to benefit substantially from certain tax advantages provided by the 2017 Tax Cuts and Jobs Act ("TCJA"). In the introduction to *Congress' Secret*, Mr. Scheidt explains that upon review of the TCJA, he discovered a "last-minute add on to the bill that would enrich many of the congressmen and senators who supported the legislation. They set themselves up to receive large, regular checks with a greatly reduced tax burden" that, by Mr. Scheidt's count "could total up to $1.17 trillion—possibly more!" (Ex. 3, *Congress' Secret* at 11; at 13 ("Part II of the law adds new sections to the tax code that offer incredible tax advantages to certain investments—investments that many of Washington's power players use to earn 'bonus' income checks year after year," and identifying congressmen and senators who benefit from these types of investments.).) Throughout *Congress' Secret*, Mr. Scheidt refers to the dividends and share buybacks consumers may receive when they participate in the 13 investment opportunities he identifies as "Congressional Checks," (in reference to what he viewed as Congress' self-dealing in passing the new tax law).

To promote *Congress' Secret* to potential new subscribers of *LIR*, Mr. Scheidt recorded a video encouraging readers to purchase *Congress' Secret* to learn about how to obtain

"Congressional Checks." (Compl. ¶ 69.)  Scheidt explains that Congressional Checks is used as a metaphor to describe an investment opportunity related to a new tax provision—that requires certain private entities to pay out money to their investors—from which congressional representatives were benefitting, and he expressly states that what he is describing is not a government program. (Ex. 4, Congressional Checks Promotion at 3 ("*I call this opportunity 'Congressional Checks'…because*…a handful of congressmen  have already been collecting this easy cash."); at 4 ("some savvy *investors* are already cashing in"); at 8 ("[T]his has *nothing to do with Social Security or any government program*."); at 19 ("The *entities* impacted by Section 199A 'must distribute' most of their money."); at 25 ("Section 199A benefits a very specific and select group of *private entities*."); at 27 ("Of course, like any other *investment*, nothing is guaranteed. All investing carries a level of *risk*. But the good news is, so far, anyone who's *become a partner of these entities* has received a check."); at 28 ("Right now, there are only 416 of those fiscally transparent entities in the U.S…. I've already identified the ones that could pay the biggest Congressional Checks.") (emphases added).)

In October 2018, Agora Financial began promoting *Congress' Secret* using the phrase "Republican Checks" instead of "Congressional Checks." (Compl. ¶65.) The Republican Checks promotion also explained that Republican Checks is a metaphor to describe an investment opportunity related to a new tax bill—that provides tax benefits for payouts by certain private entities to their investors—that the Republican-majority Congress passed, from which multiple politicians are benefitting; it states that Republican Checks is not a government program; it makes clear that there is risk involved and that an investor's payout is dependent on the amount invested. (Ex. 5, Republican Checks Promotion at 3 ("The Republican Congress has passed a groundbreaking new law… a few everyday folks like you are already collecting extra *investment*

102753\000004\4810-5616-9137.v7

*income* thanks to this new tax provision…In the form of what I call 'Republican Checks.'"); at 4 (*"**Depending on how much you invest**, you could see 'Republican Checks' ranging from just a few hundred dollars to thousands of dollars."); at 5 (testimonials are from investors who "took a position larger than the typical investor," allowing them to collect "***above-average*** 'Republican Checks'"; "this investment has ***nothing to do with Social Security or any government program***"); at 17 ("many [politicians] are collecting millions because of their ***larger than average initial stake***"); at 24 ("Anyone can become a partner ***shareholder of those entities***.") (emphases added).)

Counts III and IV of the FTC's Complaint assert claims against the Financial Defendants under Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), for unfair or deceptive acts or practices in or affecting commerce in connection with the promotional materials for *Congress' Secret*. Count III asserts a claim for alleged ***misrepresentations*** regarding *Congress' Secret* and *LIR*. Specifically, the FTC alleges that "in connection with the advertising, marketing, promotion, offering for sale, or sale" of *Congress' Secret* or *LIR* the Financial Defendants:

> have represented, directly or indirectly, expressly or by implication that:
> a) Consumers are entitled, by law or otherwise, to money from Congressional Checks or Republican Checks
> b) Consumers can collect money from Congressional Checks or Republican Checks just by adding their name to 'the list of check payees;"
> c) Consumers can collect hundreds to thousands of dollars per month in Congressional Checks or Republican Checks with little or no risk;
> d) Congressional Checks or Republican Checks are affiliated or furnished by Congress or another government agency or program;
> e) Anyone can collect hundreds to thousands of dollars in Congressional or Republican Checks.

(Compl. ¶ 111.) The FTC asserts that those representations are false or misleading, and violative of the FTC Act. (Compl. ¶¶ 112-13.) Count IV asserts a claim for alleged ***material omissions*** regarding *Congress' Secret*. Specifically, the FTC alleges that "in connection with the advertising, marketing, promotion, offering for sale, or sale" of *Congress' Secret*, Agora and Mr. Scheidt "fail[ed] to disclose that consumers must spend tens of thousands to hundreds of thousands of

dollars to collect the promised amounts," and that this information "would be material to consumers in deciding to pay any money to receive" *Congress' Secret*. The FTC asserts that the omission of this information violated the FTC Act. (Compl. ¶¶ 112-13.)

The FTC claims it is entitled to relief under Section 13 of the FTC Act, 15 U.S.C. § 53(b) for Defendants' alleged violations of Section 5, 15 U.S.C. § 45(a). As set forth below, each count fails to state a claim upon which relief can be granted and the FTC's Complaint should be dismissed.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a complaint." *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017). To survive the motion, the complaint "must contain facts sufficient to 'state a claim to relief that is plausible on its face.'" *Balt. Scrap Corp. v. Exec. Risk Specialty Ins. Co.*, 388 F. Supp. 3d 574, 583 (D. Md. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A court decides whether this standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Soc'y Without a Name v. Comm'w of Va.*, 655 F.3d 342, 346 (4th. Cir. 2011). The court, however, need not "accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678. And if a complaint "provides no more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,' it is insufficient." *Balt. Scrap. Corp.*, 388 F. Supp. 3d at 583 (quoting *Twombly*, 550 U.S. at 555).

Generally, courts considering a Rule 12(b)(6) motion are "limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015)

7

(citations omitted). Consideration of other documents attached to the motion "ordinarily is permitted only when the document is 'integral to and explicitly relied on in the complaint,' and when 'the plaintiffs do not challenge [the document's] authenticity.'" *Id.* at 606-07. "To be 'integral,' a document must be one 'that by its very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Balt. Scrap Corp.* 388 F. Supp. 3d at 585 (citation omitted). "The rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated where plaintiff has actual notice and has relied upon these documents in framing the complaint." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (citation and internal punctuation omitted). Here, while the FTC did not attach any documents to its Complaint, it attached the promotional materials giving rise to its claims and the underlying publications to its Motion for Preliminary Injunction, filed simultaneously with its Complaint. The FTC has actual notice of those documents, the representations in them are integral to the FTC's claims, and the FTC has conceded their authenticity. This Court may properly consider those documents in ruling on Defendants' Motion to Dismiss.

