**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Civil Case No. 1:19-cv-3100-SAG** |
| | * | |
| **AGORA FINANCIAL, LLC,** *et al.*, | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>**MEMORANDUM OPINION**</u>

Plaintiff Federal Trade Commission (the "FTC") filed a Complaint against Defendants Agora Financial, LLC, Dr. Richard Gerhauser, Health Sense Media, LLC, Health Sense Publishing, LLC, NewMarket Health, LLC, Newmarket Health Publishing, LLC, and Zachary Scheidt (collectively "Defendants"), seeking preliminary and permanent injunctive relief against Defendants' advertising.  ECF 1.  The FTC simultaneously filed a Motion for Preliminary Injunction, ECF 2, along with a Memorandum of Law in support thereof, ECF 2-1 (collectively, "the Motion").  Defendants filed an Opposition, and the FTC filed a Reply.  ECF 33, 37.  A hearing was held on February 7, 2020.  For the reasons that follow, the FTC's Motion is granted, although the scope of the preliminary injunction entered by the Court will be more limited than that requested by the FTC. In addition, Defendants filed a Motion to Dismiss the FTC's suit, ECF 41. This Court has reviewed that motion, along with the opposition and reply. ECF 44, 46. For the reasons stated herein, that Motion is denied.

**I.      FACTUAL BACKGROUND**

Agora Financial, LLC ("Agora") and NewMarket Health, LLC ("NewMarket") are publishing entities under the umbrella of Monument and Cathedral Holdings, LLC ("M&C").  ECF

33-23 ¶ 3.  M&C owns more than eighty separate entities.  *Id.* Each entity has its own publisher or senior manager, and operates independently.  *Id.* ¶¶ 4-6.

This case is premised on two separate promotions sponsored by Defendants, one for a health-related online publication and one involving a book provided for free with a subscription to an online financial newsletter.  This Court will address each promotion separately.  The Defendants in the health-related claims are Agora, NewMarket, NewMarket Health Publishing, LLC, Health Sense Publishing, LLC, Health Sense Media, LLC, and Dr. Richard Gerhauser, M.D. ("Dr. Gerhauser") (collectively "the Health Defendants").  ECF 2-1 at 1.  The Defendants in the financial newsletter claims are Agora and Zachary Scheidt (collectively, "the Financial Defendants").  *Id.*

**A.  *The Doctor's Secret to REVERSING Diabetes in 28 Days ("The Doctor's Guide")***

Dr. Gerhauser is a licensed physician in good standing in Nevada, Arizona, and California. ECF 33-5 ¶ 3.  Since 2016, Dr. Gerhauser has been the named author of a paid newsletter entitled *National Health Response* ("NHR"), which was originally published by Defendant Health Sense Media, LLC. *Id.* ¶ 10.  Although some of the material is written by other employees, Dr. Gerhauser retains final editorial control over all content, and the informational publications bear his name as author. ECF 33-3 ¶ 7; ECF 33-5 ¶ 10.

In August, 2018, Defendant NewMarket Health Publishing, LLC ("NewMarket Publishing") took over as publisher of the NHR newsletter written by Dr. Gerhauser. ECF 33-3 ¶ 5.  At that time, *The Doctor's Guide* was already "in the works", to be sold as an eleven-module protocol for treatment of Type 2 Diabetes without pharmaceuticals. *Id.* ¶ 6.  Advertising for *The Doctor's Guide* included emails, internet banner advertisements, and advertisements in various newsletters distributed by Agora and other M&C companies. *See, e.g.,* ECF 2-8 at 10; ECF 2-11, ECF 2-12. The emails, banner advertisements, and newsletter advertisements urged consumers to

enroll to watch a "live" video, or to review the transcript of that video.  *See id.* The video (and its transcript) depicted Dr. Gerhauser promoting *The Doctor's Guide.* ECF 2-19, 2-26.  For example, the Health Defendants made the following representations in their email/newsletter advertisements or in the video/transcript:

- "Because after 37 years in practice, I recently discovered a simple, at-home treatment for Type 2 diabetes.  And no, it has nothing to do with diet or exercise. It doesn't involve a single drug either.  Yet this new treatment is scientifically proven to **reverse every symptom of your diabetes in 28 days.**" ECF 2-5 at 2–3.

- "World famous doctor and diabetes expert, Dr. Richard Gerhauser, just made a <u>shocking announcement</u>. He said 'Type II Diabetes is not caused by what you eat.'" ECF 2-7 at 2.

- "Shocking study shows 100% cure rate." ECF 2-26 at 2.

- "It has nothing to do with changing your diet or exercising more." *Id.*

- "Can this new treatment really reverse Type II Diabetes in 28 days? Without diet, exercise, or a single drug?  Sure, it sounds impossible . . .  But according to a new study from the University of Kansas, it's true . . ." ECF 2-9.

- "How to Reverse Diabetes Without Dieting." ECF 2-8 at 10.

In *The Doctor's Guide*, which consists of eleven modules, Module #11 is entitled "How to 'Eat Away' Your Diabetes." ECF 2-25 at 73–83.  It contains dietary recommendations, including that protocol followers "[e]at a seasonal, low-carb, organic diet with plenty of seafood," and engage in intermittent fasting.  *Id.* at 75.  The last four pages of Module #11 contain a seven-day meal plan.  *Id.* at 80-83.

Prospective customers who responded to the advertisements had to watch the entire video, or scroll through the entire transcript, before they could purchase *The Doctor's Guide*. ECF 33-3 ¶ 8. On December 11, 2018, when *The Doctor's Guide* video and transcript went live, its purchase price was $150.00.  *Id.* ¶ 9.  After that date, the price was $250.00.  *Id.*  *The Doctor's Guide* came with a 100% unconditional money back guarantee for dissatisfied customers. *Id. The Doctor's*

*Guide* is no longer promoted or offered for sale, although the customers who purchased it retain access to their copies. *Id.* ¶ 10.