Moreover, the Court need not accept as true the FTC's self-serving, conclusory, and often inaccurate summary of the alleged "representations" in the promotional materials, since the promotional materials themselves, *i.e.*, Defendants' actual representations, are properly before the Court. Under the "exhibit prevails rule," "in the event of a conflict between the bare allegations of the complaint and any exhibit attached . . . the exhibit prevails."[3] *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991).

---

[3] The exhibit prevails rule is not limited to instances where a plaintiff has affirmatively attached a document to its complaint, but also applies where the complaint "otherwise shows that the plaintiff has adopted the contents of the document." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 167 (4th Cir. 2016); *see also Clark v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 788 (D. Md. 2013) (applying the "exhibit prevails" rule to documents attached both by the

## **ARGUMENT**

Under the FTC Act, the FTC is empowered to regulate misleading commercial speech; the FTC has no jurisdiction over noncommercial speech. *In re R.J. Reynolds Tobacco Co.*, 111 F.T.C. 539, 541 (1988) (Unless speech "can be classified as commercial speech, it is not subject to the [FTC's] jurisdiction."). In fact, Congress often circumscribes the scope of statutes allowing government regulation of speech specifically to avoid offending the First Amendment. *See Lowe v. SEC*, 472 U.S. 181, 207, 210 (1985) (noting that there can be "no doubt about the protected character" of financial newsletters containing commentary on general market conditions, and discussing Congress' apparent intent to keep the Investment Advisors Act of 1940, which regulated investment advice, "free of constitutional infirmities," by exempting such publications from the act); *Oxycal Labs., Inc. v. Jeffers*, 909 F. Supp. 719 at 722–24 (S.D.Ca. 1995) ("Congress explicitly limited the reach of the Lanham Act to statements made in commercial advertising in order to preserve its constitutionality"). The FTC does not dispute that *The Doctor's Guide* and *Congress' Secret* are noncommercial speech that are not within the scope of the FTC Act. Its challenges are purportedly limited to representations in Defendants' promotional materials for *The Doctor's Guide* and *Congress' Secret*. However, because the challenged representations in Defendants' promotional materials are inextricably intertwined with the fully protected speech in the underlying publications, they are also outside of the FTC's reach. Because a non-commercial representation cannot serve as the basis for a violation of 15 U.S.C. § 45(a), the FTC's Complaint fails to state a claim upon which relief can be granted as to these representations.

Moreover, certain of the challenged alleged representations and omissions are in the Congressional Checks promotion, which the Financial Defendants ceased using more than a year

---

plaintiff to the complaint and by the defendant to its motion to dismiss); *Beeline Entm't Partners, Ltd. V. Cty. of Orange*, 243 F. Supp. 2d 1333. 1336 (M.D. Fla. 2003) (same).

before the FTC filed suit. Those representations thus cannot serve as the basis for a claim for relief under 15 U.S.C. § 53(b), and Counts III and IV fail to state a claim upon which relief can be granted for the Congressional Checks promotion. Finally, as to the Republican Checks promotion, the Financial Defendants disclosed the very information the FTC claims they omitted. Because a non-existent omission cannot serve as the basis for a violation of 15 U.S.C. § 45(a), Count IV fails to state a claim upon which relief can be granted for the Republican Checks promotion.

## I.     *Congress' Secret* and *The Doctor's Guide* Are Not Commercial Speech.

The FTC concedes, as it must, that *Congress' Secret* and *The Doctor's Guide* are not commercial speech. (Reply in Support of Mot. for Prelim. Injunction, ECF No. 37 at 13 (the proposition that publications are noncommercial is "non-controversial").) Nevertheless, the proposition bears repeating, as it is significant to understanding why the representations the FTC challenges, despite being in promotional materials, take on the noncommercial character of their source materials.

Courts consistently find publications like *Congress' Secret* and *The Doctor's Guide* are not commercial speech and reject attempts to regulate allegedly false or misleading claims in those publications. *William O'Neil & Co. v. Validea.com Inc.*, 202 F. Supp. 2d 1113, 1119 (C.D. Cal. 2002) (investment book); *Oxycal*, 909 F. Supp. at 723-24 (book advancing "theories on the causes of cancer and the ways to eliminate cancer"); *Ginsburg v. Agora, Inc.,* 915 F. Supp. 733, 740 (D. Md.1995) ("investment newsletters"); *Lane v. Random House, Inc.*, 985 F. Supp. 141 (D.D.C. 1995) (book analyzing "the arguments raised by leading conspiracy critics" concerning the presidential assassination); *Nat'l Life Ins. Co. v. Phillips Publ'g, Inc.,* 793 F. Supp. 627, 645 (D. Md. 1992) (investment newsletter); *SEC v. Hirsch Org., Inc.,* 1982 WL 1343 (S.D.N.Y. 1982) (financial newsletter). Thus, no matter the extent to which the FTC may disagree with the views

10

expressed therein, it may not regulate *Congress' Secret*, *The Doctor's Guide*, or other similar publications.

## II.  Representations in Promotional Materials for Publications That Are Inextricably Intertwined With the Content of the Underlying Publications Are Noncommercial.

The Supreme Court has defined commercial speech as "expression related ***solely*** to the economic interests of the speaker and its audience," and as that which "does '***no more than*** propose a commercial transaction.'" *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561 (1980) (emphasis added); *Va. State Bd. of Pharmacy v. Va. Citizens of Consumer Council*, 425 U.S. 748, 762 (1976) (emphasis added) (citation omitted). Purely commercial speech is that which is "removed from the 'exposition of ideas' or the expression of 'truth, science, morality, [the] arts in general' and other topics that characterize speech fully protected by the First Amendment." *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 257 (4th Cir. 2017) (unpublished).[4] Here, Defendants' promotional materials for *The Doctor's Guide* and *Congress' Secret* do more than just propose a commercial

---

[4] *Handsome Brook Farm* is one of several Fourth Circuit cases that have touched on the inextricably intertwined doctrine, albeit in the context of non-profit entities arguing that their charitable message was "inextricably intertwined" with speech related to goods or services that would indisputably have been commercial were it by a for-profit entity. In *Handsome Brook Farm*, the Fourth Circuit merely rejected the notion that a non-profit entity's speech is always non-commercial by virtue of its non-profit status, reasoning: "the identity of a speaker does not categorically determine whether the speaker is economically motivated. Where a non-profit organization has a direct economic stake in the provision of its product or service, and structures its message in the hopes of realizing an economic gain rather than merely informing the public of its ideological views, it may reasonably be viewed as economically motivated." 700 F. App'x at 259. The Fourth Circuit's jurisprudence, however, does not address the inextricably intertwined doctrine in the context of speech promoting speech, as opposed to a good or service, and is largely inapposite to the inquiry in this case.