### B. *Congress' Secret $1.17 Trillion Giveaway* (*"Congress' Secret"*)

In 2017, Evaldo Albuquerque, a copywriter charged with developing marketing concepts and strategies for Agora's publications, developed the idea of using "Congressional Checks" as a metaphor for certain dividend income. ECF 33-1 ¶¶ 3, 5, 6. Albuquerque reached out to Defendant Zachary Scheidt, the editor of Agora's subscription financial newsletter, *Lifetime Income Report* ("LIR"), to suggest that Scheidt write a book about the anticipated tax-advantaged treatment of certain pass-through dividend income that would result from the 2017 Tax Cuts and Jobs Act ("TCJA") passed by the Republican Congress in 2017. *Id.* ¶¶ 6, 7, 9. At least one news article had suggested that the real estate tax breaks in the TCJA would personally benefit some Republican lawmakers. *See* ECF 33-2. Scheidt approved Albuquerque's proposed book, and authorized the promotion of the book using the metaphor "Congressional Checks." ECF 33-1 ¶ 10. The book, entitled *Congress' Secret $1.17 Trillion Giveaway,* "identifies 13 companies with high yield potential." ECF 33-24 ¶ 17. *Congress' Secret* was published on approximately March 26, 2018. *Id.*

Advertisements for LIR and the book occurred by email, online newsletters, internet banner ads, and the Financial Defendants' websites.[1] *See, e.g.,* ECF 2-70, 2-51, 2-65, 2-68. Advertisements included the following representations:

- "In case you haven't heard yet, a small group of in-the-know Americans are now collecting 'Congressional Checks' of up to $6,235 each. In fact, there is $ 1.17 Trillion at stake thanks to section 199A of Trump's new tax law. And if you $ follow the instructions on the next page, you could add your name to the list, too. But if you do not act by the October 18th deadline, you will miss out on the next check, and . . . your money will be sent to somebody else . . . To prevent your check from

---

[1] Dr. Gerhauser and NHR send out some emails cross-promoting stock purchase and investment or other financial advice. *See, e.g.,* ECF 2-108, 2-111, 2-113. They are not named by the FTC as Financial Defendants.

being sent to someone else, you must get on the list for the next 'Congressional Check' by Thursday, October 18." ECF 2-68.

- "With the information inside this book, you'll have the chance to collect up to 40 Congressional Checks every year . . . Checks that go anywhere from $939 to as high as $6,235 or more." ECF 2-51.

- "This Free Book is Packed with Details on How To Legally Collect $1,000s From US Government Every Month.  Just 945 Copies Exist!  Claim Yours Now." ECF 2-70 at 3.

- "[T]he law dictates that this pile of cash MUST be distributed!  That's not a question of if . . . It's the law!  These cash distributions are contractually required by the U.S. government . . . So if you don't collect someone else will." ECF 2-126 at 14-15.

- "You just need to add your name to the list of check payees before October 18th." *Id.* at 15.

- "As a taxpayer, nobody deserves this money more than you.  Remember, this is wide open to the public.  There's no income requirement.  No age limit." *Id.* at 22.

- "The potential massive payout opportunities inside are actually fully legal – I'd say add your name to the list of recipients for them starting within 5 minutes of getting this . . . Again, you could potentially collect a 6k check for doing nothing except applying what was perfectly within your rights anyways!" ECF 2-73 at 2–3.

- "The average Social Security monthly stipend of about $1,400 simply isn't enough to pay for housing, groceries, and medical bills.  Fortunately, there's hope . . . If you're looking for retirement income, I strongly encourage you to check out what's inside this book." ECF 2-74.

Defendants' advertisements include images of consumers holding checks with their names and the amounts received, and the words "Congressional Check" or "Republican Check" emblazoned across the top in large writing, with the seal of the United States Congress. *See, e.g.,* ECF2-35, 2-37. Those photos are actually stock photos (available online), which have been edited to depict the alleged "Congressional" or "Republican" checks.  *See, e.g.,* ECF 2-29 at 9-11; ECF 2-36, ECF 2-37, ECF 2-38, ECF 2-39. Other marketing materials showed an alleged version of then-Congressman Darrell Issa's Financial Disclosure Report, indicating that he had received

either a "Congressional Check" of $410,000 or a "Republican Check" of $410,000. *See, e.g.,* ECF 2-29 at 20, ECF 2-47 ("For example, representative Darrell Issa filed this paper at the clerk of the House of Representatives . . ."); ECF 2-48. Congressman Issa's publicly available Financial Disclosure Report demonstrates that no such check exists, and thus, this claim is false. *See* ECF 2-50.

Similar to *The Doctor's Guide* promotion, customers who clicked on the advertisements touting "Congressional Checks" or "Republican Checks" reached a video advertisement narrated by Scheidt, with an option to review a transcript instead of watching the video. ECF 33-21 ¶ 15; ECF 33-24 ¶ 18. A customer who attempted to click out of the video would see a pop-up ad, and would have to either finish watching the video or scroll to the end of the transcript. ECF 2-4 ¶ 47(a). At the end of the video or transcript, consumers are told that to claim *Congress' Secret*, a customer has to take a free trial subscription to LIR. ECF 33-21 ¶ 18. Consumers who did not cancel the trial subscription were charged $99 for a one-year subscription to LIR. *Id.*

On October 2, 2018, Agora learned that a nonprofit named The Congressional Award reported receiving inquiries about its "Congressional Checks" promotion. ECF 33-21 ¶ 23. On October 5, 2018, the United States House of Representatives wrote to, among other agencies, the FTC, to notify it about the promotion run by the Financial Defendants. ECF 2-29. The letter states, "The Clerk has already received seven letters from individuals attempting to apply to the Clerk to collect their 'Congressional Checks.'" *Id.* at 4.

Shortly after the "Congressional Checks" promotion began, Albuquerque suggested renaming the promotion "Republican Checks," to highlight the fact that the TJCA was passed through Congress without a single Democratic vote. ECF 33-1 ¶ 12. Scheidt approved the change in spring 2018, *Id.* ¶ 13, and the Republican Checks promotion went live in May, 2018. *Id.* ¶ 14.

In the new "Republican Checks" version of the marketing, consumers are immediately charged $49 for an annual subscription to *LIR,* as a condition for receipt of the book.  ECF 2-4 ¶ 47(e). Some of the later "Republican Checks" advertisements specify that the checks will be paid by "private sector institutions known as 'fiscally transparent entities.'" ECF 2-59 at 2.

In the fall of 2018, Albequerque updated the long-form ad copy for the Republican Checks promotion, in the form of a question and answer from Scheidt. ECF 33-1 ¶ 15; ECF 2-60 at 11-12. In response to a purported customer inquiry about receipt of his "Congressional checks," Scheidt states in the new advertisement, "But don't take the term 'Congressional check' too literally.  It's a nickname for the payments politicians receive from REITs, master limited partnerships and other pass-through securities. . . Cutting taxes on pass-through earnings was almost like giving law makers a special bonus for voting in favor of the bill.  So I decided to call the payouts from pass-through entities Congressional checks.  But really, they're just the regular payouts that these kinds of companies always make."  ECF 2-60 at 11.  The Financial Defendants stopped using the "Congressional Checks" promotion for *Congress' Secret* in October, 2018, after receiving an inquiry from a nonprofit called The Congressional Award about consumer confusion.  ECF 33-21 ¶ 23.  The "Republican Checks" promotion was discontinued on October 27, 2019.  *Id.* ¶ 21. *Congress' Secret* remains available to active subscribers of LIR, but the Financial Defendants no longer promote the book or make it available to new purchasers.  *Id.* ¶ 22.