The FTC suggested in its Reply in Support of its Motion for Preliminary Injunction ("Reply") that, like the defendant in *Handsome Brook*, Defendants contend their promotional materials are noncommercial simply because they discuss matters of public concern. The key to Defendants' position is not just the subject matter of the speech, but also that the challenged representations appear in and stem from the underlying, noncommercial publications. The FTC concedes that it cannot regulate the underlying publications. As addressed below, publishers should necessarily be permitted leeway in promoting their publications, particularly where the publications address "matters of public concern." *See Charles v. City of Los Angeles*, 697 F.3d 1146, 1154-55 (9th Cir. 2012) ("[i]f advertisements for expressive works were not entitled to the same immunity from tort as the underlying work, publishers would be unable to truthfully advertise certain protected works."); *cf. Splawn v. California*, 431 U.S. 565, 603 n.2 (1977) ("to ban advertising of a book or film is to suppress the book or film itself") (Stevens, J., dissenting).

11

transaction; they convey the fully protected, noncommercial ideas and opinions in the underlying publications.

The alleged representations at issue in Counts I through III are noncommercial speech because, despite the fact that the representations appear in promotional materials, they are "inextricably intertwined" with the noncommercial speech in the underlying publications they promote. *Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 958 (9th Cir. 2012) ("[E]ven if the publication meets this threshold commercial speech classification, courts must determine whether the speech still receives full First Amendment protection, because the commercial aspects of the speech are 'inextricably intertwined' with otherwise fully protected speech, such that the publication sheds its commercial character and becomes fully protected speech."). This is because speech that "in the abstract is indeed merely 'commercial'" does not "*retain*[] its commercial character when it is inextricably intertwined with otherwise fully protected speech." *Riley v. Nat'l Fed'n of Blind,* 487 U.S. 781, 796 (1988) (emphasis added).

In *Board of Trustees of SUNY v. Fox*, the Supreme Court elaborated on what courts mean when they determine that commercial and noncommercial speech are inextricably intertwined. 492 U.S. 469 (1989). *Fox* involved a regulation that prohibited the operation of commercial enterprises on university grounds, which the university had invoked to prohibit dormitory Tupperware parties for housewares at which the party hosts discussed home economics. *Id.* at 472. In holding that that the commercial and noncommercial speech at issue were not "inextricably intertwined," the Court observed that it is possible to sell housewares without teaching home economics, and vice versa. *Id.* at 474. By contrast, it is impossible to promote a publication without describing its content. Thus, courts have held that when statements in promotional materials are "adjunct" or "incidental" to a protected publication, even "advertisements that accurately reprint[] false claims contained in

the advertised works" are protected "to the same degree as the underlying works." *Charles*, 697

F.3d at 1154-55.

A.    **In Determining Whether Promotions Selling Speech Are Commercial for Purposes of the FTC Act, the Court Should Bear in Mind the Fundamental Differences Between Promotions Selling Speech and Promotions Selling Goods and Services.**

In its Reply in Support of its Motion for Preliminary Injunction, the FTC devoted the

majority of its First Amendment argument to the commercial nature of advertisements generally—

but that argument misses the point. Whether the promotional materials are "advertisements" is

irrelevant; the very premise of the inextricably intertwined doctrine is that the speech in question

is, "***in the abstract***," "***merely commercial***." *See Riley,* 487 U.S. at 796 (emphasis added). The

FTC's analysis, however, ignores that the promotional materials at issue in this case are for

publications, not goods or services, so the inquiry does not end with the promotions, but looks to

whether the challenged claims in the promotions stem from the publications.[5] *See, e.g., Gordon &*

*Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1541 (S.D.N.Y. 1994)

(emphasizing the important distinction between speech selling speech and speech selling products

like pain killers or motor oil, in evaluating whether promotional materials are commercial).

The scope of the FTC's authority to regulate promotional materials for goods and services

is well trod ground. However, the scope of the FTC's authority to regulate promotional materials

for publications under the FTC Act, and particularly how that authority intersects with the

"inextricably intertwined" doctrine, appears to be an issue of first impression.[6] Defendants submit

---

[5] The FTC does not allege that the subject promotions are for anything other than the underlying publications, or that Defendants sell anything other than publications through the promotions.

[6] This is likely because this case represents a dramatic departure from the approach the FTC has historically taken in cases involving advertising for publications. For example, Kevin Trudeau has published *The Weightloss Cure "They" Don't Want you to Know About*, a book that he markets through infomercials. Beginning in 1998, the FTC brought multiple claims against Mr. Trudeau and various entities in connection with his infomercials for both his publications and other goods. *See FTC. v. Trudeau*, 579 F.3d 754, 756-58 (7th Cir. 2009) (describing past cases by the FTC against

that this is a distinct issue because promotional materials selling books are fundamentally different from promotional materials selling goods and services that happen to have some noncommercial component because of the speaker's political, religious, or other "noncommercial" motives. The key difference is the constitutional protection afforded the item being sold. The First Amendment does not protect a merchant's right to sell goods like eggs, motor oil, or tupperware. Publications like *The Doctor's Guide* and *Congress' Secret*, on the other hand, are speech on matters of public concern that are "at the heart of the First Amendment's protection," they "occup[y] the highest rung of the hierarchy of First Amendment values."[7] *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011)

---

Trudeau for claims in promotions for a hair farming system, a product to increase reading speed, a product to increase memory, and dietary supplements to cure many ailments). Following the original case and a number of subsequent contempt proceedings, Mr. Trudeau consented to entry of an order—*in which he expressly waived his First Amendment rights*, s*ee FTC v. Trudeau*, 567 F.Supp.2d 1016, 1022 n.7 (N.D. Ill. 2007), *vacated in part on other grounds* 579 F.3d 754—prohibiting him from appearing in infomercials. The consent order had one important exception: "Trudeau could participate in infomercials for publications, including his own publications, as long as the publication did not refer to any other product Trudeau was marketing," and *so long as "the infomercial for any such book" did not "misrepresent the content of the book."* 579 F.3d at 757-58 (emphasis added). Here, by contrast, the FTC seeks to restrain promotional materials regardless of whether they accurately represent the content of the book.