## II.     LEGAL STANDARD

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes this Court to grant a preliminary injunction to prevent ongoing consumer harm.  The FTC bears the burden to show that the injunction would be in the public interest, considering (1) the FTC's likelihood of success on

the merits; and (2) whether the equities weigh in favor of a preliminary injunction.  *See FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1343 (4th Cir. 1976).

To meet the first element, likelihood of success on the merits, the FTC must show "preliminarily, by affidavits or other proof, that it has a fair and tenable chance of ultimate success on the merits."  *In re Sanctuary Belize Litig.,* No. 18-CV-3309-PJM, 2019 WL 3714392, at *9 (D. Md. Aug. 2, 2019).  To show that an act or practice is deceptive or misleading, so as to be prohibited under Section 5 of the FTC Act, the FTC must establish (1) that there was a representation; (2) that the representation was likely to mislead consumers; and (3) that the misleading representation was material.  *See FTC v. Ross,* 897 F. Supp. 2d 369, 381 (D. Md. 2012). A preliminary injunction affords "'an extraordinary and drastic remedy' prior to trial." *Ultimate Outdoor Movies, LLC v. FunFlicks, LLC,* 2019 WL 2642838, at *6 (D. Md. June 27, 2019) (quoting *Munaf v. Green*, 553 U.S. 674, 689–90 (2008)).

In considering the second requirement for an injunction, whether the equities weigh in favor of preliminary relief, the Court balances Defendants' private interests against the interest of the public.  Generally, "private injuries are not proper considerations for granting or withholding injunctive relief under Section 13(b)."  *FTC v. Ameridebt, Inc.*, 373 F. Supp. 2d 558, 564 (D. Md. 2005) (citing *Food Town Stores,* 539 F.2d at 1346).  In addition, "[t]he public interest in ensuring the enforcement of federal consumer protection laws is strong."  *FTC v. Mallett*, 818 F. Supp. 2d 142, 149 (D.D.C. 2011); *see also Sanctuary Belize*, 409 F. Supp. 3d at 396 ("In balancing the public and private equities associated with deciding to impose a preliminary injunction, the public interest is given greater weight.").

III.    ANALYSIS

A. *The Doctor's Guide*

1.   **Likelihood of Success on the Merits**

The first two counts of the FTC's Complaint allege claims relating to *The Doctor's Guide*.

Count One asserts "False or Unsubstantiated Efficacy Claims" relating to five representations:

1)   "The protocol described in *The Doctor's Guide* will cure, treat, or mitigate type 2 diabetes or its symptoms," *see, e.g.,* ECF 2-26 at 2;

2)   "The protocol described in *The Doctor's Guide* does not require consumers to restrict or make changes to their diets," *see, e.g., id.;*

3)   "Supplements, including Himalayan Silk, Epsom Blue, and Chromanite, will, either alone or in combination, cure, treat, or mitigate type 2 diabetes or its symptoms," *see, e.g., id.* at 9-12;

4)   "Type 2 diabetes is caused by NIR exposure," *see, e.g., id.* at 6-8; and

5)   "Consumers can prevent Type 2 diabetes through the use of Non-Ionizing Radiation 'blockers,' or by otherwise avoiding NIR," *see, e.g., id.* at 8, 13.

ECF 1 ¶ 105. Count Two asserts a false establishment claim relating to Defendants' representation that the protocol contained within *The Doctor's Guide* "is scientifically proven to cure, treat, or mitigate type 2 diabetes or its symptoms in 28 days." ECF 1 ¶ 108; ECF 2-1 at 7 n. 40-42 (citing ECF 2-26). False establishment claims generally challenge a defendant's assertion that scientific proof establishes its product's efficacy.[2] *See POM Wonderful, LLC v. FTC*, 777 F.3d 478, 490 (D.C. Cir. 2015) (distinguishing between an establishment and an efficacy claim). To defeat a false establishment claim, an advertiser must proffer evidence sufficient to satisfy the relevant scientific community of the assertion's truth. *Id.* at 491.

---

[2] The FTC has asserted four counts of deception under Section 5 of the FTC Act. ECF 2-1 at 26. As explained in detail, this Court concludes that two statements in Defendants' advertising for *The Doctors' Guide* are likely to mislead consumers. Importantly, "all that is necessary for preliminary injunctive relief is establishing the likelihood of success on at least one of [its] claims. *See, e.g., Stinnie v. Holcomb*, 355 F. Supp. 3d 514, 527 (W.D. Va. 2018).

#### Whether There was a Representation

As noted above, to sustain a claim under Section 5 of the FTC Act, the FTC must first establish that Defendants made representations.  Here, the FTC has satisfied its burden. The evidence showing that Defendants made each of the representations in their advertising is cited above.  For example, in promoting *The Doctor's Guide*, Defendants claimed that a "shocking study shows 100% cure rate" for Diabetes.  ECF 2-26.

#### Whether the Representations are Likely to Mislead Consumers

The next issue, however, is whether the representations are likely to mislead consumers. The FTC submits that, to establish that health-related assertions are not misleading, advertisers must have "competent and reliable scientific evidence," or "CRSE," to support their claims. *See* ECF 21 at 16-17 (*citing National Urological Grp., Inc.*, 645 F. Supp. 2d at 1190).  In support of its view, the FTC cites a long line of cases suggesting that CRSE, in the context of health-related efficacy claims about products, must consist of independent, randomized, human clinical trials ("RCTs").  *See, e.g., FTC v. Alcoholism Cure Corp.,* Civil No. 3:10-cv-266-J-34JBT, 2011 WL 13137951 (M.D. Fl. Sept. 16, 2011) (selling participation in  an ongoing, monthly alcoholism cure program and representing that the program "cures alcoholism for most alcoholics who sign up for the program" and "cures alcoholism while allowing alcoholics to drink socially."); *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1177 (N.D. Ga. 2008) (selling weight loss and/or erectile performance dietary supplements); *FTC v. NPB Advertising, Inc.*, 218 F. Supp. 3d 1352, 1359 (M.D. Fl. 2016) (selling green coffee extract as a dietary weight-loss supplement); *FTC v. Roca Labs, Inc.,* 345 F. Supp. 3d 1375, 1381, 1387-89 (M.D. Fl. 2018) (selling various weight loss products, including "formula" and "anti-cravings"); *FTC v. Direct Marketing Concepts, Inc.*, 569 F. Supp. 2d 285, 303-04 (D. Mass. 2008) (selling herbal dietary supplements).