Tellingly, the FTC made no attempt to regulate Hulda Clark, author of the book *The Cure for All Cancers*, and its publisher, John A. Perkins, doing business as "ProMotion Publishing." *See Oxycal*, 909 F. Supp. at 720. In the book, Clark claimed, *inter alia*, that "all cancers can be rid from the human body by eliminating harmful toxins," and recommended certain activities, avoiding certain foods and household items, and certain methods of testing for the presence of toxins that should be avoided—a "comprehensive plan for identifying and removing all causes of cancer." *Id.* at 721. In the 1990s and early 2000s, the FTC sued a number of entities and individuals who were selling products using allegedly false claims in *The Cure for All Cancers* as the basis for statements about the efficacy of the products. *See FTC v. Dr. Clark Research Ass'n, et al.*, N.D. Oh. Case No. 3-cv-54-JRA; *FTC v. W. Dietary Prods. Co. Skookum, et al.*, W.D. Wash. Case No. 01-cv-818R. Presumably because the FTC recognized that the noncommercial nature of *The Cure for All Cancers* prevented it from prohibiting the book's publication or promotion, these cases did not involve claims against Ms. Clark or the publisher of her book. In fact, when another entity aggrieved by the allegedly false claims in *The Cure for All Cancers* sued Ms. Clark and her publisher for false advertising under the Lanham Act, the court found that the plaintiff was not likely to succeed on the merits of its claims because the speech in Ms. Clark's book was noncommercial. *Oxycal*, 909 F. Supp. at 726 ("[U]nless the speech is determined to be commercial speech, [the Lanham Act] does not apply, and the truth or falsity of the statements is not at issue.")

[7] The FTC does not dispute that Dr. Gerhauser is constitutionally entitled to express the ideas and opinions in *The Doctor's Guide*, but it has not explained how the Health Defendants can convey what consumers will receive when they purchase *The Doctor's Guide* without repeating the opinions and information set forth therein. The preliminary injunctive relief the FTC is seeking is a prime illustration of the danger of permitting the FTC unfettered authority to regulate publishers as if they were selling goods. If the Court imposed the FTC's requested blanket prohibition on all health claims in promotional materials that lack supporting competent reliable scientific evidence, the Health Defendants could not promote any publication unless the publication, too, were supported by competent reliable scientific evidence. Therein lies the problem with the FTC's attempt to graft standards that apply to advertising for goods or services onto promotions for publications without regard to the constitutional protections afforded the

(quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–759 (1985);

*Connick v. Myers*, 461 U.S. 138, 145 (1983)) (internal quotation marks omitted). Similarly, the

First Amendment does not protect a consumer's interest in receiving goods like eggs, motor oil,

or tupperware. By contrast, consumers' "First Amendment freedoms are implicated and infringed

directly when the government denies access to or proscribes reading materials on the basis of the

contents of those materials." *Lubin v. Agora, Inc.*, 389 Md. 1, 17 (2005); *see also Bd. of Educ.,*

*Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (The "right to receive

information and ideas . . . is an inherent corollary of the rights of free speech and press . . . [it]

follows ineluctably from the sender's First Amendment right to send them.").

These First Amendment values should factor into determining whether promotional

materials for speech are commercial for purposes the FTC Act, and they counsel a flexible

approach to the inextricably intertwined doctrine. This is because a rigid application of the

inextricably intertwined doctrine in the context of promotional materials for books, movies, and

other types of speech fully protected by the First Amendment runs the very real risk of permitting

FTC to censor promotional materials in a manner that impermissibly chills both components of

the inextricably intertwined speech.[8] *See New York Times v. Sullivan*, 376 U.S. 254, 272 (1964)

---

underlying speech. The FTC cannot possibly cite any authority supporting such an extensive prior restraint that will indisputably chill fully protected speech. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) (The "common thread" of Supreme Court precedent is that "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights.").

Even the **consent** order in *Trudeau, supra*, did not require Mr. Trudeau to possess **any** level of substantiation for the claims in the infomercials for his weight loss book, so long as the infomercials accurately represented the content of the books. Indeed, in holding Mr. Trudeau in contempt of the consent order, the district court did not cite any lack of scientific support for Mr. Trudeau's promotional claims, only the fact that the promotional claims did not accurately portray the content of the book. *FTC v. Trudeau*, 567 F. Supp. 2d 1016, 1022 (N.D.Ill.2007), *vacated in part on other grounds* 579 F.3d 754.

[8] Defendants do not suggest that FTC can never regulate advertisements for publications and other speech fully protected by the First Amendment (movies, television, etc.). Take, for example, a publisher that promotes a book on Constitutional law authored by Alan Dershowitz and Lawrence Tribe, but the book a consumer receives was actually wholly authored by Joe Schmo. Joe Schmo's book and the opinions and ideas therein are indisputably entitled to First

15

(explaining that free debate, including inevitable erroneous statements therein, "must be protected if the freedoms of expression are to have the 'breathing space' that they need to survive" (citation omitted)); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988) (explaining that falsehoods are "inevitable in free debate," and "a rule that would impose strict liability on a publisher for false factual assertions would have an undoubted 'chilling' effect on speech" of greater constitutional value).

In the context of books, the United States District Court for the District of Columbia has held that, "it is essential to identify and protect advertising which summarizes an argument or opinion contained in the book." *Lane*, 985 F. Supp. at 152. In *Lane*, the court affirmed summary judgment in the defendant's favor where the challenged advertising for a book repeated statements in the book, finding that the advertising "cannot be divorced" from the book. *Id*. The court in *Lane* is not alone. *Stutzman v. Armstrong*, No. 2:13-cv-0116, 2013 WL 4853333, *18-19 (E.D. Cal. Sept. 10, 2013) (finding advertising for a book about Lance Armstrong's life was afforded First Amendment protection because the promotional statements were "inextricably bound to the non-commercial contents of the books"); *William O'Neil & Co*, 202 F. Supp. 2d at 1119 (advertising for book analyzing investment strategies is "entitled to First Amendment protection to the same extent as the underlying publication," "to the extent the advertising is merely an adjunct of the protected publication and promotes only the protected publication."). Ultimately, none of these

---

Amendment protections. And because the claim of authorship has no connection with, i.e., is not inextricably intertwined with, Joe's opinions and ideas, the FTC can regulate the false claim of authorship without running afoul of those First Amendment protections. *Cf., Bantam Books, Inc. v. FTC*, 275 F.2d 680, 681 (2d Cir. 1960) (requiring publisher of republished paperbacks to disclose in clear, conspicuous type the fact that a book is an abridgement or published under a new title); *New Am. Library of World Literature v. FTC*, 213 F.2d 143, 144 (2d Cir. 1954) (same)).

In this case, the Court need not identify the precise bounds of the FTC's authority because, as addressed below, each of the alleged representations the FTC challenges undoubtedly implicates the First Amendment protections afforded the content of the underlying publications.

102753\000004\4810-5616-9137.v7

cases confronts the scope of the FTC's authority to regulate promotional materials for publications under the FTC Act, but they do clearly illustrate the preeminence of First Amendment protections for publishers—and their attendant promotional efforts—over claims that statements are false or misleading.