As Defendants note, however, this case is distinguishable from the precedent the FTC cites, because these Defendants are selling publications, not medical supplements, devices, or services. Importantly, a "health-related efficacy claim," which states that *the product* yields the benefit promised, likely will mislead a reasonable consumer if the claim is false or if the advertiser lacks competent and reliable scientific evidence to substantiate the claim." *NPB Advertising*, 218 F. Supp. 3d at 1358 (emphasis added).  In this case, Defendants have not attempted to sell a product that they claim will yield particular benefits. Rather, Defendants advertised a book that provides, in their view, recommendations on how individuals might reduce the risks and symptoms associated with Type 2 diabetes. In the cases cited by the FTC, the respective defendants marketed products that would be sold for the buyer to consume, and purportedly reap the alleged benefits. The FTC has not identified any case in which a court has applied the health-related efficacy standard in the circumstances presented here.

The dearth of case law in a factually analogous circumstance is likely attributable to First Amendment considerations, which Defendants properly invoke. ECF 33 at 13–17. Noncommercial speech is strongly protected under the First Amendment, and content-based restrictions on this type of speech are evaluated under strict scrutiny, the highest standard in this area of the law. *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 561-62 (1980); *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010). In contrast, restrictions on advertising and other commercial speech are evaluated under a more lenient, multi-factor standard. *Central Hudson*, 447 U.S. at 563-66 (1980).  The FTC expressly concedes in this case that it seeks only to regulate Defendants' advertising of *The Doctor's Guide,* not the content of the publication itself. *See* ECF 45 at 85:17-19 (hearing transcript in which FTC's counsel represented, "To be clear, Your Honor, the injunctive relief relates to advertising.  The book is free to exist.").

Looking at the advertising, then, the Supreme Court defined commercial speech as "expression related solely to the economic interests of the speaker and its audience." *Central Hudson,* 447 U.S. at 561. Protection for commercial speech is dependent on the nature of the expression and the governmental interests served by its regulation. *Id.* at 563.  As the Court noted, this protection does not extend to deceptive advertising practices, even if the advertisements contain certain accurate information within them. *Id.* ("[T]here can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it."). *Id.* (citing *Friedman v. Rogers*, 40 U.S. 1, 13-16 (1979)).

In another case decided three years after *Central Hudson*, the Supreme Court described commercial speech as "speech which does 'no more than propose a commercial transaction.'" *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 762 (1976)).  The Court found that three specific factors, when taken together, strongly support the argument that a given statement is commercial speech: (1) if the statement is conceded to be an advertisement; (2) if the statement refers to a specific product or service; and (3) if the person making the statement has an economic motivation for using the statement in a mail advertisement or the like. *Id.* at 66-67.  Relevant to the issues in this case, the *Bolger* Court clarified that "advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech." *Id.* at 68 (quoting *Central Hudson*, 447 U.S., at 563, n. 5). The government retains the right to regulate "false, deceptive, or misleading sales techniques." *Id.* at 69. The Court explained that,

> [a] company has the full panoply of protections available to its direct comments on
> public issues, so there is no reason for providing similar constitutional protection

when such statements are made in the context of commercial transactions. Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues.

*Id.* (citations omitted).

Defendants contend that the "inextricably intertwined" doctrine creates enhanced constitutional protection for their advertising in this case. ECF 33 at 14-17. That doctrine, used to describe statements with aspects of both commercial and noncommercial speech, derives from a Supreme Court case related to fundraising campaigns for a charitable non-profit organization. *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 795-96 (1988). In *Riley*, the Court stated,

> It is not clear that a professional's speech is necessarily commercial whenever it relates to that person's financial motivation for speaking. But even assuming, without deciding, that such speech in the abstract is indeed merely "commercial," we do not believe that the speech retains its commercial character when it is inextricably intertwined with otherwise fully protected speech. Our lodestars in deciding what level of scrutiny to apply to a compelled statement must be the nature of the speech taken as a whole and the effect of the compelled statement thereon. This is the teaching of *Schaumburg* and *Munson*, in which we refused to separate the component parts of charitable solicitations from the fully protected whole. Regulation of a solicitation "must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech ... and for the reality that without solicitation the flow of such information and advocacy would likely cease." Thus, where, as here, the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase. Such an endeavor would be both artificial and impractical. Therefore, we apply our test for fully protected expression.

*Id.* (citations omitted). The *Riley* Court emphasized the fact that the speaker in its case was a charitable organization, noting that "where the solicitation is combined with the advocacy and dissemination of information, the charity reaps a substantial benefit from the act of solicitation itself." *Id.* at 798. This logic would not apply to a for-profit entity such as Defendants.

In subsequent cases, courts have interpreted this so-called "inextricably intertwined" test as a "narrow exception to the general principle that speech meeting the *Bolger* factors will be treated as commercial speech." *Dex Media West, Inc. v. City of Seattle*, 696 F.3d. 952, 958 (9th Cir. 2012). This considerably narrow test applies only when it is impossible to extricate the commercial aspects of a statement from its noncommercial aspects. *Bd. of Trs. of the State University of N.Y. v. Fox*, 492 U.S. 460, 474 (1989) ("No law of man or of nature makes it impossible to sell housewares without teaching home economics, or to teach home economics without selling housewares. Nothing in the resolution prevents the speaker from conveying, or the audience from hearing, these noncommercial messages, and nothing in the nature of things requires them to be combined with commercial messages.") Perhaps most importantly, case law makes clear that, at a minimum, to be inextricably intertwined, the commercial aspects of a statement must match the noncommercial aspects of that statement. For example, to support their argument, Defendants cite *William O'Neil v. Validea.com*, 202 F. Supp. 2d 1113 (C.D. Cal. 2002). In *O'Neil*, a well-known financial analyst had published two books on the topic of investment strategies. *Id.* at 1115. The plaintiff sued because the book, in one of its chapters, inaccurately described his investment philosophy. *Id.* The Court determined that not only was the book entitled to First Amendment protection, but the concomitant advertising materials were as well. *Id.* at 1119. According to the Court, the advertising materials were merely "an adjunct" of the book, and thus, were entitled to the same level of First Amendment protection. *Id.* Similarly, in *Lane v. Random House*, 985 F. Supp. 141 (D.D.C. 1995), an advertisement appeared in *The New York Times*, in support of a book about the assassination of President John F. Kennedy. *Id.* at 144. The plaintiff sued, because the ad featured a photo of him alongside other, well-known theorists. *Id.* In analyzing the commercial speech implications, the Court found that the ads merely summarized

14

the content featured in the book. *Id.* at 152. Thus, there was no justification for categorizing the ad as commercial speech. *Id.* (stating the ads "cannot be divorced from the book").