**B.      The Challenged Representations in the Health Defendants' Promotional Materials for *The Doctor's Guide* Are Inextricably Intertwined with the Underlying Publication.**

In Count I, the FTC first challenges the alleged representation in the promotional materials for *The Doctor's Guide* that Dr. Gerhauser's protocol will "cure, treat, or mitigate type 2 diabetes or its symptoms." (Compl. ¶ 105(a).) However, the promotional materials do not actually promise that Dr. Gerhauser's protocol will "cure" diabetes; the only place the word "cure" appears is in a statement at the beginning of the transcript of the video that a "shocking study shows 100% cure rate." (Compl. ¶ 28; *see also* Ex. 2, *The Doctor's Guide* Promotion at 2.) Aside from this single reference to a single ***study*** as showing a "cure," Dr. Gerhauser otherwise consistently refers to "reversing" diabetes and its symptoms throughout both the promotional materials and *The Doctor's Guide*. (*Compare* Ex. 1, *The Doctor's Guide* at 2 (protocol "reverses every symptom of your diabetes in 28 days"), *with* Ex. 2, *The Doctor's Guide* Promotion at 3 ("I specifically developed these guidelines to help you or someone you care about reverse diabetes in just 28 days."), and at 4 ("Program can reverse every symptom of your Type II diabetes in as little as 28 days.").) The representations in the promotional materials regarding Dr. Gerhauser's protocol's ability to reverse type 2 diabetes are inextricably intertwined with *The Doctor's Guide* and are thus noncommercial speech.

Second, the FTC challenges the alleged representation in the promotional materials that the protocol described in *The Doctor's Guide* "does not require consumers to restrict or make changes to their diets." (Compl. ¶ 105(b).) In fact, the promotional materials state that (a) the protocol does

not require readers to "give up the foods [they] love," (b) readers will be able to eat certain "forbidden foods" such as burgers, fries, and pie "without worrying about what they're doing to [readers'] blood sugar," and (c) readers can go out to restaurants without being "chained to the salad section." (Ex. 2, *The Doctor's Guide* Promotion at 3, 4, 11, 13.) These representations are true and consistent with the underlying publication. In *The Doctor's Guide*, Dr. Gerhauser explains that his three-step protocol refers to (1) limiting exposure to environmental toxins, (2) helping the body to make more insulin, and (3) teaching the body's cells to use insulin effectively. (Ex. 1, *The Doctor's Guide* at 37.) Those three steps do not involve restricting or making dietary changes. In addition to the "protocol," *The Doctor's Guide* includes a number of ancillary recommendations, including Dr. Gerhauser's "delicious and easy-to-follow meal plan," a proposal that readers eat a "seasonal, low-carb, organic diet with plenty of seafood," to ensure that readers are getting "vital nutrients," ***while still being able to eat many of the "forbidden foods" other doctors say to avoid***. (*Id.* at 38, 74-75 (emphasis added).) Moreover, in *The Doctor's Guide*, Dr. Gerhauser emphasizes that participants in the chromium studies ate "all the CARBS they wanted," which means that readers "can finally enjoy" birthday cake, pizza, and baked potatoes without worrying about their blood sugar, while counseling that he recommends those treats as "the exception, instead of the rule." (*Id.* at 59 (emphasis in original).) The representations in the promotional materials regarding diet are inextricably intertwined with the *The Doctor's Guide* and are thus noncommercial speech.

The FTC's third challenge in Count I is to the alleged representation in the promotional materials for *The Doctor's Guide* that a trio of supplements (which Dr. Gerhauser calls Himalayan Silk, Epsom Blue, and Chromanite in the promotional materials and identifies as mulberry, magnesium, and chromium in *The Doctor's Guide*) "will, either alone or in combination, cure, treat, or mitigate type 2 diabetes or its symptoms." (Compl. ¶105(c).) With respect to those

18

supplements, Dr. Gerhauser explains in both the promotional materials and *The Doctor's Guide* that in a 24-person University of Kansas study, Himalayan Silk (or mulberry) was shown to reverse diabetes in 100% of the individuals who received it in just 28 days. (*Compare* Ex. 2, *The Doctor's Guide* Promotion at 9-10, *with* Ex. 1, *The Doctor's Guide* at 40-42.) In both the promotional materials and *The Doctor's Guide*, Dr. Gerhauser describes a study in *Diabetes, Obesity, and Metabolism* in which, "a handful of patients" were given Epsom Blue (magnesium) and showed improved HbA1c and fasting glucose levels. (*Compare* Ex. 2, *The Doctor's Guide* Promotion at 11, *with* Ex. 1, *The Doctor's Guide* at 46, 49.) And in both the promotional materials and *The Doctor's Guide*, Dr. Gerhauser describes a 90-day study on Chromanite (chromium) from the Health Sciences Center in Louisiana, which showed improved fasting glucose levels. (*Compare* Ex. 2, *The Doctor's Guide* Promotion at 12, *with* Ex. 1, *The Doctor's Guide* at 56-58.) There is not a single representation about these supplements (or the basis for Dr. Gerhauser's claims about them) in the promotional materials that does not also appear in *The Doctor's Guide*. Thus, the representations in the promotional materials regarding Himalayan Silk, Epsom Blue, and Chromanite are inextricably intertwined with *The Doctor's Guide* and are noncommercial speech.

The FTC's fourth and fifth challenges in Count I are to the alleged representations in the promotional materials that "[t]ype 2 diabetes is caused by NIR," and that "[c]onsumers can prevent type 2 diabetes through the use of Non-Ionizing Radiation 'blockers,' or by otherwise avoiding NIR." (Compl. ¶ 105(d) and (e).) With respect to non-ionizing radiation, Dr. Gerhauser actually states in the promotional materials that ***in his medical opinion***, there is a connection between the type of non-ionizing radiation emitted by electronic devices and the body's ability to regulate insulin, such that increased use of electronic devices is contributing to the incidence and severity of type 2 diabetes. (Ex. 2, *The Doctor's Guide* Promotion at 6-8.) Consistent with this

19

representation, an entire module of *The Doctor's Guide* is dedicated to Dr. Gerhauser's opinion that type 2 diabetes is not "always" caused by diet and exercise, and that increased exposure to "non-ionizing radiation" is also a cause of diabetes. (Ex. 1, *The Doctor's Guide* at 23-35.) Both the promotional materials and *The Doctor's Guide* explain that Dr. Gerhauser's medical opinion stems from a study showing that despite the fact that diabetes is skyrocketing in the United States, the Amish, who eat a standard American diet, are far less likely to develop diabetes. (*Compare* Ex. 2, *The Doctor's Guide* Promotion at 5-6, *with* Ex. 1, *The Doctor's Guide* at 28.) And both the promotional materials and *The Doctor's Guide* explain that Dr. Gerhauser's opinion is based on studies that have shown (a) blood sugar levels spiking when individuals are around technology, and (b) HbA1c levels of non-diabetic individuals rising when around higher levels of [EMFs]. (*Compare* Ex. 2, *The Doctor's Guide* Promotion at 6-7, *with* Ex. 1, *The Doctor's Guide* at 30.) Thus, the challenged representations in the promotional materials regarding NIR are inextricably intertwined with *The Doctor's Guide* and are noncommercial speech.