By contrast, Defendants' marketing material is not an "adjunct" of *The Doctor's Guide*. For example, whereas the marketing material contends that customers need not change their diet to permanently reverse their Type 2 diabetes, *The Doctor's Guide* recommends specific dietary changes, such as eating a seasonal, low-carb, and organic diet. As demonstrated by the cases noted above, when a promotion for a book does not present the same information as that contained in the book, it could not quality for protection under the "inextricably intertwined" doctrine, because the divergent statements made in the promotion can be isolated and differentiated from the protected statements made in the book.

As another concrete example of the "inextricably intertwined" doctrine, an advertiser might tell a customer, "Buy this book about tax policy, and it will show you how to make millions of dollars with zero work on your part." However, the book only provides information on tax policy, and does not include any information about methods for making millions of dollars without any work being done. In this example, it would be easy to extricate the commercial speech (the get-rich-quick scheme presented to the customer in the advertisement) from the protected speech (the book about tax policy).

Accordingly, fraudulent commercial claims can be extricated out of advertisements for products featuring noncommercial speech. This logic comports with the Supreme Court's ardent protection for truthfulness, and its correlated disfavor of deception. In *Virginia State Bd. Of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976), the Court explained:

> Untruthful speech, commercial or otherwise, has never been protected for its own sake. Obviously, much commercial speech is not provably false, or even wholly

false, but only deceptive or misleading. We foresee no obstacle to a State's dealing effectively with this problem. The First Amendment, as we construe it today does not prohibit the State from insuring that the stream of commercial information flow cleanly as well as freely.

*Id.* at 771-72 (citations omitted).   In addition, in *Riley,* the Court specifically indicated that professional fundraisers' attempts to make money with false statements would not be afforded First Amendment protection. 487 U.S. at 800.

Even so, in determining whether Defendants have made any false, fraudulent, or misleading commercial claims here, this Court is not persuaded that its inquiry must include whether the medical claims within *The Doctors' Guide* are supported by CRSE.   The Health Defendants did not sell or have a commercial interest in supplements, medical devices, or even an ongoing program of health-related care. They sold an online publication, or, essentially, an online book.   As noted above, the content of that book is non-commercial speech, lies outside of the FTC's jurisdiction, and is subject to broad constitutional protections.   *See In re R.J. Reynolds Tobacco Co.,* 111 F.T.C. 539, 541, 1988 WL 490114 (1988) (noting that noncommercial speech is "entitled to the highest level of protection" and its regulation "generally is limited to reasonable time, place and manner restrictions"). The more limited question within the FTC's consumer protection purview, then, is whether Defendants' advertising, or commercial speech, misrepresents their product.   In other words, do the advertisements accurately represent the content of *The Doctors' Guide,* such that consumers can make an informed decision about whether they want to purchase the book?

Thus, the questions posed by the FTC go far beyond the limited scope of its jurisdiction, and the appropriate review by this Court.   If Defendants were selling a medical product or service, such as the products in *National Urological Group*, *Alcoholism Cure*, or *NPD Advertising*, this Court would have to determine whether their representations about the efficacy of their product or

16

service were accurate.   Because Defendants are selling a book, this Court need not apply the standard for health-related efficacy claims. A consumer might purchase the book, put it to its intended use by reading it, and then decide, for whatever reason, not to take any further action to follow its recommended protocol. The book would have proved efficacious in communicating its ideas to the reader, and thus served its purpose.   Efficacy is simply not an appropriate measure when reviewing a seller's advertisements for a written publication.

Thus, the so-called "battle of the experts" in this case is not a fray into which this Court must enter.    The FTC's expert witness, Charles Burant, M.D.[3], opines that claims relating to treatment of Type II Diabetes must be supported by an "independent, well-designed, well-conducted, randomized, double-blind, placebo-controlled, human clinical trial" ("RCT"). ECF 2-124 ¶¶ 34-46.  Expert witnesses proffered by Defendants, including Dr. Gerhauser and Dr. Mark Hyman[4], opine that such studies are not typically employed in the context of natural approaches to medical conditions, due to the limited risk of side effects and other health concerns associated with those treatments.  *See, e.g.*, ECF 33-5 ¶ 9 ("Additionally, while the dangers of pharmaceutical drugs and their side effects may often warrant strict randomized studies, the same dangers and side effects are typically not seen in the use of supplements and lifestyle changes to manage symptoms, and the rigorous testing that must be employed before pharmaceutical drugs are used to treat diseases should not be thoughtlessly imposed on natural treatments that do not pose comparable health risks."); ECF 33-20 ¶ 9-10 ("Much of the practice of medicine today, including mainstream, prescription-drug based medicine, involves multi-faceted approaches that are not, in their entirety,

---

[3] Dr. Burant is board certified in Endocrinology, Diabetes, and Metabolism and is the Director of the A. Alfred Taubman Medical Research Institute at the University of Michigan, among other qualifications.  *See* ECF 2-124 ¶ 4.

[4] Dr. Hyman is board certified in Family Medicine and is the Head of Strategy and Innovation of the Cleveland Center for Functional Medicine, among other qualifications.  *See* ECF 33-20 ¶ 2.

supported by RCTs or capable of being tested by RCTs . . . It would not be appropriate or feasible to require the protocol described in *The Doctor's Guide* to be tested in the same way as a pharmaceutical drug using RCTs, as recommending over-the-counter supplements combined with environmental and lifestyle changes does not present the same issues.").  Because this Court does not find it appropriate to impose any specific standards of medical testing on the contents of a written publication (or, more specifically, an advertisement accurately summarizing the contents of a written publication), it need not espouse any of the proposed experts' views.