Finally, in Count II, the FTC challenges the alleged representations in the promotional materials that the "protocol described in *The Doctor's Guide* is scientifically proven to cure, treat, or mitigate type 2 diabetes or its symptoms in 28 days." (Compl. ¶ 108.) The promotional materials, however, do not make such a conclusory promise of "scientific proof." The FTC has omitted from its Complaint the full scope of Dr. Gerhauser's representations in the promotional materials regarding the "scientific proof" underlying his opinions in *The Doctor's Guide*. In fact, as discussed above, the promotional materials discuss exactly what the "scientific proof" entails, providing consumers who purchase *The Doctor's Guide* with a comprehensive understanding of the basis for Dr. Gerhauser's recommendations well in advance of their purchase.[9] (*See* Ex. 2, *The*

---

[9] Even if, arguendo, Dr. Gerhauser's representations in the promotional materials regarding the "scientific proof" underlying his opinions were not inextricably intertwined with *The Doctor's Guide*, the Health Defendants' alleged

*Doctor's Guide* Promotion at 5 (describing the Amish study, discussed above, which led Dr. Gerhauser to conclude, "in [his] medical opinion" that exposure to technology is related to the increased incidence of diabetes); at 6-7 (describing the "undeniable scientific proof" that convinced him of the relationship between NIR and diabetes—the *Informa Healthcare* and *International Journal of Environmental Research and Public Health* studies on NIR exposure, discussed above); at 9, 11, and 12 (describing the mulberry, magnesium, and chromium studies). And as discussed above, Dr. Gerhauser examines those very same studies in *The Doctor's Guide* as the basis for his opinions. (Ex. 1, *The Doctor's Guide* at 28, 30-31, 40-42, 49, 58.) Thus, Dr. Gerhauser's claims regarding the "scientific proof" underlying his opinions are inextricably intertwined with *The Doctor's Guide* and are noncommercial speech.

The "challenged" representations in Counts I and II are noncommercial and thus not subject to the FTC's jurisdiction under the FTC Act.

**C.     The Challenged Representations in the Financial Defendants' Republican Checks Promotion for *Congress' Secret* Are Inextricably Intertwined With the Underlying Publication.**

In Count III, the FTC first challenges the alleged representation that "[c]onsumers are entitled by law or otherwise, to money from Congressional Checks or Republican Checks."

---

"establishment" claims are not actionable because of Dr. Gerhauser's detailed exposition on what he means by "scientific proof" in the promotional materials. As the United States Court of Appeals for the District of Columbia Circuit explained in *POM Wonderful, LLC v. FTC*, the level of detail with which an advertiser describes its "scientific proof" governs the type of substantiation necessary: "If an establishment claim 'states a specific type of substantiation,' the 'advertiser must possess the specific substantiation claimed.' If an ad instead conveys a non-specific establishment claim—e.g., an ad stating that a product's efficacy is 'medically proven' . . .—the advertiser 'must possess evidence sufficient to satisfy the relevant scientific community of the claim's truth.'" 777 F.3d 478, 491 (D.C. Cir. 2015) (citations omitted). Thus, advertisements must "go beyond merely describing specific research in sufficient detail to allow a consumer to judge its validity" to be actionable as establishment claims. *Id.* at 492. Here, the publisher accurately describes specific, existing research in sufficient detail to allow a consumer to judge their validity. In order to offer *The Doctor's Guide*, the Health Defendants need not possess evidence sufficient to satisfy the relevant scientific community that Dr. Gerhauser's ideas and opinions are true. Such a standard would effectively eliminate alternative medicine publishing altogether.

21

(Compl. ¶ 111(a).) The Republican Checks[10] promotion actually states: "the law dictates that this pile of *cash MUST be distributed*! That's not a question of if…It's the law! These cash distributions are contractually required by the US government," that the referenced cash "must be paid out by law. According to federal law… [t]he entities impacted by Section 199A '*must distribute'* most of their money in the form of investment income via what [Scheidt] call[s] 'Republican Checks,'" and that "[b]ecause of the rules that regulate these investment payouts…You could possibly receive up to 40 of those checks every year." (Ex. 5, Republican Checks Promotion at 11, 17, 20 (emphasis added).) *Congress' Secret* includes identical representations: "*[b]y law*, REITs must pay at least 90% of their taxable income to shareholders as dividends," that "[t]hese companies make as much as $1.3 trillion in a single year… and *must* immediately send most of that money back out to shareholders," and that, while paying dividends is optional for many companies, "REITs and FTEs *must* pay out most of their profits to shareholders . . . If you own shares of pass-through entities like these, you will get payouts as long as the company makes money." (Ex. 3, *Congress' Secret* at 14, 16, 19 (emphasis added).) Thus, the challenged representations in the Republican Checks promotion that the referenced payments are legally required are inextricably intertwined with *Congress' Secret* and are noncommercial speech.

Second, the FTC challenges the alleged representation that "[c]onsumers can collect money from Congressional Checks or Republican Checks just by adding their name to 'the list of check payees.'" (Compl. ¶ 111(b).) This statement does not appear verbatim in *Congress' Secret*. Nevertheless, and particularly given the degree of leeway that publishers should be afforded in

---

[10] The Court should dismiss the challenged representations in the Congressional Checks promotion for the reasons set forth in Section IV, *infra*.

promoting speech and other works protected by the First Amendment, the representation is not

actionable as "commercial speech" under the FTC Act. The statement is a metaphor (not meant to

be taken literally) for the relative ease with which consumers can invest in entities and begin

making money. It is an extension of certain concepts—the relative safety of this category of

investments and the fact that anyone can participate—that appear throughout *Congress' Secret*, as

addressed below. The representation is, at most, hyperbolic puffery. *E.g., In re Stratasys Ltd.*

*Shareholder Securities Litigation*, 864 F.3d 879, 882 (8th Cir. 2017) (in case for securities fraud,

"[a] statement is not material and is mere puffery, if it is 'so vague and such obvious hyperbole

that no reasonable investor would rely upon it.'" (citation omitted)). This type of puffery is not

actionable as deceptive under the Lanham Act because:

> The job of marketing specialists involves the communication of feelings, sensations and ideas to consumers. Often this is accomplished through the creative use of metaphors, and metaphorical images, which are designed to impart abstractions to the consuming public. It is not unusual for these images to exaggerate their underlying meaning, beyond the point of believability, in order to ensure that that underlying message is conveyed.

*Gillette Co. v. Norelco Consumer Prod. Co.*, 946 F. Supp. 115, 130 (D. Mass. 1996). Viewed in

the full context of the Republican Checks promotion, no reasonable consumer could believe that

he literally needed to do no more than add his name to a list to become an investor in (which, as

addressed below, connotes an outlay of money), and receive value from, the referenced companies.

In promoting books, publishers' freedom of expression should be permitted "breathing space"

similar to that enjoyed by the underlying works. *See Sullivan*, 376 U.S. at 272; *Hustler Magazine*,

485 U.S. at 52. Otherwise, publishers would be limited to repeating the text of their publications

verbatim in promotional materials, lest they run afoul of the FTC Act.