This Court's conclusion about the limited scope of the FTC's authority in this matter recognizes the potential chilling effect on medical discourse that could stem from imposing specific CRSE requirements on health-related publications.  At the hearing in this matter, the Court queried the FTC repeatedly to ascertain how Dr. Gerhauser could market *The Doctor's Guide* under the FTC's proposed standard, which would require RTCs before the Health Defendants could publish any written publication containing health related claims.   Other than utterly implausible proposals, the FTC could not conceive of a way in which the publication could be marketed.   *See, e.g.,* ECF 45 at 90:22-91:2 (hearing transcript in which FTC suggests that Dr. Gerhauser could advertise a book suggesting that NIR causes diabetes if the advertisement said, "one study shows that consumers whose diet we don't know, who lived near a cell phone tower, may have had increased diabetes rates.").

The FTC equates Defendants' advertising material with the content in *Cher v. Forum Int'l LTD*, 692 F.2d 634 (9th Cir. 1982). In that case, musician Cher sued an interviewer for breach of contract, when he sold a taped interview of her to tabloid magazines. *Id.* at 636–37.  In determining whether the advertisement was entitled to constitutional protection, the Court found that the ad was not truthful. Specifically, the tabloid indicated that Cher tells certain things to that publication

when, in fact, she had not told it anything. *Id.* at 639. Since the ads were "patently false," or perhaps more aptly, "Fake News," they were not entitled to constitutional protection. *Id.* Here, the FTC has not demonstrated that Defendants' claims, with regard to the effectiveness of their protocol, are "patently false" in a similar manner.[5] Neither this Court nor the FTC is well-equipped to determine the validity of a human clinical trial in India, and whether it indicates what Dr. Gerhauser believes it indicates, in his medical opinion. Similarly, neither this Court nor the FTC can state with certainty whether non-iodizing radiation has any causal relationship to a patient's development of Type II Diabetes. Those types of untested theories are best assessed by qualified medical professionals exchanging opinions in the marketplace of ideas. For this Court to prevent dissemination of those ideas on a "false advertising" theory, or to require specific medical testing before such ideas can be explored in a written publication that is accurately advertised to prospective consumers, could do a grave disservice to current or future medical patients. The FTC, and this Court through adjudication of claims under the FTC Act, are charged with protecting consumers from false or misleading advertising of products being sold, not from being exposed to novel or unproven medical ideas contained in health-related publications.

To that end, in order to determine whether Defendants made misrepresentations likely to mislead consumers, this Court will assess the FTC's claims only to determine whether Defendants misrepresented the contents of *The Doctor's Guide*. In so doing, this Court finds instructive a Supreme Court decision from 1948, in which the Court upheld actions taken by the Postmaster

---

[5] The FTC may ultimately show that the injunction should be broadened. For instance, it might demonstrate that claims about mulberry extract, magnesium, and chromium are patently false, and thus, are not deserving of any First Amendment protection. *See Vollette v. Watson*, 2012 WL 3026360, at *17 (E.D. Va. July 24, 2012) ("[T]he findings of fact and conclusions of law made by a court in ruling on a preliminary injunction are not binding at trial on the merits.") (quoting *AttorneyFirst, LLC v. Ascension Entm't, Inc.*, 144 F. App'x 283, 287–88 (4th Cir. 2005))

General to forbid delivery of fraudulent advertisements through the mail. In *Donaldson v. Read Magazine*, 333 U.S. 178, 188-89 (1948), the Supreme Court stated:

> Advertisements as a whole may be completely misleading although every sentence separately considered is literally true. This may be because things are omitted that should be said, or because advertisements are composed or purposefully printed in such way as to mislead. That exceptionally acute and sophisticated readers might have been able by penetrating analysis to have deciphered the true nature of the contest's terms is not sufficient to bar findings of fraud by a factfinding tribunal. Questions of fraud may be determined in the light of the effect advertisements would most probably produce on ordinary minds. People have a right to assume that fraudulent advertising traps will not be laid to ensnare them. "Laws are made to protect the trusting as well as the suspicious."

<u>Whether the Misleading Representations are Material</u>

Applying that standard, the FTC can establish two actionable misrepresentations in the advertising for *The Doctors' Guide*. First, Defendants' advertising, including Dr. Gerhauser's video itself, repeatedly represents that its protocol "has nothing to do with changing your diet." ECF 2-5 at 2-3; *see also* ECF 2-26 at 2 ("[I]t has nothing to do with diet or exercise."); ECF 2-8 at 10 ("How to reverse diabetes without dieting."). However, Module #11 of the eleven module protocol exclusively discusses dietary changes, including the importance of a low-carb diet and implementation of intermittent fasting. ECF 2-25 at 73-83. Thus, the advertising plainly misrepresents the content of *The Doctor's Guide.*

Second, the FTC's advertising misrepresents that the protocol described in *The Doctor's Guide* has been "scientifically proven" to "reverse your diabetes in just 28 days." In fact, Defendants do not assert that *The Doctor's Guide*'s protocol has been subject to any testing. *See, e.g.,* ECF 2-11 at 3. Moreover, *The Doctor's Guide* relies on studies that indicate a longer timeline for any potential success. *See, e.g.*, ECF 2-25 at 45 ("And, after just 24 weeks, the patients taking magnesium had normal blood sugar"). Those two misrepresentations are material in that they

would induce a reasonable consumer, who does not want to abide by a medically restricted diet, to purchase the publication.[6]

### 2. Balance of the Equities

The FTC's interest in protecting the public outweighs the potential injuries to Defendants. *See FTC v. Ameridebt, Inc.*, 373 F. Supp. 2d 558, 564 (D. Md. 2005) ("The Fourth Circuit has gone so far as to say that private injuries 'are not proper considerations for granting or withholding injunctive relief under Section 13(b)'") (quoting *Food Town Stores*, 539 F.2d at 1346). Specifically, the equities weigh in favor of granting injunctive relief as to the Health Defendants' two misrepresentations. Again, the injunctive relief to be granted prevents repetition of the misleading advertising claims, not the dissemination of *The Doctor's Guide* itself. Protecting consumers from making a decision to purchase the publication based on false representations about the nature of its content is a significant public interest, and Defendants, (who in fact claim they are no longer marketing *The Doctor's Guide*), have not identified any countervailing interest to warrant permitting their continued misrepresentation of its content. *See* ECF 45 at 68:9-11 (hearing transcript explaining that *The Doctor's Guide* is no longer being marketed). The precise scope of the injunctive relief will be addressed below.