Third, the FTC challenges the alleged representation that "[c]onsumers can collect

hundreds to thousands of dollars per month in congressional checks or Republican Checks with

little or no risk." (Compl. ¶ 111(c).) As a preliminary matter, nowhere in the Republican Checks promotion does Mr. Scheidt state that the investment strategy recommended in *Congress' Secret* involves "little to no risk." In fact, the Republican Checks promotion explains: "nothing in the market is guaranteed. If you are set up to collect checks from these entities, there are risks involved. But the good news is, so far, anyone who's become a partner of the top entities I've identified has received a check… in 100% of the cases." (Ex. 5, Republican Checks Promotion at 24-25.) Mr. Scheidt thus describes his strategy as providing "a safe and consistent income stream" (*Id.* at 4.) These representations are consistent with *Congress' Secret*, in which Mr. Scheidt explains that the recommended investments are consistent with his "three pillars of investing," which are "a clear set of guidelines to make sure you buy **only the safest, most profitable companies** out there." (Ex. 3, *Congress' Secret* at 21 (emphasis added).)[11] Mr. Scheidt describes his first recommendation, Brookfield Renewable Partners, the "single largest public owner of hydroelectric power plants on the planet" as "pretty immune to competition." (*Id.* at 25.) He explains that Brookfield's "cash flow is derived from fixed-price, long-term contracts, which make it both predictable and stable," particularly since its "prices [are] linked to inflation to ensure Brookfield's revenues increase as its expenses do." (*Id.* at 25-26.) He states that you "aren't going to find a safer revenue stream than Brookfield." (*Id.* at 26.) Mr. Scheidt offers a similar analysis with respect to risk-level of each recommended investment. The representations in the Republican Checks promotion regarding the risk associated with Mr. Scheidt's investment strategy are inextricably intertwined with the

---

[11] Moreover, the FTC cannot dispute, based on the evidence it submitted in support of its Motion for Preliminary Injunction, the truth of Mr. Scheidt's representations regarding the relative safety and likely profitability of the recommended investments. (*See* Rottner Decl. ¶ 48, ECF No. 2-4 at 22; FTC Exhibit 55/Rottner Attachment 54, ECF No. 2-58 at 2 (showing increased stock price for majority of recommended entities, and consistent dividend payouts for all recommended entities, from 2018 through October 2019).)

introductory statements regarding his investment strategy and the analysis he provides for each of his recommendations in *Congress' Secret*, and are noncommercial speech.

Fourth, the FTC challenges the alleged representation that "Congressional Checks or Republican Checks are affiliated or furnished by Congress or another government agency or program." (Compl. ¶ 111(d).) Again, nowhere in the Republican Checks promotion does Mr. Scheidt state that his investment strategy is "affiliated" with or "furnished by" the government. The FTC apparently implies that the Financial Defendants' general use of the "Republican Checks" metaphor conveys government affiliation. However, specifically to avoid such an impression, the Republican Checks promotion advises readers, early on, that "this investment has nothing to do with Social Security or any government program." (Ex. 5, Republican Checks Promotion at 5.) Moreover, both the promotion and *Congress' Secret* make clear that, rather than suggesting government affiliation, the Congressional Check and Republican Check metaphors are in reference to what Mr. Scheidt viewed as the Republican-led congress' self-serving behavior. (*Compare id.* at 2  ("Thanks to a New Republican Law, Hundreds of Private Sector Institutions Known as 'Fiscally Transparent Entities' are Set to Pay . . ."), and at 14-15 ("Some Republicans Who Helped Pass this Law are Already Cashing In.") *with* Ex. 3, *Congress' Secret* at 11 (many of the congressmen and senators who supported the TCJA "set themselves up to receive large, regular checks with a greatly reduced tax burden"), and at 13 ("Part II of the law adds new sections to the tax code that offer incredible tax advantages to certain investments—investments that many of Washington's power players use to earn 'bonus' income checks year after year," and identifying congressmen and senators who benefit from these types of investments.).) Use of the Republican Checks metaphor in promoting *Congress' Secret* is inextricably intertwined with Mr. Scheidt's use of the metaphor in the underlying publication and is noncommercial speech.

Fifth, the FTC challenges the alleged representation that "[a]nyone can collect hundreds to thousands of dollars in Congressional or Republican Checks." (Compl. ¶ 111(e).) The FTC asserts that this is a misrepresentation because of the "cost" of collecting the promised amounts. (Compl. ¶ 112(e).) As for use of the term "anyone," in the Republican Checks promotion, it is clear that Mr. Scheidt is referring to a general lack of barriers to entry—and that the term is not in reference to the cost of participation. Mr. Scheidt explains that there is no "income or age requirement," and that "anyone can collect," including "liberal snowflakes." (Ex. 5, Republican Checks Promotion at 6-7, at 13 ("incredible opportunity for anyone to collect extra income"), at 17 ("this is wide open to the public"), at 18 ("no income requirement. No age limit."), at 21 ("this cash is available to any person who chooses to invest"), and at 24 ("[a]nyone can become a partner shareholder of those entities if you follow the right steps.")). Similarly, in *Congress' Secret*, Mr. Scheidt explains that lawmakers get away with personally benefitting from the TCJA "by claiming anyone can enjoy the same tax breaks. ***And it's true—you can buy into these investments yourself***, collect steady income from them and possibly deduct part of the money from your taxes." (Ex. 3, *Congress' Secret* at 18 (emphasis added).) Accordingly, the alleged representations regarding "anyone's" ability to participate in the investment strategy are inextricably intertwined with *Congress' Secret* and noncommercial speech.

Moreover, the FTC's reasoning for why use of the term "anyone" is false or misleading is squarely related to the omission it alleges in Count IV, and is demonstrably false. The promotion does not state or suggest that there is no "cost" to "collect the promised amounts." The word "investment" (which is used throughout the promotion) indisputably connotes an outlay of money. "Investment." The Merriam-Webster.com Dictionary, Merriam-Webster Inc., https://www. merriam-webster.com/dictionary/investment?utm_campaign=sd&utm_medium=serp&utm_

26

source =jsonld. Accessed 13 December 2019 ("the outlay of money usually for income or profit: capital outlay"); Black's Law Dictionary 11th ed., 2019 ("An expenditure to acquire property or assets to produce revenue; a capital outlay"). And as discussed below, the promotion contains a number of disclosures that the amount consumers stand to collect from his strategy is directly related to the amount consumers invest. (*See* Ex. 5, Republican Checks Promotion at 4-5, 17, 21.)

In sum, the "challenged" representations in the Republican Checks promotion in Count III are inextricably intertwined with the content of *Congress' Secret* and are, accordingly, noncommercial speech not subject to the FTC's jurisdiction under the FTC Act.