### B. *Congress' Secret*

### 1. Likelihood of Success on the Merits

Counts Three and Four of the FTC's Complaint address *Congress' Secret.* ECF 1 ¶¶ 64-116. In Count Three, the FTC alleges five specific misrepresentations in the advertising:

---

[6] The Court understands that it has not applied the traditional test for efficacy or establishment claims. The FTC identified Counts I and II as "efficacy" and "establishment" claims, respectively. However, these titles are, ironically, somewhat misleading, given that the substance of the counts describe how Defendants' advertising has misrepresented *The Doctor's Guide*. *See* ECF 1 at 28. Because Defendants marketed a book, rather than a product, this case has unique First Amendment considerations. As such, the Court has determined which statements misrepresent *The Doctor's Guide*, and thus, constitute a deceptive act or practice, in violation of Section 5 of the FTC Act.

21

1)  "Consumers are entitled, by law or otherwise, to money from Congressional Checks or Republican Checks," *see, e.g.* ECF 2-29 at 15, 16;

2)  "Consumers can collect money from Congressional Checks or Republican Checks just by adding their name to 'the list of check payees,'" *see, e.g., id.* at 16, *see also* ECF 2-29 at 53 ("As long as you sign up before October 18th, you could collect your first check.");

3)  "Consumers can collect hundreds to thousands of dollars per month in Congressional Checks or Republican checks with little or no risk";

4)  "Congressional Checks or Republican Checks are affiliated or furnished by Congress or another government agency program," ECF 2-70 at 3 (including Congressional seal on check); and

5)  "Anyone can collect hundreds to thousands of dollars in Congressional or Republican Checks." ECF 2-29 at 11-13, 23.

ECF 1 ¶ 111.  The FTC also alleges a material omission in the failure to tell consumers that the book, when purchased, would tell them they are required to invest "tens of thousands to hundreds of thousands of dollars in order to collect the promised amounts." ECF 1 ¶ 115.

> Whether There was a Representation

Applying the three elements to show a deceptive or misleading practice prohibited by Section 5 of the FTC Act, first, each of the above statements was made or implied in Defendants' advertising as cited above, with the exception of Number 3.  The FTC has not pointed the Court to any advertisement using the phrase "little to no risk."  In fact, this Court has found one instance in which Defendants acknowledge that some risk does exist, although it is mitigated by the alleged success of persons receiving the checks.  *See, e.g.,* 2-29 at 31 ("Of course, like any other investment, nothing is guaranteed.  All investing carries a level of risk.  But the good news is, so far, anyone who's become a partner of these entities has received a check . . . in 100% of cases.").

<u>Whether the Representation was Likely to Mislead Consumers</u>

Next, the representations referenced above are likely to mislead consumers.  Like with *The Doctor's Guide*, Defendants' argument that their advertising is noncommercial speech, or "inextricably intertwined" with noncommercial speech, is unpersuasive.  The FTC appropriately focuses its regulation efforts on the advertising for *Congress' Secret*, not on the editorial content of the publication itself. It concedes that the Financial Defendants would be free to market *Congress' Secret,* so long as their advertisements matched the contents of the book.  The book is not commercial speech.  However, the advertisements are unquestionably commercial, because they seek to sell subscriptions to LIR by convincing people to obtain a free copy of *Congress' Secret* (with payment of a shipping fee).  Thus, the issue is a simple one: do the Financial Defendants' advertisements accurately portray the content of the book they sell?  And once again, the answer is that they do not.

The statements alleged by the FTC, as stated above, do not even hint to the consumer that the book is an investment guide recommending the purchase of shares in thirteen private companies.  The handful of isolated references to "investment" or "investors," in the lengthy video presentation about "Congressional Checks," do not salvage the overall misleading impression conveyed to consumers about the book's content.[7] ECF 2-29. *See Fanning v. FTC*, 821 F.3d 164, 170 (1st Cir. 2016) (noting that the FTC "looks at the 'overall net impression' left with consumers acting reasonably under the circumstances.") (citations omitted).  The advertisements therefore

---

[7] In addition, the Financial Defendants expressly geared the advertisements to people without significant assets to invest. *See, e.g.,* ECF 2-29 at 45 ("Because I know that without these income secrets . . . You'll likely retire on Social Security.  And I think we can both agree that's just not enough income, right? I mean, the average retiree's monthly budget is currently $1,305.  That's barely above the federal poverty line.  The bottom line is . . . If you depend exclusively on Social Security for income . . . You'll most likely spend your golden years eating cat food and struggling to make ends meet.").  The target customer described in that advertisement is unlikely to have the resources to invest in enough shares of a company to receive substantial dividend payments or, as the Financial Defendants call them, "Congressional Checks" or "Republican Checks."

cannot even benefit from the protection afforded "advertisements that accurately reprint[] false claims contained in the advertised works." *Charles v. City of Los Angeles,* 697 F.3d 1146, 1154 (9th Cir. 2012). In this case, the advertising is easily divorced from the book, because the advertising does not accurately represent the ideas in the publication.

The fact that the term "Congressional Checks" is used both in the book and in the advertisements does not mean the ideas contained in both are the same. The book makes clear what the advertisement does not – that "Congressional Checks" are actually dividend payments consumers obtain by investing in a variety of private companies, because the returns will be tax-advantaged as a result of a law passed by Congress. The overall impression in the advertising is entirely different, exacerbated by the stock photos appearing to depict happy customers holding faux checks emblazoned, "Congressional Checks," or "Republican Checks."

<u>Whether the Representation was Material</u>

Defendants cite to the video transcript to suggest that Scheidt accurately disclosed the nature of the program. ECF 33 at 19. While the video is somewhat more candid than the email and banner advertisements (particularly in their earlier versions), those advertisements contain patently false assertions about the nature of the "Congressional Checks" program. ECF 33 at 19. The Republican Checks promotional materials evidenced a slight improvement in terms of disclosure. ECF 59. However, the overall impression of the advertising schemes remained consistent. Essentially, consumers were led to think that *Congress' Secret* would instruct them as to how they could put their name on a list to receive checks, without needing to have significant resources to invest. Those representations were both misleading and material, as they were likely to cause consumers to subscribe to LIR to obtain the publication.

## 2.  Balance of the Equities

Like in the analysis relating to *The Doctor's Guide,* the balance of the equities weighs in favor of protecting the public from deceptive advertising, rather than protecting the Financial Defendants' interest in engaging in questionable marketing practices (for a publication they assert they are no longer distributing).  Ultimately, because the representations enumerated by the FTC falsely represented the content of *Congress's Secret*, injunctive relief is warranted.