At base, the FTC's challenge in Counts I through III "is over the fact that the statements were made, not over where they happen to appear." *Nat'l Life Ins. Co.*, 793 F. Supp. at 644. This "does not transform the character of their content into commercial speech," and the FTC cannot bypass the First Amendment protections simply by attempting to separate "advertising" for a publication from the publication itself. *Id*.

## III.    The Alleged Omission in Count IV Is Demonstrably False.

Count IV asserts a claim under the FTC Act for the Financial Defendants' alleged "fail[ure] to disclose that consumers must spend tens of thousands to hundreds of thousands of dollars to collect the promised amounts," in connection with promoting Congress' Secret. With respect to the Republican Checks promotion, Count IV fails to state a claim upon which relief can be granted because the promotion demonstrably, conclusively discloses the very information the FTC alleges the promotion omits. As noted above, under the exhibit prevails rule, where a bare allegation in a complaint and the document on which it is based conflict, the document prevails. For example, as the Fourth Circuit recently explained, "if a securities-fraud plaintiff alleges that the defendant's prospectus failed to disclose a material risk, the claim will be dismissed if the prospectus shows

27

the disclosure was in fact made." *Goines*, 822 F.3d at 166–67 (citing *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 625 (4th Cir. 2008)).

In the Republican Checks promotion, Mr. Scheidt advises that "***Depending on how much [they] invest***, [readers] could see 'Republican Checks' ranging from just a few hundred dollars to hundreds of thousands of dollars," that the referenced ***testimonials*** for monthly checks of $21,538 and $27,897 are from individuals who "had the ability to collect above-average 'Republican Checks'" because "they took a ***position larger than the typical investor***," that members of Congress "are collecting millions ***because of their larger than average initial stake***," and that readers "could end up collecting thousands every single month ***depending on [their] starting stake***." (Ex. 5, Republican Checks Promotion at 4-5, 17, 21 (emphasis added).) The Republican Checks promotion plainly and repeatedly discloses to readers that the amounts they stand to receive are directly connected to the amounts they invest. It informs readers that, "in order to collect the promised amounts," they ***must*** take a position larger than the typical or average investor. Because the Financial Defendants disclosed the very "material" information the FTC says they omitted, Count IV fails to state a claim upon which relief can be granted.

## IV. The FTC Cannot Cite the Congressional Checks Promotion as a Basis for its Claim That the Financial Defendants Are "Violating, or About to Violate," the FTC Act.

As noted above, and as the FTC concedes, the Financial Defendants ran two separate promotions for *Congress' Secret*. (Compl. ¶ 65.) Before October 2018, the Financial Defendants ran the "Congressional Checks" promotion; after October 2018, the Financial Defendants ran the "Republican Checks" promotion. (*Id.*) The Congressional Checks promotion and the Republican Checks promotion are substantially different in many respects critical to the FTC's claims (*compare* Ex. 4, Congressional Checks Promotion *with* Ex. 5, Republican Checks Promotion), and

whether the FTC's Complaint states a claim upon which relief can be granted should be considered separately for each promotion.

As the United States Court of Appeals for the Third Circuit explained Section 13 of the FTC Act "authorizes the FTC—in certain circumstances—to file suit in federal district court," as opposed to initiating administrative proceedings. *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 155 (3d Cir. 2019). Specifically, the FTC may only seek injunctive relief from a federal court under Section 13 "when it 'has reason to believe' that violations of the FTC Act are occurring or are about to occur." *Id.* (citing 15 U.S.C. § 53(b)). The court in *Shire* concluded that the "is violating, or is about to violate" language in Section 13 (b) "is unambiguous; it prohibits existing or impending conduct. Simply put, Section 13(b) does not permit the FTC to bring a claim based on long-past conduct without some evidence that the defendant "is" committing or "is about to" commit another violation." *Id.* at 156; *see also FTC v. AMG Capital Management, LLC*, 910 F.3d 417, 430 (9th Cir. 2018) ("[Section] 13(b) anticipates that a court may award relief to prevent an *ongoing* or *imminent* harm.") (O'Scannlin, J., concurring) (emphasis in original); *FTC v. Hornbeam Special Situations, LLC*, No. 1:17-cv-3094, 2018 WL 6254580, at *2 (N.D. Ga. Oct. 15, 2018) ("is violating, or is about to violate" language in Section 13 "plainly creates a precondition to the FTC's statutory authorization to bring suit.").

The FTC generically alleges that it "has reason to believe" the Financial Defendants are "violating or are about to violate laws enforced by the Commission." (Compl. ¶ 105.) Equally important—and dispositive of the FTC's attempt to seek relief for the Congressional Checks promotion under Section 13—it also alleges that the Financial Defendants ceased running the Congressional Checks promotion in October 2018, a full year before it filed its Complaint. (Compl. ¶ 65.) Accordingly, regardless of whether the FTC possesses some general belief that the Financial

29

Defendants are violating or about to violate the FTC Act, that belief is not, and cannot be, based on representations in a promotion that the Financial Defendants voluntarily ceased running a full year before the FTC filed suit. Thus, with respect to representations in the Congressional Checks promotion in particular, Counts III and IV fail to state a claim upon which relief can be granted. Any of the FTC's claims related to the promotional materials for *Congress' Secret* that survive this Motion to Dismiss should be limited to representations in the Republican Checks promotion.

## <u>CONCLUSION</u>

As set forth above, the FTC is improperly seeking to control promotional materials for ***publications*** that are fully protected by the First Amendment to the United States Constitution. The representations the FTC challenges in the promotions are inextricably intertwined with the content of the underlying publications, which renders those representations noncommercial speech protected from the FTC's grasp. Moreover, because the FTC concedes the Financial Defendants ceased running the Congressional Checks promotion in October 2018, the FTC has no "reason to believe" that a violation of the FTC Act is occurring or about to occur with respect to any representations therein, and its claims regarding that promotion should also be dismissed. Finally, because the Financial Defendants' alleged omission is demonstrably false, it cannot sustain a claim for relief. Counts I through IV fail to state a claim upon which relief can be granted, and the FTC's Complaint should be dismissed in its entirety.

102753\000004\4810-5616-9137.v7

Respectfully Submitted,


|       /s/ William M. Krulak, Jr.     |       /s/ Ari N. Rothman     |

_____/s/ William M. Krulak, Jr._____
William M. Krulak, Jr. (Fed. Bar No. 26452)
Joshua J. Gayfield (Fed. Bar No. 29189)
Megan J. McGinnis (Fed. Bar No. 12810)
MILES & STOCKBRIDGE P.C.
100 Light Street
Baltimore, Maryland 21202
T/F: 410-385-3448
wkrulak@milesstockbridge.com
jgayfield@milesstockbridge.com
mmcginnis@milesstockbridge.com

*Counsel for Defendants*

_____/s/ Ari N. Rothman_____
Ari N. Rothman (Federal Bar No. 17560)
VENABLE LLP
600 Massachusetts Avenue, N.W.
Washington, D.C. 20001
T: 202-344-4000
F: 202-344-8300
anrothman@venable.com

31