## IV.   MOOTNESS

Defendants contend that the FTC is limited to seeking relief when a defendant "is violating, or is about to violate" the FTC Act.  ECF 33 at 26. Since Defendants voluntarily ceased operating the "Congressional Checks" promotion in October, 2018, they contend  that the FTC has no authority to seek to enjoin it.[8] Defendants cite *FTC v. Shire Viropharma, Inc.*, 917 F.3d 147 (3d Cir. 2019), for the proposition that the FTC must plead violations that are "ongoing" or "impending" in order to secure preliminary relief under Section 13(b). In that case, the defendant had manufactured and marketed a drug to treat gastrointestinal infection. *Id.* at 149. As an attempt to thwart other companies from marketing generic equivalents, the defendant filed numerous meritless filings with the FDA. *Id.* Nearly five years after the defendant divested itself of the relevant drug, the FTC sought to permanently enjoin the defendant from similar petitioning activity. *Id.* at 150. However, the Third Circuit found that the defendant was not currently violating the law, nor was it alleged to do so anytime in the foreseeable future. *Id.* at 161. Here, by contrast, the FTC has "reason to believe" that Defendants will continue to violate the FTC Act. Whereas the defendant in *Viropharma* had divested itself entirely of the product, Defendants have the ability to re-start their promotions for "Congressional Checks" and "Republican Checks" at any time. In

---

[8] At the hearing, Defendants stated that they have also ceased marketing "Republican Checks."

fact, the harm to consumers is ongoing, in some sense, because customers continue to maintain subscriptions to *Lifetime Income Report*.

Defendants' argument is a variation of a challenge to Article III mootness, although not labeled as such. *See United States v. Ketter*, 908 F.3d 61, 65 ("Because mootness is jurisdictional, we can and must consider it even if neither party has raised it."). "A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). Since the parties lack an interest in the outcome of the case, "the court's subject matter jurisdiction ceases to exist also," requiring dismissal of the case. *S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015); *see also Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71-72 (2013) ("If an intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the lawsuit,' at any point during litigation, the action can no longer proceed and must be dismissed as moot.") (citation omitted)).

However, one of the "well-recognized" exceptions to the mootness doctrine is the doctrine of voluntary cessation. *E.g., Porter v. Clarke*, 852 F.3d 358, 363–64 (4th Cir. 2017). If a defendant voluntarily abandons a challenged practice, the Court generally does not lose its power to determine the policy's legality. *Id.* (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). "Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, [and] then pick up where he left off . . . ." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). The standard for determining whether a defendant's voluntary conduct has mooted a case is "stringent": the defendant's conduct must make it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *United States v.*

*Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)); *see also Already, LLC*, 568 U.S. at 91.  The "heavy burden" to demonstrate mootness by voluntary cessation lies with the party asserting mootness.  *Friends of the Earth*, 528 U.S. at 189.

Here, while Defendants' two publications are not currently being offered for sale, nothing short of injunctive relief would prevent Defendants from resuming the sales, including the misleading representations in their advertising.  Thus, Defendants' voluntary cessation of their marketing practices does not moot the FTC's claim.

## V.        SCOPE OF THE INJUNCTION

Particularly as to *The Doctor's Guide,* as discussed above, the FTC's requested relief is overbroad.  *See Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) ("Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."); *FTC v. John Beck Amazing Profits, LLC*, 888 F. Supp. 2d 1006, 1012 (C.D. Cal. 2012) ("The framing of the scope of the injunction depends upon the circumstances of each case").  First, the requested injunction purports to require Defendants to cite RTCs for any health-related claims, not only for *The Doctor's Guide* promotion but for any "dietary supplement, food, drug, or other product" sold by Defendants.  Defendants are publishing companies, and their products, as far as the Court can tell from the existing record, are limited to written publications.  Thus, for the reasons described above, this Court does not credit the assertion that RTCs are a relevant standard when assessing written or published works. Moreover, it appears from the record that Defendants offer a large and varied number of promotions and publications. It would be simply too broad to speculate that Defendants are engaged in deceptive marketing as to each of their publications, without specific information to support that claim.  To establish deceptive marketing for each publication, under the standard

set forth above, the FTC would have to demonstrate a variance between the advertising and the publication's content.  The FTC's skepticism about the provable efficacy of natural remedies discussed in the publications themselves is insufficient to warrant the broad injunctive relief it seeks.

Instead, the appropriate relief here is to enjoin the disconnect between Defendants' advertising and their publications' content.  In other words, this Court's injunction will ensure that Defendants' advertisements accurately represent the content of the publications, to allow consumers to make an educated decision about whether they wish to purchase that content. However, the injunction will constitute only a narrow prior restraint on Defendants' commercial speech, banning only speech that lacks constitutional protection due to its deceptive nature.

The limitations described above inherently address the other area of overbreadth in the FTC's proposed order.  Because the injunction only governs entities that have been, or will be, engaged in marketing *The Doctor's Guide* and *Congress' Secret,* a limited number of entities other than Defendants themselves will need to be provided a copy of the Injunctive Order.

Finally, the FTC's original proposed order required Defendants to provide a copy to each "client," ECF 2-2 at 13-14, and to provide the FTC with a list of the names, addresses, phone numbers, and email addresses of each person who receives a copy of the Order.  It is unclear whether, by referring to "client," the FTC seeks a list of Defendants' customers.  The injunction issued by this Court will require Defendants to send a copy of the Order to each customer who purchased *The Doctor's Guide* or *Congress' Secret.*  However, while a list of the customers receiving the Order must be maintained by Defendants, it need not be provided to the FTC. Instead, within ten (10) days from the date of entry of the preliminary injunction, Defendants must

provide the FTC with a sworn statement that they have complied with the court-ordered distribution provisions.

## VI.     MOTION TO DISMISS

Defendants filed a Motion to Dismiss the FTC's suit, and a supporting memorandum of law. ECF 40, ECF 40-1. Defendants raise largely the same arguments as those made in opposition to the FTC's request for a preliminary injunction. Namely, Defendants contend that their advertising materials are "inextricably intertwined" with the underlying publications. ECF 41-1 at 17–27. Defendants also invoke case law to demonstrate that, as publications, *The Doctor's Guide* and *Congress' Secret* are entitled to more First Amendment protection than a typical product or service. *See* ECF 41-1 at 13–17.  The Court has addressed all of these arguments in the analysis herein, and will deny the Motion to Dismiss. As explained above, the injunctive relief will be limited to claims in Defendants' advertising material that are in conflict with the underlying publications.

## VII.    CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Preliminary Injunction, ECF 2, is GRANTED, although the injunction is more limited than that the FTC originally requested. Defendants' Motion to Dismiss, ECF 41, is denied. Two separate Orders are filed herewith.


Dated: March 2, 2020                              _____/s/_____
                                                                  Stephanie A. Gallagher
                                                                  United States District Judge